DANIEL M. PETROCELLI (S.B. # 97802)
dpetrocelli@omm.com
DAVID MARROSO (S.B. #211655)
dmarroso@omm.com
JAMES M. PEARL (S.B. # 198481)
jpearl@omm.com
STEPHEN J. MCINTYRE (S.B. # 274481)
smcintyre@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars
Los Angeles, California  90067
Telephone:   (310) 553-6700
Facsimile:   (310) 246-6779

Attorneys for Plaintiff
TOP RANK, INC.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TOP RANK, INC. | Case No. |
| Plaintiff, | **COMPLAINT FOR VIOLATIONS OF SHERMAN ACT AND CALIFORNIA UNFAIR COMPETITION LAW** |
| v. | |
| ALAN HAYMON, HAYMON BOXING LLC, HAYMON SPORTS LLC, HAYMON HOLDINGS, LLC, WADDELL & REED FINANCIAL, INC., MEDIA GROUP HOLDINGS LLC, and DOES 1 through 10, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiff Top Rank, Inc. avers on knowledge as to itself and its own acts, and on information and belief as to all other matters, as follows:

### INTRODUCTION

1.     Defendant Alan "Al" Haymon, a former music mogul turned boxing manager, is "the fight game's biggest mystery."[1]  Operating in the shadows, he has no website, avoids being photographed, and famously runs his empire from an old school flip phone.  For years, Haymon refused to acknowledge that he even had an office.  Now, armed with nearly half a billion dollars from a Kansas City-based investment fund, Haymon and Defendant Waddell & Reed are "making a play to take over boxing"[2]—law, fair competition, and fighters' rights be damned.  Widely regarded as "boxing's most powerful figure,"[3] Haymon brazenly claims that he "could run boxing."[4]  He and Waddell & Reed will stop at nothing to get there.

2.     But just as there are rules inside the ring, there are extensive regulations outside of it to ensure fair competition—the Muhammad Ali Boxing Reform Act, the Sherman Antitrust Act, unfair competition laws, and other standards and restrictions.  If any one person breaks those rules, then everybody loses—the boxers, their managers, the promoters, and, of course, the fans themselves.

3.     With the financial backing, complicity, and material assistance of Waddell & Reed and other financiers, Haymon is rigging the boxing industry so they can act as manager, promoter, sponsor, and ticket broker for nearly every

---

[1] Greg Bishop, *The Man With The Plan*, SPORTS ILLUSTRATED, Dec. 22, 2014, http://www.si.com/vault/2014/12/22/106690278/the-man-with-the-plan.
[2] *Id.* (quoting veteran journalist and boxing historian Thomas Hauser).
[3] Bryan Armen Graham, *With Boxing's Return to Prime-time Network TV, Al Haymon Makes His Move*, THE GUARDIAN, Mar. 6, 2015, http://www.theguardian.com/sport/2015/mar/06/with-boxings-return-to-prime-time-network-tv-al-haymon-makes-his-move.
[4] Greg Bishop, *Behind the Scenes, Haymon Is Shaking Up the Fight Game*, N.Y. TIMES, Dec. 17, 2011, at SP1.

COMPLAINT FOR VIOLATIONS OF
SHERMAN ACT AND CALIFORNIA
UNFAIR COMPETITION LAW

1  major professional boxer competing in the United States, all in violation of the

2  Muhammad Ali Boxing Reform Act, the Sherman Act, and a host of other state and

3  federal laws.  Openly defying the statutorily-mandated "firewall" between manager

4  and promoter—two distinct professional roles that, as described at length below,

5  serve fundamentally different purposes in the boxing industry—Haymon has

6  leveraged his dominance in the boxing management business to injure and exclude

7  competitors in the business of promoting professional boxing matches in the United

8  States.

9      4.    The regulators have recently begun to take notice.  In June 2015, the

10  company controlled by Haymon and Waddell & Reed was criticized for blocking

11  California venues from promotional competitors.  Haymon reserved prime locations

12  such as Staples Center and The Forum so that they could not be booked by the

13  competition, and then canceled after the competitors were forced to seek other

14  locations.  The tactic unfairly injured his competitors and deprived consumers of

15  access to events with no legitimate business purpose other than to unfairly harm

16  competition.

17      5.    Using one's power to box out competitors is a classic monopolistic

18  tactic.  Haymon's actions also violate the Muhammad Ali Boxing Reform Act's

19  proscriptions against managers acting as promoters (a criminal violation).  In fact,

20  the Association of Boxing Commissions recently sent a letter to United States

21  Attorney General Loretta Lynch urging an investigation into Haymon's practices.

22  Haymon has also been sued by boxer Bernard Hopkins and Oscar De La Hoya's

23  Golden Boy Promotions for similar illegal and anticompetitive practices.

24      6.    Given Haymon's experience in the music business, it is no surprise

25  that his current monopolistic tactics in boxing mirror the predatory "payola"

26  practices employed in the music industry in the mid-20th century.  Reversing the

27  ordinary flow of money between television broadcasters and promoters, Haymon

28  and Waddell & Reed have purchased airtime on over half a dozen leading

- 3 -

COMPLAINT FOR VIOLATIONS OF
SHERMAN ACT AND CALIFORNIA
UNFAIR COMPETITION LAW

broadcasters to promote Haymon's boxing matches under the "Premier Boxing Champions" ("PBC") brand.  In order to stifle legitimate promoters from competing against PBC, Haymon has obtained exclusivity commitments from broadcasters. Between these predatory "payola" payments and the expenses of promoting each televised match, Haymon and Waddell & Reed are operating at a significant short-term loss in the millions of dollars.  This "loss leader" strategy—which Waddell & Reed has bankrolled and actively participated in—has allowed Haymon to gain unfair advantage in the promoter market to the severe detriment of legitimate competitors like Top Rank.  Once Haymon obtains monopoly power in the market for promoting professional boxing matches, he will recoup the losses by charging exorbitant prices to broadcasters, sponsors, and consumers.  Haymon and Waddell & Reed will be the sole competitor.

7.     Haymon's assault on the boxing promotion business (in which he cannot even legally operate, due to his role as a boxing manager) has taken other forms as well.  Among other things, Haymon and his co-conspirators have engaged in the following unlawful, anticompetitive, and tortious conduct:

A.     inducing professional boxers to enter unlawful "tie out" agreements, which prevent the boxers (whose interests Haymon purports to represent) from freely contracting with legitimate promoters;

B.     illegally acting as a promoter and fraudulently operating in the promotion business through a network of "sham" promoters;

C.     blocking legitimate promoters' access to major venues through fraud, overbooking, and other unlawful means; and

D.     preventing legitimate promoters from access to television broadcasters through exclusive dealing, overbooking, and other unlawful means.

8.     In so doing, and as alleged below, Haymon, Waddell & Reed, and

- 4 -

their co-conspirators and accomplices have violated a number of state and federal laws, including the Sherman Antitrust Act, 15 U.S.C. §§ 1 *et seq.*; the Muhammad Ali Boxing Reform Act, 15 U.S.C. §§ 6301 *et seq.*; the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*; the California Unfair Practices Act, Cal. Bus. & Prof. Code §§ 17000 *et seq.*; and other state laws and regulations.

## THE PARTIES

9.    Plaintiff Top Rank is a limited liability company with its principal place of business in Las Vegas, Nevada.  Top Rank is a boxing promoter licensed in the States of California and Nevada, among others.

10.    Defendant Al Haymon is a resident of California.  Individually and through the instrumentality of Haymon Boxing LLC and Haymon Sports LLC, Haymon has done substantial business in California and in this District.

11.    Defendant Haymon Boxing LLC ("Haymon Boxing") is a Delaware limited liability company with its principal place of business at 3930 Howard Hughes Parkway, Suite 350, Las Vegas, Nevada 89109.  Haymon Boxing has done substantial business in California and in this District.

12.    Defendant Haymon Sports LLC ("Haymon Sports") is a Delaware limited liability company with its principal place of business at 3930 Howard Hughes Parkway, Suite 350, Las Vegas, Nevada 89109.  Haymon Sports has done substantial business in California and in this District.

13.    Defendant Haymon Holdings LLC ("Haymon Holdings") (together with Defendants Al Haymon, Haymon Boxing, and Haymon Sports, "Haymon") is a Delaware limited liability company with its principal place of business at 3930 Howard Hughes Parkway, Suite 350, Las Vegas, Nevada 89109.  Haymon Holdings is the managing member of Defendant Haymon Sports.  Haymon Holdings has done substantial business in California and in this District.

14.    Defendant Waddell & Reed Financial, Inc. ("Waddell & Reed") is a

COMPLAINT FOR VIOLATIONS OF
SHERMAN ACT AND CALIFORNIA
UNFAIR COMPETITION LAW

publicly traded asset management and financial planning company that is incorporated in the State of Delaware.  Waddell & Reed has done substantial business in California and in this District.

15. Defendant Media Group Holdings LLC ("MGH") is a Waddell & Reed-affiliated Delaware series limited liability company, with its principal place of business in Overland Park, Kansas.  MGH is an investor in and member of Defendant Haymon Holdings.  MGH has done substantial business in California and in this District.

16. The true names and capacities of Defendants named herein as Does 1 through 10 are unknown to Plaintiff.  Plaintiff will seek leave from this Court to amend this Complaint to identify these Defendants' true names and capacities, once such information has been ascertained.  Plaintiff alleges that Does 1 through 10 participated in Defendants' misconduct, as herein alleged, and are therefore liable to Plaintiff for the same.

## JURISDICTION AND VENUE

17. This Court has original jurisdiction over Plaintiff's federal antitrust claims, which arise under the Sherman Antitrust Act (15 U.S.C. §§ 1, 2) and the Clayton Act (15 U.S.C. §§ 15, 26).  28 U.S.C. §§ 1331, 1337(a).  This Court has supplemental jurisdiction over the related claims for violations of California statutory and common law alleged herein, because those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.  28 U.S.C. § 1367(a).

18. Venue is proper in this District under 28 U.S.C. § 1391(b), because a substantial part of the acts and circumstances giving rise to this action occurred in this District, and all Defendants are subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

### Federal Government Regulation of Professional Boxing

19. The federal government has long taken an interest in preventing and

remedying anticompetitive and abusive practices in the professional boxing industry.  In the early 1950s, for example, the United States Department of Justice (the "DOJ") brought a civil complaint against certain boxing clubs and promoters, alleging they had conspired to restrain and monopolize the market for promoting championship boxing matches, in violation of Sections 1 and 2 of the Sherman Act.

20.    The defendants argued the antitrust laws did not apply to professional boxing, but the Supreme Court disagreed, holding that "the Government's allegations bring the defendants within the scope of the [Sherman] Act."  *United States v. Int'l Boxing Club of N.Y., Inc.*, 348 U.S. 236, 240–41 (1955) ("*International Boxing Club I*").

21.    After a bench trial, the district court ruled that the defendants had unreasonably restrained and monopolized "trade and commerce in the promotion of professional world championship boxing contests among the several states." *United States v. Int'l Boxing Club of N.Y., Inc.*, 150 F. Supp. 397, 421–22 (S.D.N.Y. 1957), *aff'd*, 358 U.S. 242 (1959).  The court found that the defendants had acquired monopoly power in the promotion business and succeeded in excluding several rival competitors.  *See id.* at 414–19.  The instruments of their conspiracy included, among other things, preventing the boxers from contracting with rival promoters, negotiating exclusive dealing arrangements with major venues, and tying up the rights to radio and television broadcasts.  *Id.* at 411–19

22.    On appeal, the Supreme Court affirmed the district court's judgment. *See Int'l Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242 (1959) ("*International Boxing Club II*").  In so doing, the Court held that the business of promoting championship boxing contests was a distinct market from promoting run-of-the-mill boxing matches, since "championship boxing is the 'cream' of the boxing business, and . . . is a sufficiently separate part of the trade or commerce to constitute the relevant market for Sherman Act purposes."  *Id.* at 249, 252.

23.    The Supreme Court's *International Boxing Club* decisions established

1   conclusively that (1) the Sherman Act fully applies to the business of boxing

2   promotion; and (2) the business of promoting boxing matches involving "the

3   'cream' of the boxing business" is a distinct and cognizable relevant market for

4   antitrust purposes.

5        24.    In the years and decades following these decisions, Congress took

6   sustained interest in professional boxing.  For example, beginning in 1960, Senator

7   Estes Kefauver, Chair of the Senate Subcommittee on Antitrust and Monopoly,

8   held hearings investigating of the professional boxing industry.  At a 1961 hearing,

9   former heavyweight champion Gene Tunney testified that "there is a great tendency

10  for monopoly to develop in the sport,  . . . and monopoly in the sport is strong,

11  influential, and almost unbreakable."

12       25.    Again in the 1970s, a House subcommittee held hearings to investigate

13  the so-called United States Boxing Championships by Don King Productions and a

14  television network.  From 1977 through 1993, a number of boxing bills were

15  introduced in Congress, which aimed to address such practices as bribery,

16  racketeering, licensing, safety, and conflicts of interest between managers and

17  promoters.  In 1996, with the sponsorship of Senators John McCain and Richard

18  Bryan, Congress passed the Professional Boxing Safety Act, which was designed to

19  ensure athletes' safety.  Pub. L. 104-272.

20             **<u>The Muhammad Ali Boxing Reform Act</u>**

21       26.    While the Professional Boxing Safety Act sought to protect boxers

22  against physical harm, it did not address exploitative and anticompetitive practices

23  that had taken root in the boxing industry.

24       27.    Congress was particularly concerned with individuals developing

25  unchecked contracting power that could result in a single person "gain[ing] control

26  over a majority of championship bouts in a weight division."  S. Rep. 105-371, at 5

27  (Oct. 6, 1998).

28       28.    Such contractual abuses could often be avoided if the boxer had

COMPLAINT FOR VIOLATIONS OF
SHERMAN ACT AND CALIFORNIA
UNFAIR COMPETITION LAW

competent and independent representation.  This is where boxing managers come into play.  Ideally, a manager should fiercely and exclusively advocate for the boxer's interests when negotiating with sophisticated business entities.  But that was frequently not the case:

> A manager is supposed to have some degree of independent judgment. . . .  [T]here are situations where a manager is actually a paid employee of a promoter or even an officer of a promotion company.  Sometimes this is quite overt, and since one of the roles of manager is to represent a boxer in negotiations with a promoter it is obvious that appropriate objectivity cannot exi[s]t in such a circumstance.

*Business Practices in the Professional Boxing Industry: Hearing Before the Committee on Commerce, Science, and Transportation*, S. Hrg. 105-712, at 29 (1998) (prepared statement).

29.     As part of its investigation into unscrupulous and anticompetitive practices in boxing, Congress commissioned a report from the National Association of Attorneys General ("NAAG"), which formed a task force under the leadership of then-New York Attorney General Eliot Spitzer.  Among other things, the NAAG task force found that "[m]anagers are sometimes on the payroll, either directly or as consultants, of promoters."  Nat'l Ass'n of Attys. Gen. Boxing Task Force, Report on Findings and Recommendations 4–5 (May 2000).  NAAG recommended that Congress take action to "curb[] anti-competitive and fraudulent business practices, and protect[] the health and safety of professional boxers."  *Id.* at 11.

30.     In order to address exploitative and anticompetitive business practices, Senators McCain and Bryan proposed the Muhammad Ali Boxing Reform Act (the "Ali Act").  According to the initial Senate Report, the Ali Act was intended to "curb several of the most restrictive, onerous, and anti-competitive contracting practices" in the industry.  S. Rep. 105-371, at 5 (Oct. 6, 1998).  The bill was designed to impose "sensible, pro-competitive limitations on these onerous practices."  *Id.*

31.     Moreover, the bill proposed to outlaw conflicts of interests between

promoters and managers.   The Senate Report emphasized that "it remains essential that managers serve and protect the interest of the boxer," and that managers "should not be serving the financial interests of the promoter, while simultaneously taking a 33% earnings cut from the boxer for biased representation as manager." *Id.* at 7.

32.    Congress ultimately passed the Ali Act in 2000.   President Bill Clinton signed the bill into law on May 26, 2000.

33.    As passed, the Ali Act mandated the following major reforms:

A.    **"Firewall" Between Managers and Promoters**:  The Ali Act establishes a "firewall" between promoters and managers. Managers are prohibited from having a "direct or indirect financial interest in the promotion of a boxer," and from being "employed by or receiv[ing] compensation or other benefits from a promoter."  15 U.S.C. § 6308(b).

B.    **Protection from Coercive Contracts**:  The Ali Act declares that long-term "option" contracts are "in restraint of trade, contrary to public policy, and unenforceable against any boxer." *Id.* § 6307b(a).

C.    **Required Disclosures**:  Promoters are required to make certain financial disclosures regarding the bouts they promote.  *Id.* § 6307e.

34.    The Ali Act carries severe sanctions, including criminal penalties for individuals who violate the manager-promoter "firewall."  *Id.* § 6309.

35.    Because the amount a promoter makes is, in part, a function of how much it pays the boxers—that is, how big of a "purse" the promoter guarantees— promoters and boxers can be expected to negotiate hard over payment and other terms.  The promoter and the boxer sit on opposite sides of the bargaining table, and if they strike a deal, they become business partners—but the promoter does not

owe a fiduciary duty to the boxer.  Rather, it is ***the manager's*** job to represent the boxer in negotiating promotion contracts.  Since the manager's fee is tied to the size of the purse, the manager is supposed to have every incentive to bargain hard for a bigger payout to his client (and, by extension, to himself).  In order for a manager to effectively perform his duty as a fiduciary, it only makes sense that he should not simultaneously be sitting on the other side of the table, acting as (or on behalf of) a promoter.

36.     The Ali Act serves to protect boxers, the boxing industry, and the public from abusive, exploitative, and anticompetitive behavior.  The establishment of a strict "firewall" between managers and promoters underscores Congress' judgment that "***[a] manager must be a determined advocate for the boxer's interests and not be influenced by financial inducements from a promoter***."  S. Rpt. No. 106-83, at 11 (June 21, 1999) (emphasis added).  The Act's express overarching purpose was to "reform unfair and anticompetitive practices in the professional boxing industry."  Pub. L. No. 106-210, 114 Stat. 321 (2000).   In promoting fair competition, the Ali Act benefits not only professional boxers, but the public at large.

## The Professional Boxing Industry

37.     As the Ali Act suggests, there are at least two distinct markets in the business of professional boxing, which now comprises a multibillion dollar industry:  a market for managers, and a market for promoters.  This market separateness is a practical reality and is ***specifically mandated and required*** by the Ali Act.  As stated, the Ali Act places a strict "[f]irewall between promoters and managers," and prohibits managers from having "a direct or indirect financial interest in the promotion of a boxer" or being "employed by or receiv[ing] compensation or other benefits from a promoter."  15 U.S.C. §§ 6308(b)(1)(B)(i)–(ii).  In other words, no one person is allowed to simultaneously compete in the market for boxing managers ***and*** the market for boxing promoters.  This "firewall"

COMPLAINT FOR VIOLATIONS OF
SHERMAN ACT AND CALIFORNIA
UNFAIR COMPETITION LAW

1   benefits boxers and consumers alike.

2   *Boxing Managers*

3   38.    Under the Ali Act, "manager" refers to "a person who receives

4   compensation for service as an agent or representative of a boxer."  *Id.* § 6301(5).

5   A manager is supposed to be wholly devoted to his or her clients' best interests.

6   Before any boxing match—and in particular highly publicized bouts between

7   Championship-Caliber Boxers—a boxer must navigate complex contractual

8   relationships.  This can be daunting, especially for fighters who are not experienced

9   or educated in the business side of boxing.  A manager's professional role (and

10  ethical responsibility) is to represent the boxer in these various negotiations and

11  otherwise handle the boxer's business affairs.

12  39.    As compensation, the manager typically receives a percentage of the

13  boxer's "purse" for each bout.  The "purse" is the amount of money the boxer

14  receives from the promoter of a fight.  The promoter guarantees the purse at the

15  outset; the purse amount does not depend on the outcome of the match.  Because

16  the manager's compensation is ordinarily tied to the purse, the manager has an

17  incentive to negotiate vigorously with the promoter.

18  40.    Many states require boxing managers to be professionally licensed,

19  and have promulgated regulations governing managers' conduct.  In California, for

20  example, managers must pass a written examination administered by the State

21  Athletic Commission in order to be licensed.  *See* Calif. Code Regs. title 4, §

22  218(a).  In Nevada, managers must apply for a license as provided in Nev. Admin.

23  Code § 467.012.  Both states prohibit a person from acting as both manager and

24  promoter.  *See* Calif. Code Regs. title 4, § 396; Nev. Admin. Code § 467.104.

25  41.    As further alleged below, Haymon holds a dominant position in the

26  market for professional boxing managers.  Haymon has approximately 200 fighters

27  in his management stable, including current and former world champions Adonis

28  Stevenson, Danny Garcia, Adrien Broner, Anthony Dirrell, Peter Quillin, and Keith

COMPLAINT FOR VIOLATIONS OF
SHERMAN ACT AND CALIFORNIA
UNFAIR COMPETITION LAW

Thurman, to name just a few.  No other boxing manager represents more than a dozen or so boxers.  There is no close second.

42.    All or virtually all boxers managed by Haymon have been required to sign and have signed an exclusive services contract granting Haymon near-total control over the boxer's career and revenue-generating abilities.  It is no surprise, then, that many call Haymon "the most powerful man in boxing."[5]

*Boxing Promoters*

43.    Promoters play a different role in boxing.  The Ali Act defines "promoter" as "the person primarily responsible for organizing, promoting, and producing a professional boxing match."  15 U.S.C. § 6301(9).  Promoters contract with boxers to provide a certain number of fights in return for compensation, in the form of a "purse" for each fight.  Promoters make money primarily from selling tickets, television rights, and advertising rights for a bout, as well as from other promotional activities.  Because a promoter's profit depends on its ability to generate more money in revenue than it spends promoting each fight, the promoter is the party that assumes all of the financial risk.  In contrast, the boxer and his manager are assured compensation at the outset, since promoters guarantee the "purse" before a fight.

44.    States regulate promoters as well.  In California, a promoter must demonstrate, among other things, that it possesses "financial responsibility" and the "necessary knowledge and experience to act as a promoter" in order to obtain a license.  Calif. Code Regs. title 4, § 213.  Additionally, all contracts between boxers and promoters must be presented to, and approved by, the State Athletic Commission.  *Id.* § 222.

45.    The market for professional boxing promoters has traditionally been

---

[5] *See, e.g.*, Jonathan Snowden, *Is HBO vs. Al Haymon Boxing's Next Big Fight?*, BLEACHER REPORT, Mar. 12, 2015, http://bleacherreport.com/articles/2393981-is-hbo-vs-al-haymon-boxings-next-big-fight.

COMPLAINT FOR VIOLATIONS OF
SHERMAN ACT AND CALIFORNIA
UNFAIR COMPETITION LAW

1  competitive—at least before Haymon came on the scene.  There are several major
2  competitors vying to do business with top boxers, including Top Rank, Golden Boy
3  Promotions, Main Events, Don King Productions, K2, Roc Nation, and others.  If
4  Haymon has his way, however, his sham promotion business will become the only
5  name in professional boxing promotion.  Already, legitimate promoters like Top
6  Rank have been excluded from contracting with Championship-Caliber Boxers in
7  Haymon's stable.

8  <u>**The Defendants' Illegal, Tortious, and Anticompetitive Scheme**</u>

9  46.    In defiance of these clear directives from Congress, Al Haymon is
10  intentionally leveraging his dominant position in the boxing management business
11  to acquire, maintain, and expand power in the boxing promotion business.  With the
12  funding and material assistance of his co-conspirator Waddell & Reed, Haymon is
13  seeking to buy up and monopolize the entire vertical channel—by "locking in" all
14  the top boxing talent, "tying out" legitimate promoters from top boxing matches,
15  excluding legitimate promoters from major venues, and buying up the most visible
16  and desirable placement on television in a predatory "payola" scheme.

17  47.    Haymon is using his market power in one business to ***take over a***
18  ***different business that federal and state law prohibits him from entering***.  Despite
19  his reclusive *modus operandi*, Haymon's activities in the promotion business are
20  increasingly coming to light.  According to the *New York Times*, for example,
21  "Haymon is licensed in Nevada as a manager, yet he also performs many of [the]
22  same functions as promoters."[6]  The newspaper reported that, in disregard of the Ali
23  Act's "firewall" between managers and promoters, Haymon "appears to operate as
24  a hybrid."[7]  Eight of Haymon's business associates told the same story—but
25  tellingly, seven of them "spoke on the condition of anonymity for fear of retribution

26

27  [6] Greg Bishop, *Behind the Scenes, Haymon Is Shaking Up the Fight Game*, N.Y.
   TIMES, Dec. 17, 2011, at SP1.
28  [7] *Id.*

COMPLAINT FOR VIOLATIONS OF
SHERMAN ACT AND CALIFORNIA
UNFAIR COMPETITION LAW

1  in future negotiations."[8]

2      48.    Nonetheless, Haymon's open defiance of the Ali Act has already

3  elicited a formal challenge from prominent members of the boxing industry.  In

4  April 2015, for example, the Association of Boxing Commissions ("ABC") wrote a

5  six-page letter to United States Attorney General Loretta Lynch, calling on the DOJ

6  to investigate and take action against Haymon and his co-conspirators.  In the letter,

7  ABC wrote that "Haymon and related companies make no attempt to hide that they

8  operate in the dual capacities of promoter and manager."  ABC formally requested

9  that the DOJ open an investigation under the Ali Act.

10     49.    After ABC submitted this request to the DOJ, World Boxing

11  Organization ("WBO") president Francisco "Paco" Valcárcel voiced his public

12  support for a DOJ investigation of Haymon.  On the social networking website

13  Twitter, Valcárcel wrote, "I'm in agreement with the ABC's request to the US

14  Attorney General to investigate Haymon," and pledged that "[t]he [WBO] is willing

15  to cooperate with any investigation of the US Attorney General for the betterment

16  of the sport of boxing."

17     50.    Because Haymon is acting as both promoter and manager, he enjoys

18  an unfair and illegal advantage over legitimate boxing promoters.  As described

19  above, legitimate boxing promoters must comply with extensive regulatory

20  requirements at both the federal and state level.  But since Haymon operates in the

21  shadows, he does not comply with these laws and regulations—to the detriment of

22  boxers, legitimate promoters, and ultimately the viewing public.

23     51.    Haymon's anticompetitive and exclusionary conduct has taken many

24  forms, including but not limited to those alleged below.

25              *Exclusionary "Tie Out" Contracts*

26     52.    Haymon "locks in" talent on the management side—and then prevents

27

28  [8] *Id.*

COMPLAINT FOR VIOLATIONS OF
SHERMAN ACT AND CALIFORNIA
UNFAIR COMPETITION LAW

his boxers from "contract[ing] with those promoters they personally choose."  S. Rpt. No. 106-83, at 8–9 (June 21, 1999).  Acting in concert with Waddell & Reed and others, Haymon uses signing bonuses and the promise of exorbitant purses to induce top boxing talent to enter into long-term exclusive contracts with restrictive and anticompetitive terms.

53.    These purported management agreements—which Haymon often styles as "advisor" contracts—not only lock up managerial rights, but also restrict boxers from entering into any other agreement, including those relating to **promotional rights**, without Haymon's express consent.

54.    By expressly conditioning his managerial services on boxers' agreement to **not** freely contract with legitimate promoters, Haymon effectively excludes legitimate promoters from accessing and promoting many of the industry's top boxers—which in turn allows Haymon to act illegally as both manager and promoter to his clients.  Because Haymon possesses immense power in the boxing management business—as noted, Haymon has approximately 200 boxers in his stable—the effect of this "tie out" arrangement on the boxing promotion business is substantial, resulting in millions of dollars of lost revenue among legitimately licensed promoters.

55.    But for Haymon's "tie out" contracts, the Championship-Caliber Boxers in Haymon's management stable would in fact contract with legitimate boxing promoters, including Top Rank.

### *Illegal Promotional Activities*

56.    Haymon's coercive and exclusionary "tie out" agreements are only the beginning.  Having prevented his clients from freely contracting with legitimate promoters, Haymon himself acts as an unlicensed and illegal promoter for his clients' bouts.

57.    In at least some instances, Haymon falsely and fraudulently conceals his role in promoting his clients' bouts by employing "sham" promoters or

COMPLAINT FOR VIOLATIONS OF
SHERMAN ACT AND CALIFORNIA
UNFAIR COMPETITION LAW

1   "frontmen"—nominal promoters who are in fact controlled or dominated by
2   Haymon.  Haymon's network of "sham" promoters includes, but is not limited to,
3   Warriors Boxing and TGB Promotions.  For a fee, these (and other) sham
4   promoters effectively rent their promoters' licenses to Haymon and Waddell &
5   Reed, and function in a perfunctory role under the instruction of Haymon.
6   Ultimately, however, the money passes through Haymon's accounts, and Haymon
7   makes all material decisions.

8        58.   In response to recent public criticism of Haymon's disregard for the
9   Ali Act's "firewall," one of Haymon's frontmen, Lou DiBella, has stated:  "Nothing
10  says that a manager can't utilize the services of a promoter."  But the Ali Act
11  plainly prohibits "collusion between manager and promoter."  *Main Events*
12  *Productions, LLC v. Lacy*, 358 F. Supp. 2d 391, 398 (D.N.J. 2004).  Haymon may
13  conceal his illicit promotional activities by "utiliz[ing] the services" of frontmen
14  like DiBella, but the reality is undeniable:  Haymon simultaneously serves as
15  manager and promoter to his clients, and thereby obtains a "direct or indirect
16  financial interest in the promotion of . . . boxer[s]," in violation of the Ali Act.  15
17  U.S.C. § 6308(b)(1)(B)(i).

18       59.   Haymon's brazen illegal activities were recently put on public display.
19  In April 2015, a boxer named Julio Cesar Chavez, Jr. competed against Andrzej
20  Fonfara in Carson, California.  After the fight, Chavez, Jr. posted on the popular
21  social networking site Instagram a picture of a $1,750,000 million check made out
22  to his personal company, Chavez Jr. Promotions, LLC.  The payor:  Defendant
23  Haymon Sports, whose offices are at 3930 Howard Hughes Parkway, Suite 350, in
24  Las Vegas.  The following is written in the Notes section of the $1,750,000 check:
25  "Purse 4/18/15."

26
27
28

COMPLAINT FOR VIOLATIONS OF
SHERMAN ACT AND CALIFORNIA
UNFAIR COMPETITION LAW

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16    The transaction could hardly be more explicit—Haymon paid nearly $2

17 million of Chavez Jr.'s "purse" for the bout against Fonfara.  Paying the purse is a

18 classic promoter responsibility, ***not*** the job of a true manager.  Tellingly, Chavez

19 Jr.'s Instagram post was removed minutes after it appeared on the Internet site.

20    60.    While Haymon's sham promoters may formally execute contracts with

21 venues, sponsors, broadcasters, and other stakeholders, and may submit those

22 contracts to state athletic commissions, they do not control the negotiations.

23 Rather, Haymon directs everything himself.  In other words, it is Haymon, in

24 collusion with Waddell & Reed and MGH, who acts as the promoter for the boxers'

25 matches, even if his name does not appear on the contract.  The façade of

26 Haymon's frontmen is underscored by the fact that, more often than not, ***they do***

27 ***not have promotion contracts with the boxers themselves***, as a legitimate promoter

28 normally would.

COMPLAINT FOR VIOLATIONS OF
SHERMAN ACT AND CALIFORNIA
UNFAIR COMPETITION LAW

61.     As Bill King of *Sports Business Journal* recently described, Haymon "work[s] with a handful of promoters, most of them tied regionally, paying them a fee to operate the shows.  [¶]  While they will execute the events, ***there is no question of who will make most of the decisions with regard to such matters as ticket prices and presentation***."[9]  The fact that Haymon may pay his frontmen a fee to carry out some logistical tasks does not change the fact that Haymon himself is the real promoter.

62.     Industry observers widely recognize that Haymon acts as the true promoter for his boxers.  For example, Haymon was hailed as the "main promoter" for the immensely lucrative bout on May 2, 2015 between Floyd Mayweather and Manny Pacquiao.[10]  The *Washington Post* reported that "[Haymon's] fingerprints are on every part of the fight—from the signed contracts and lucrative terms of the deal, to the venue, to the television deals that will score both figers—and Haymon, too—millions of dollars."[11]

63.     Communications that would ordinarily be directed at a boxer's promoter go straight to Haymon instead.  When the International Boxing Federation (the "IBF") proposes fights, for instance, it ordinarily contacts each boxer's promoter.  But in the case of Haymon's boxers, all communications from the IBF are directed to Haymon.

64.     Demonstrating his immense power and self-interest, Haymon has

---

[9] Bill King, *Boxing's Grand New Stage*, Sports Bus. J., April 20, 2015, http://www.sportsbusinessdaily.com/Journal/Issues/2015/04/20/In-Depth/Main.aspx (emphasis added).

[10] Bill Dwyre, *Manny Pacquiao Calms the Chaos as Floyd Mayweather Jr. Bout Approaches*, L.A. Times, Apr. 4, 2015, at D1, http://www.latimes.com/sports/la-sp-manny-pacquiao-dwyre-20150404-column.html.

[11] Rick Maese & Joe DePaolo, *The Man Behind the Man: Al Haymon Pulls the Strings to Floyd Mayweather's Bouts*, Wash. Post, April 28, 2015, http://www.washingtonpost.com/sports/boxing-mma-wrestling/boxings-man-of-mystery/2015/04/28/2a2f5570-edf8-11e4-8abc-d6aa3bad79dd_story.html.

COMPLAINT FOR VIOLATIONS OF
SHERMAN ACT AND CALIFORNIA
UNFAIR COMPETITION LAW

induced boxers under his control to forego significant earnings for the sole purpose of harming legitimate promoters.  In 2014, upstart boxing promoter Roc Nation (which is owned by recording artist and entrepreneur Jay Z) won a $1.9 million purse bid to promote a fight between Peter Quillin and Matt Korobov.   Quillin was an undefeated WBO middleweight champion who stood to earn $1.4 million for the fight—***more than three times*** larger than any previous payday he had seen.  He was also a new father.  Nonetheless, at the direction of Haymon, Quillin turned down the fight and relinquished his title.  As was reported in the press, "It's most likely that Quillin dropping the title was a move orchestrated by Haymon to keep Jay Z out of his business."[12]  As one Roc Nation executive wondered, "Who turns [down] $1.4 million and gives up his belt for nothing?"

65.    Acting as both promoter and manager, Haymon runs headlong into the precise conflict of interest the Ali Act is designed to prevent—to the detriment of his boxers, his boxers' would-be opponents, ***and*** legitimate promoters like Top Rank.

66.    In each of these activities, Haymon takes a "direct or indirect financial interest in the promotion of a boxer"—in blatant violation of federal and state law. 15 U.S.C. § 6308(b)(1)(B)(i); *see also, e.g.*, Calif. Code Regs. title 4, § 396.  By traversing the Ali Act's "firewall" and acting outside of regulations that apply to licensed promoters, Haymon gains an unfair advantage over legitimate promoters like Top Rank.  Moreover, because Haymon has a dominant position in the managerial market, he can effectively block huge numbers of boxers—including much of the sport's top talent—from contracting with legitimate promoters, as they would normally do, or from competing with boxers who are contracted with

---

[12] Kevin Iole, *Peter Quillin Passes on Career-high $1.4 Million, Dumps WBO Middleweight Belt*, YAHOO! SPORTS, Sept. 4, 2014, https://sports.yahoo.com/ blogs/boxing/peter-quillin-passes-on-career-high--1-4-million--dumps-wbo-middleweight-belt-195021380.html.

COMPLAINT FOR VIOLATIONS OF
SHERMAN ACT AND CALIFORNIA
UNFAIR COMPETITION LAW

1    legitimate promoters.  As a direct and proximate result of Haymon's conduct,

2    legitimate promoters have been excluded from contracting with many

3    Championship-Caliber Boxers, and from promoting bouts between their clients and

4    Championship-Caliber Boxers in Haymon's stable.

5                              *Predatory "Payola" Practices*

6           67.    Before entering the boxing industry, Haymon was a music promoter

7    who staged over 1,000 concerts.  His clients included artists like M.C. Hammer and

8    Whitney Houston.  Given his background, it is not surprising that Haymon has

9    engaged in an unlawful and anticompetitive practice that has historically been

10   associated with the music business:  "payola."

11          68.    Payola is the practice of paying broadcasters in return for airtime.  In

12   the music industry, record companies have at times been known to compensate or

13   otherwise induce disc jockeys and radio stations to play their artists' songs more

14   frequently.  In the late 1950s and early 1960s, Congress held several hearings on

15   payola, and the Federal Trade Commission (the "FTC") issued scores of

16   complaints.  The FTC alleged that payola was a "deceptive act," and that it had "the

17   capacity . . . to restrain and suppress competition in the offering for sale, sale[,] and

18   distribution of phonograph records, and to divert trade unfairly to the [record

19   companies] from their competitors."  *See, e.g.*, *In re Chess Record Corp.*, 59 F.T.C.

20   361 (1961).  Ultimately, Congress amended the Federal Communications Act to

21   expressly prohibit undisclosed payola.  *See* 47 U.S.C. § 317.

22          69.    More recently, the New York Attorney General's Office conducted a

23   large-scale investigation of payola in the music business.  Several major record

24   companies ultimately settled the allegations for tens of millions of dollars.  The

25   New York investigation and settlements were followed by a slew of antitrust suits,

26   some of which were filed in this District.  While most of these cases settled quickly,

27   in at least one instance a district judge—Judge Margaret M. Morrow—issued a

28   ruling on the complaints.  Judge Morrow denied a motion to dismiss, holding that

COMPLAINT FOR VIOLATIONS OF
SHERMAN ACT AND CALIFORNIA
UNFAIR COMPETITION LAW

the plaintiffs had adequately alleged that the defendants' payola practices violated the Sherman Act. *See Radikal Records, Inc. v. Warner Music Group Corp.*, No. 06-CV-1713 (C.D. Cal. Oct. 11, 2006), Dkt. No. 30.

70.     Acting as an illegal promoter, Haymon has engaged in a new form of payola:  paying broadcasters to air fights involving Haymon-contracted boxers, under the PBC banner.  With the financing, complicity, and material assistance of his co-conspirators Waddell & Reed and MGH, Haymon has taken unprecedented steps to buy up and lock in television time with major broadcasters.  Haymon, Waddell & Reed, and MGH do this despite at a massive short-term loss in order to sustain their illegal presence in the boxing promotion business and exclude legitimate competitors like Top Rank.  If left unrestrained, Haymon stands to achieve a monopoly in the promotion business, which will allow him to recoup his and Waddell & Reed's short-term losses.

71.     So far, Haymon, Waddell & Reed, and MGH have bought airtime for PBC fights on over half a dozen major broadcasters.  These buys are substantial and far-reaching, with over 100 different show dates locked up with different broadcasters, leaving no room, no dates, and no opportunities for other promoters and other fighters, to the detriment of the consumers.

72.     While many of the details surrounding these transactions have not been publicly disclosed, it has been reported that Haymon, Waddell & Reed, and MGH agreed to pay tens of millions of dollars per year for airtime, with millions more set aside for "promotion and marketing."

73.     In addition to paying for blocks of airtime and footing the bill for promotion and marketing, ***Haymon pays the boxers' purses***.  In other words, Haymon performs the exact role a licensed promoter would ordinarily play—and in so doing takes "a direct or indirect financial interest in the promotion of a boxer," in blatant violation of the Ali Act.  15 U.S.C. § 6308(b)(1)(B)(ii).

74.     Haymon's aggressive "payola" scheme has been bankrolled by

Haymon's co-conspirators, Waddell & Reed and MGH. According to recent reports, Waddell & Reed has sunk **hundreds of millions** of dollars into PBC, through various Waddell & Reed investment funds (including Ivy Assets Strategy Fund, WRA Asset Strategy, and Ivy Funds VIP Asset Strategy). These funds have given staggering sums to Haymon by means of the following subterfuge: purchasing tens of millions of dollars' worth of "Series H" stock in MGH, which is a Waddell & Reed-affiliated holding company. MGH in turn transferred these funds to Haymon by investing in, and becoming a member of, Haymon Holdings.

75.     Waddell & Reed and MGH's involvement in Haymon's illegal conspiracy is **not** limited to financial investment. Rather, Waddell & Reed and MGH have played an active, complicit, and indispensable role in bringing Haymon's predatory and anticompetitive scheme to fruition. Their involvement began when a senior executive at Waddell & Reed and MGH named Ryan Caldwell was presented with an opportunity to meet with Al Haymon. An avid boxing fan with ambitions to "own live sports,"[13] Caldwell leapt at the chance. At their meeting, Haymon laid out his vision for what was to become PBC, and Caldwell agreed that Waddell & Reed would join in the venture. By his own account, Caldwell told Haymon, "You have to be capitalized for three to five years to do this. To weather the storm. Because in some regards you [are] going to be the irrational player for a while."[14]

76.     In order to facilitate and effectuate Haymon's anticompetitive "payola" scheme, Caldwell attended meetings and engaged in negotiations with broadcasters, in his capacity as a representative of Waddell & Reed and MGH. It was Waddell & Reed and MGH's involvement in PBC that ensured the predatory scheme's success. Indeed, Haymon brought Caldwell to participate in these meetings (many of which occurred in California) in order to help close the deals. According to Caldwell, he

---

[13] King, *supra* note 9.
[14] *Id.* (emphasis added).

explained to the broadcast executives "[h]ere is why Waddell is behind this and involved."[15]  Caldwell informed the executives that Waddell & Reed had pledged upward of $425 million from the $40 billion in Waddell & Reed's coffers to Haymon, which would allow PBC to be self-sustaining (and operate at a significant loss) in the near term.  By the Defendants' own telling, it was Caldwell's active involvement on behalf of Waddell & Reed and MGH that made Haymon's "payola" scheme possible.  But for Waddell & Reed and MGH's financial support and active participation, many (if not all) of the broadcast agreements would not have taken place.

77.    Defendants' network time-buys reverse the ordinary flow of money as between promoter and broadcaster.  Typically, the money flows from broadcaster to promoter—promoters *sell* broadcast rights to television channels.  But as Caldwell himself admits, Haymon's illegal payola scheme turns this model on its head.  Haymon, Waddell & Reed, and MGH *pay* major broadcasters huge sums to air PBC fights featuring the boxers he manages and promotes—at a significant short-term loss.  One boxing industry insider has estimated that the conspirators' losses may exceed *$200 million* in PBC's first 24 months of operation.[16]  Others estimate that the losses could be even more than that.[17]

78.    These "payola" deals are predatory in the extreme.  By operating significantly below cost in the short term, Haymon, Waddell & Reed, and MGH are attempting to expand Haymon's (already unlawful) presence in the boxing promotion business, so that Haymon can operate as a monopolist and recoup the

---

[15] *Id.*

[16] John Chavez, *A Second Look at the Premier Boxing Champions Platform*, UNDISPUTED CHAMPION NETWORK, Apr. 1, 2015, http://ucnlive.com/a-second-look-at-the-premier-boxing-champions-platform/.

[17] *See, e.g.*, King, *supra* note 9 ("[I]t became clear that Haymon's company might have to bleed upward of $100 million—*and perhaps two to three times that much*—as it built a brand and an audience" (emphasis added)).

Defendants' losses in the long run. Haymon, Waddell & Reed, and MGH are paying customers to take their product in order to eliminate competition from legitimate promoters and build a monopoly. Once that objective is obtained, Haymon, Waddell & Reed, and MGH will more than recoup their upfront losses through supracompetitive pricing. This expectation is explicit; as Caldwell (who now serves as Chief Operating Operator for PBC) put it to Haymon, PBC would need sufficient capitalization to "be the irrational player for a while." But once Haymon has achieved a monopoly in the promotion market, PBC's losses will turn to profits, and Caldwell's investments will pay off for Waddell & Reed and MGH—to the detriment of television broadcasters and consumers alike. Already, the Defendants' predatory "payola" scheme has harmed legitimate promoters like Top Rank by shutting off broadcast opportunities.

79. In addition to being predatory in the extreme, Haymon and Waddell & Reed's "payola" scheme is anticompetitive for yet another reason. Haymon, Waddell & Reed, and MGH have insisted on and obtained exclusivity commitments (tacit or express) as part of their agreements with broadcasters. Many of these broadcasters are based in California. Because Haymon enjoys unparalleled dominance in the management market—and is prepared to pay broadcasters exorbitant fees to exclusively broadcast PBC fights—he and his co-conspirators at Waddell & Reed and MGH have the power to demand these exclusionary terms, and they are in fact exercising that power to suppress competition.

*Venue Blocking*

80. In the course of unlawfully promoting boxers and boxing matches, Haymon has exercised his dominant position in the management market to block legitimate promoters from obtaining favorable dates at top venues. For example, Golden Boy and Banner Promotions recently attempted to stage a fight between Ruslan Provodnikov and Lucas Matthyse at the StubHub Center in Carson, California. The fight was originally set for March 28, 2015. However, acting on

COMPLAINT FOR VIOLATIONS OF
SHERMAN ACT AND CALIFORNIA
UNFAIR COMPETITION LAW

his own and through his network of sham promoters, Haymon locked up Golden Boy and Banner's desired date for the Provodnikov-Matthyse fight—not only at the StubHub Center, but at numerous other venues in Southern California as well. Ultimately, the promoters were forced to move the fight to another location.

81.    Haymon had booked the StubHub Center on March 28, 2015, ostensibly to host a fight between Jhonny Gonzalez and Garry Russell Jr.  But as soon as Golden Boy and Banner Promotions relocated the Provodnikov-Matthyse fight, Haymon moved the Gonzalez-Russell bout to The Palms in Las Vegas, Nevada.  Haymon's purpose in locking up the StubHub Center and alternative Southern California venues (through his network of frontmen) was unmistakable: to lock out the Provodnikov-Matthyse fight and prevent any possible cannibalization of tickets sales in the same local area for Haymon's bout between Julio Cesar Chavez, Jr. and Andrzej Fonfara, which was scheduled to take place at the StubHub Center just three weeks later, on April 18, 2015.

82.    Because of Haymon's dominance in the management business, he exercises significant power in negotiating with venues like the StubHub Center. Venues that refuse to comply with Haymon's coercive and exclusionary demands risk being denied access to bouts involving many of the top boxers in the industry. In other words, failing to acquiesce to Haymon can be financially devastating to these venues.

83.    Haymon has leveraged his dominance in the management business, and employed fraud, overbooking, and other unlawful tactics, to impede legitimate promoters like Top Rank from obtaining critical dates for boxing matches in major arenas.  Legitimate promoters have had to schedule bouts for less desirable dates and at less desirable venues, which significantly impacts the profits legitimate promoters earn.  As a direct and proximate result of this Haymon's exclusionary conduct, Top Rank and other promoters have suffered significant and irreparable harm.

COMPLAINT FOR VIOLATIONS OF
SHERMAN ACT AND CALIFORNIA
UNFAIR COMPETITION LAW

1

*Other Tortious and Illegal Conduct*

2        84.    The Defendants' anticompetitive conspiracy includes a wide range of

3   other exclusionary conduct, much of which is independently tortious and unlawful.

4   This includes, at a minimum, the following acts:  illegally "scalping" tickets to

5   boxing matches through a network of co-conspirators in order to increase their

6   revenue and gain an unfair advantage over legitimate promoters; and illegally

7   entering into "blocking" agreements that prevent boxers from participating as

8   sparring partners for boxers not under Haymon's control, including most recently

9   with Manny Pacquiao in advance of Pacquiao's May 2, 2015 bout against Haymon

10  boxer Floyd Mayweather.

11       85.    As this course of predatory and anticompetitive conduct demonstrates,

12  Haymon and his co-conspirators will stop at nothing to obtain their unlawful

13  design:  total control over all aspects of the boxing management business ***and*** the

14  boxing promotion business.  If left unabated, this conspiracy threatens to fatally

15  cripple competition in both of these businesses, thereby causing substantial and

16  irreversible harm to boxers, legitimate promoters, and consumers.

17                    **RELEVANT MARKET AND MARKET POWER**

18       86.    As described above, the Defendants' conduct affects two distinct

19  relevant markets—the market for professional boxing management, and the market

20  for professional boxing promotion.  Under federal and state law, there is supposed

21  to be a "firewall" between these two markets.  The Ali Act and analogous state laws

22  prohibit boxing managers from acting as or on behalf of boxing promoters, and

23  from obtaining a direct or indirect financial interest in the promotion of a boxer.

24  Nonetheless, with the assistance of his co-conspirators, Haymon is not only

25  unlawfully operating in both relevant markets—he is leveraging his dominance in

26  the management market to undermine competition and harm legitimate competitors

27  in the promotion market.

28

COMPLAINT FOR VIOLATIONS OF
SHERMAN ACT AND CALIFORNIA
UNFAIR COMPETITION LAW

## The Market for Managing Championship-Caliber Boxers

87.   In the United States boxing industry, there is a distinct and defined market for the management of "Championship-Caliber Boxers"—that is, professional boxers who, within the past three years, have demonstrated through such quantitative factors as purse size, television rights, viewership, ticket revenue, and other objective criteria, that they belong to "the 'cream' of the boxing business." *Int'l Boxing Club II*, 358 U.S. at 252.

88.   The Supreme Court has recognized that there are distinct tiers of boxers within the professional boxing industry, and that separate tiers correlate with distinct markets.  In *International Boxing Club II*, the Court affirmed that the relevant market had properly been defined as "the promotion of ***championship*** boxing contests in contrast to ***all*** professional boxing events."  358 U.S. at 249 (1959) (emphasis in original).  As noted above, the Court recognized that "the 'cream' of the boxing business . . . is a sufficiently separate part of the trade or commerce to constitute the relevant market for Sherman Act purposes."  *Id.* at 252.

89.   For this reason, management services provided to Championship-Caliber Boxers—"the 'cream' of the boxing business"—are fundamentally different from, and therefore not interchangeable with, management services provided to boxers in lower strata of the industry.  The business affairs of a Championship-Caliber Boxer are inherently more complicated than those of other professional boxers.  A manager charged with handling the business affairs of a Championship-Caliber Boxer must be highly sophisticated and experienced in many areas of the business.  Managing a boxer who participates in televised bouts held in venues like the MGM Grand in Las Vegas or Madison Square Garden in New York City, where the purse may be in the millions or tens of millions of dollars, requires far greater skill than managing a boxer who strictly participates in untelevised bouts at minor venues, where the purse may only be in the thousands or even hundreds of dollars.  The necessary business and legal acumen also makes it difficult, if not impossible,

for a Championship-Caliber Boxer to serve as his own manager.  The market for the management Championship-Caliber Boxers is defined by the distinct and inimitable nature of the services these managers provide.

90.    Moreover, because of the unique nature of the professional boxing industry, people and firms that represent other types of professional athletes, like baseball players or football players, cannot be—and, as a matter of practice, are not—a substitute for a manager who represents Championship-Caliber Boxers. Unlike other professional sports, there are no professional leagues in boxing; rather, promoters and "matchmakers" arrange bouts on an individualized basis.  In order for the boxers to get paid, boxing managers have to negotiate directly with boxing promoters—a role for which there are no clear analogues in other professional sports.  Moreover, boxing is closely regulated by state and federal laws and regulations that reflect and respond to the extraordinary nature of boxing.  Simply put, boxing managers operate in a wholly different market from agents who represent other professional athletes.

91.    Agents or representatives of other entertainers, such as actors or singers, also operate in a separate market from managers of Championship-Caliber Boxers.  The knowledge and experience required to manage Championship-Caliber Boxers are specific to the boxing industry, and in practice representatives of other entertainers are not interchangeable with, nor do they substitute for, managers of Championship-Caliber Boxers.  Additionally, representatives of other entertainers do not have the business relationships with boxing promoters that are absolutely necessary for managing a Championship-Caliber Boxer.

92.    There are also high barriers to successful entry in the management market for Championship-Caliber Boxers.  As previously noted, boxing managers must be professionally licensed in many states, including California and Nevada. In California, licensure requires that one take and pass a written exam.  In order to effectively represent Championship-Caliber Boxers, a manager must possess deep

COMPLAINT FOR VIOLATIONS OF
SHERMAN ACT AND CALIFORNIA
UNFAIR COMPETITION LAW

1    knowledge and experience in both the boxing industry and many areas of business
2    and law.  Additionally, a manager cannot attract Championship-Caliber Boxers as
3    clients unless his or her reputation in the industry is consummate with the boxers'
4    own status as "the 'cream' of the boxing business."  And perhaps most importantly,
5    the use of long-term exclusive contracts by established Championship-Caliber
6    Boxer managers, like Haymon, makes it extremely difficult, if not impossible, for
7    new entrants to obtain Championship-Caliber Boxers as clients.

8         93.    The relevant geography for the market for managers of Championship-
9    Caliber Boxers is the United States.  Although there may be some foreign-based
10   managers, none has gained a significant number of boxers or the type of business
11   resources and acumen required to serve as a close substitute to the U.S.-based (and
12   U.S.-licensed) managers of Championship-Caliber Boxers.

13        94.    Because of these market characteristics, a small but significant non-
14   transitory increase in price by a hypothetical monopolist would not induce
15   significant substitution by customers (in this case, boxers) to managers from outside
16   the market.  A manager with market power can extract more money (and more
17   egregious concessions) from Championship-Caliber Boxers, without fear that the
18   boxers will resort to the services of someone who occupies a different market.

19                  **The Market for Promoting Championship-Caliber Boxers**

20        95.    In the United States boxing industry, there is also a distinct market for
21   the promotion of Championship-Caliber Boxers (as defined herein).  As indicated
22   above, the Supreme Court has already acknowledged the existence of a separate,
23   cognizable market for promoting Championship-Caliber Boxers.  In *International*
24   *Boxing Club II*, the Court affirmed that the relevant market had properly been
25   defined as "the promotion of ***championship*** boxing contests in contrast to ***all***
26   professional boxing events."  358 U.S. at 249 (emphasis in original).  The Court
27   recognized that the promotion of championship boxing contests, which involve "the
28   'cream' of the boxing business," represents a "separate, identifiable market."  *Id.* at

- 30 -

COMPLAINT FOR VIOLATIONS OF
SHERMAN ACT AND CALIFORNIA
UNFAIR COMPETITION LAW

249, 252.  The Supreme Court further held that non-championship fights, which by definition do ***not*** involve "the 'cream' of the boxing business," were "not 'reasonably interchangeable [. . .] for the same purpose' as championship contests." *Id.* at 251 (quoting *United States v. du Pont & Co.*, 351 U.S. 377, 395 (1956)).

96.     As the Supreme Court recognized, promoting a boxing match involving a Championship-Caliber Boxer is fundamentally different from promoting boxers and matches in lower strata in the industry.  In order to effectively promote a large-scale, highly visible boxing match, a promoter must have sufficient financial resources to shoulder significant upfront expenditures, including those required to acquire an appropriate venue, attract major sponsors and advertisers, contract with innumerable outside vendors, and guarantee a certain size "purse" to the boxers and their managers—which may be in the millions or tens of millions of dollars.  Planning and negotiating each of these highly complex arrangements and, perhaps most importantly, the television broadcast of the bouts (whether on network television or pay-per-view), requires extensive, often arcane knowledge of multiple businesses, not to mention possession of useful connections in each business area.  A promoter who operates at a lower strata in the industry simply cannot accomplish what the promoter of a Championship-Caliber Boxer can.  For this reason, promoters for lower-tier boxers are not interchangeable with promoters of Championship-Caliber Boxers.  The market for the promotion of Championship-Caliber Boxers is defined by the distinct and inimitable nature of the services these promoters provide.

97.     In the world of professional sports, nothing remotely compares to the unique business of professional boxing promotion.  A professional baseball or tennis player, for example, does not directly contract with a third party to organize, sell tickets for, televise, and otherwise promote his or her games or matches.  Rather, these activities are handled by an overarching league or governing organization, such as Major League Baseball or the United States Tennis

Association.  Outside of the boxing industry, there are no close substitutes for licensed promoters of Championship-Caliber Boxers.

98.     Due in large part to the factors described above, there are significant barriers to successful entry in the market for promoting Championship-Caliber Boxers.  While all promoters must be professionally licensed and comply with extensive laws and regulations, only those with significant financial resources, deep industry knowledge, an established reputation among industry participants, and far-reaching business contacts can orchestrate a high-profile boxing match for a Championship-Caliber Boxer—and shoulder the sizeable financial risk associated with such a production.  Moreover, the statutory "firewall" separating managers from promoters prevents many industry insiders—at least the law-abiding ones—from engaging in promotion.  These inherent barriers to entry are only exacerbated by Haymon's long-term "tie out" contracts, which effectively prevent many Championship-Caliber Boxers from contracting with legitimate promoters, whether they are new entrants or incumbents.

99.     The relevant geography for the market for promoters of Championship-Caliber Boxers is the United States.  According to a recently published research report, all major boxing promoters "are based in the United States and focus on providing domestic services."  Although there may be some foreign-based promoters, none has promoted a significant number of major events or has the relationships required to serve as a close substitute to the U.S.-based (and U.S.-licensed) promoters of Championship-Caliber Boxers.

100.   Because of these market characteristics, a small but significant non-transitory increase in price by a hypothetical monopolist would not induce significant substitution by customers to promoters from outside the market.  In other words, if Haymon obtains power in this market, he will be able to charge broadcasters, sponsors, and fans more—and pay boxers less—without fear that they will resort to the services of promoters in other markets.

- 32 -

101.   The market for promotion of Championship-Caliber Boxers is distinct from the market for management of Championship-Caliber Boxers.  Under applicable state and federal laws, there is a "firewall" between these markets, and no single person may lawfully participate in both markets at the same time.  As a practical matter, most market participants *do* in fact respect the boundary between these markets—which the notable exception of Haymon, as alleged herein.

### The Defendants' Market Power

102.   Haymon possesses market power in the primary relevant market—the market for management of Championship-Caliber Boxers.  In fact, Haymon has achieved unprecedented dominance in this market.  Haymon's stable includes approximately 200 fighters, including numerous Championship-Caliber Boxers.  No other boxing manager represents more than a handful of boxers.  While Plaintiff does not have access to precise figures, Plaintiff alleges that Haymon's share of this relevant market is greater than 50 percent.

103.   By engaging in the illegal, tortious, and anticompetitive conduct alleged herein, Haymon is leveraging his market power in the primary relevant market to undermine competition in and monopolize the secondary relevant market—the market for promotion of Championship-Caliber Boxers.

104.   Haymon's ability to foreclose competition in the secondary relevant market is enhanced by a "lock in" effect.  Due to (i) Haymon's signing bonuses and promises of future earnings, (ii) asymmetrical sophistication and bargaining power between Haymon and his clients, (iii) the impracticality (if not impossibility) of assessing the long-term costs and effects of Haymon's "tie out" clauses *ex ante*, (iv) the high cost of switching from one manager to another, (v) the lengthy terms of Haymon's management contracts, and (vi) the relative lack of adequate substitutes for Haymon's management services, boxers are highly susceptible to being "locked in" to Haymon's exclusionary contracts.  Once locked in, Haymon's boxers are contractually precluded from entering into agreements with legitimate promoters

COMPLAINT FOR VIOLATIONS OF
SHERMAN ACT AND CALIFORNIA
UNFAIR COMPETITION LAW

1   without Haymon's consent.  This "lock out" effect not only strengthens Haymon's

2   dominance in the primary market for management, it enhances his ability to

3   monopolize the secondary market for boxing promotion.

### ANTICOMPETITIVE EFFECTS AND DAMAGES

5        105.   At all material times, Haymon and his co-conspirators engaged in the

6   business of professional boxing management and the business of professional

7   boxing promotion throughout the United States, including in California.  In

8   connection with this business, monies, contracts, bills, and other forms of business

9   communication and transactions were transmitted in a continuous and uninterrupted

10  flow across state lines.  The Defendants used various devices to carry out the illegal

11  acts alleged herein, including the United States mail, interstate travel, and interstate

12  telephone commerce.  Defendants' activities were within the flow of, and have

13  substantially affected, interstate commerce.

14       106.   The Defendants have taken significant overt acts in furtherance of their

15  unlawful scheme in California, including within this District.  For example, many

16  of the Defendants' meetings with broadcasters—which Caldwell attended on behalf

17  of Waddell & Reed and MGH—took place in or around Los Angeles, California.

18  Many of the PBC fights and broadcasts, which have been facilitated by Waddell &

19  Reed and MGH's active involvement in the conspiracy, have occurred in this

20  District.  For example, the March 13, 2015 Andre Berto-Josesito Lopez, Shawn

21  Porter-Erick Bone, and Chris Arreola-Curtis Harper bouts were broadcast from the

22  Citizens Business Bank Arena in Ontario, California; and the June 6, 2015 Robert

23  Guerrero-Aron Martinez fight was broadcast from StubHub Center in Los Angeles,

24  California.  Moreover, the Defendants' exclusion of legitimate promoters from

25  boxing venues has taken place throughout the country, including within this

26  District.  As previously alleged, Haymon has successfully blocked legitimate

27  promoters from booking boxing matches at such venues as Staples Center, StubHub

28  Center, and The Forum.

107.   As a direct and proximate result of the Defendants' unlawful actions, competition has been substantially foreclosed in the relevant markets.  Defendants' conduct harms competition by reducing the ability of existing managers and promoters to compete "on the merits" with Haymon.  The conduct also deters entry into the relevant markets, and thereby reduces the likelihood that rivals to Haymon will emerge in the future.  By undermining competition in these markets, Defendants have affected a substantial volume of commerce—and proximately injured boxers, legitimate promoters, and consumers alike.  If Defendants' conduct is not stopped, and Haymon obtains the monopoly he seeks in the boxing promotion market, these injuries will only continue and become more egregious.

108.   In a competitive market for professional boxing management, Haymon would not be able to obtain or exercise such sweeping control over his clients' careers.  Among other things, Haymon would not be able to induce the boxers in his stable to turn down lucrative bouts with non-Haymon boxers.  Moreover, by virtue of his dominance in the management business, Haymon coerces professional boxers into giving him veto power over any promotional contracts the boxers would otherwise enter into.  Having prevented his boxers from freely contracting with legitimate promoters, Haymon can step in and fill that role, in willful disregard for the Ali Act's "firewall" provision.

109.   By skirting the "firewall" established in the Ali Act, Haymon is essentially sitting on both sides of the bargaining table.  While purporting to act in his clients' best interests, Haymon has obtained direct and indirect financial interests in promoting his boxers—thereby creating the very conflict of interest the Ali Act sought to remedy.

110.   Haymon is exploiting his dominance in the management market to harm and exclude legitimate promoters from the promotion market.  If this conduct continues unabated, and Haymon becomes the *de facto* sole promoter of Championship-Caliber Boxers, it will become increasingly difficult for any

1   remaining non-Haymon boxers to gain exposure and quality opponents.  In order to

2   salvage their careers, non-Haymon boxers will have no choice but to sign up with

3   Haymon—on both the management and promotion sides.  As Haymon's power and

4   influence in both markets grow, he will be able to exert even more control over the

5   entire boxing industry.

6       111.   Haymon's scheme harms consumers as well.  The more power

7   Haymon has in the relevant markets, the less variety consumers will enjoy.

8   Haymon's scheme will ensure that consumers only see Haymon fights and Haymon

9   boxers.  Moreover, once Haymon's predatory tactics pay off, consumers will only

10  pay *more* to see these bouts.  The venture capitalists financing Haymon's plot fully

11  expect recoupment of the predatory outlays currently being used to finance and

12  monopolize airtime.

13      112.   Distributors of boxing content, including arenas and broadcasters, also

14  stand to lose out.  As Haymon excludes more competitors in the promotion market,

15  arenas will be forced to deal exclusively with Haymon—giving him

16  disproportionate bargaining power.  And once Haymon is the only show in town,

17  there is no reason to believe that he will be paying broadcasters to air his content.

18  Not only will broadcasters be paying him, they will be paying more than they ever

19  would in a competitive promotion market.

20      113.   Top Rank and other legitimate promoters have already been, and will

21  continue to be, injured as a direct and proximate result of the Defendants' illegal,

22  tortious, and anticompetitive conspiracy.  But for the conduct alleged herein, the

23  Championship-Caliber Boxers whom Haymon manages would be free to contract

24  with legitimate boxing promoters and to compete against boxers who are promoted

25  by legitimate promoters, and would in fact contract with such promoters and

26  compete against such boxers.  But for the conduct alleged herein, broadcasters

27  would be free to contract with legitimate boxing promoters, and would in fact

28  contract with such promoters; and leading venues for boxing matches would be free

COMPLAINT FOR VIOLATIONS OF
SHERMAN ACT AND CALIFORNIA
UNFAIR COMPETITION LAW

to contract with legitimate boxing promoters on the dates of their choice, and would in fact contract with such promoters. Through their illegal, tortious, and anticompetitive conduct, the Defendants have excluded legitimate promoters, reduced output, and undermined competition in both relevant markets. These anticompetitive effects constitute direct evidence of Haymon's market power.

114. The Defendants' anticompetitive scheme has already substantially harmed competition in both the primary and secondary relevant markets. The cumulative anticompetitive effects of this scheme lack any redeeming value and far outweigh any ostensible procompetitive benefits that Defendants may allege.

115. Haymon and his co-conspirators have engaged in the illegal, tortious, and anticompetitive conduct alleged herein with the specific intent to maintain Haymon's monopoly in the primary relevant market, and to obtain a monopoly in the secondary relevant market. If left unchecked, the Defendants have a dangerous probability of achieving monopoly power in the secondary relevant market.

116. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered significant harm. The full extent of Plaintiff's damages cannot yet be fully measured, but Plaintiff believes and alleges that its damages exceed $100 million. Such damages should be trebled pursuant to 15 U.S.C. § 15.

## CLAIMS FOR RELIEF

### COUNT I

**Unlawful "Tie Out" in Violation**

**of Section 1 of the Sherman Act (15 U.S.C. § 1)**

**(Against Al Haymon, Haymon Boxing, Haymon Sports, Haymon Holdings,**

**and Does 1–10)**

117. Plaintiff incorporates each preceding and succeeding paragraph as though fully set forth herein.

118. Defendants have knowingly and intentionally engaged in an unlawful contract, combination, or conspiracy constituting a *per se* violation of Section 1 of

1    the Sherman Act.  15 U.S.C. § 1.

2        119.   With the financial backing and complicity of Waddell & Reed and

3    MGH, Haymon has entered into agreements to restrain trade in a substantial portion

4    of the market for promotion of Championship-Caliber Boxers.  As previously

5    alleged, Haymon's "advisor" contracts with Championship-Caliber Boxers contain

6    exclusionary provisions that condition his professional services on the boxers'

7    agreement to not contract with legitimate boxing promoters without his consent.

8    These agreements constitute unlawful "tying" or "tie out" arrangements (sometimes

9    known as "negative tying").

10       120.   "Tie out" agreements constitute *per se* violations of the Sherman Act.

11   For example, plaintiffs in *Image Technical Services v. Eastman Kodak* alleged that

12   Kodak had illegally tied the sale of its photocopier parts to an agreement not to use

13   the maintenance services of independent services organizations.  903 F.2d 612,

14   614–15 (9th Cir. 1990) ("Kodak will not sell replacement parts for its equipment to

15   Kodak equipment owners unless they agree not to use ISOs").  The Ninth Circuit

16   determined that the plaintiffs' claim was cognizable under Section 1's *per se* rule,

17   *id.* at 619, and the Supreme Court affirmed.  *Eastman Kodak Co. v. Image Tech.*

18   *Servs.,* 504 U.S. 451, 479 (1992); *see also, e.g.*, *RealPage, Inc. v. Yardi Sys., Inc.*,

19   852 F. Supp. 2d 1215, 1222–29 (C.D. Cal. 2012) (denying motion to dismiss *per se*

20   "negative tying" claim under Section 1).

21       121.   Haymon's illegal agreements create a "tying" relationship between

22   services sold in separately defined relevant markets:  the market for management of

23   Championship-Caliber Boxers (*i.e.*, the "tying" market), and the market for

24   promotion of Championship-Caliber Boxers (*i.e.*, the "tied" market).  Specifically,

25   Haymon does not provide his managerial services to Championship-Caliber Boxers

26   unless the Championship-Caliber Boxers agree to not independently contract with

27   legitimate promoters like Top Rank.

28       122.   Haymon exercises market power in the market for management of

- 38 -

Championship-Caliber Boxers (*i.e.*, the "tying" market).  Haymon's economic power in the "tying" market is sufficient to substantially affect the market for promotion of Championship-Caliber Boxers (*i.e.*, the "tied" market).  Haymon's power in the "tying" market has allowed him to foreclose competition in the "tied" market.  Haymon's power in the "tied" market is enhanced by the susceptibility of boxers to become "locked in."

123.   Haymon's "tie out" contracts with Championship-Caliber Boxers have in fact had a significant adverse effect on a not insubstantial substantial amount of interstate commerce, in the millions of dollars.

124.   As a direct and proximate result of Defendants' unlawful and anticompetitive conduct, Plaintiff has been injured and damaged in its business and property.

### COUNT II

**Conspiracy in Restraint of Trade in Violation**

**of Section 1 of the Sherman Act (15 U.S.C. § 1)**

**(Against All Defendants)**

125.   Plaintiff incorporates each preceding and succeeding paragraph as though fully set forth herein.

126.   Defendants have knowingly and intentionally engaged in an unlawful contract, combination, or conspiracy that has unreasonably restrained trade in violation of Section 1 of the Sherman Act.  15 U.S.C. § 1.  The Defendants' agreements include, but are not limited to:

      A.    agreements between Waddell & Reed, MGH, and Haymon, whereby Waddell & Reed and MGH have financed, actively participated in, and gained a direct or indirect financial interest in Haymon's anticompetitive scheme;

      B.    agreements between Haymon and Championship-Caliber Boxers;

1    C.    agreements between Haymon and boxing venues;

2    D.    agreements between Haymon and television broadcasters;

3    E.    agreements between Haymon and advertisers;

4    F.    agreements between Haymon and sponsors; and

5    G.    agreements between Haymon and "sham" promoters who act as

6         "frontmen" for Haymon.

7    127.   As previously alleged, Defendants have engaged in a multi-faceted and

8  far-reaching scheme to unreasonably restrain trade in the primary and secondary

9  relevant markets.  This scheme includes, but is not limited to, the following actions:

10    A.    violating the prohibition, under state and federal law, against

11         acting as both manager and promoter, so as to gain an unfair

12         advantage over legitimate promoters;

13    B.    entering into unlawful "tie out" agreements to prevent

14         Championship-Caliber Boxers from contracting with legitimate

15         promoters,

16    C.    surreptitiously operating in the promotion business through a

17         network of "sham" promoters;

18    D.    locking up boxing talent, venues, and television broadcasters in

19         coercive and exclusionary contracts;

20    E.    paying broadcast companies for exclusive rights to television

21         airtime, at a significant short-term loss, so as to exclude

22         legitimate promoters and enhance Haymon's unlawful presence

23         in the promotion business; and

24    F.    other unlawful, anticompetitive, and tortious conduct.

25    128.   As a direct and proximate result of this illegal, tortious, and

26  anticompetitive conduct, Defendants have undermined and foreclosed competition

27  in a substantial share of the affected commerce.  Specifically, Defendants have

28  maintained and expanded Haymon's market power in the primary relevant market,

COMPLAINT FOR VIOLATIONS OF
SHERMAN ACT AND CALIFORNIA
UNFAIR COMPETITION LAW

1   and caused a significant adverse effect on a substantial volume of commerce in the

2   secondary relevant market.

3       129.   The anticompetitive effect of the Defendants' unlawful and

4   anticompetitive conduct outweighs any ostensible procompetitive benefits.

5       130.   As a direct and proximate result of Defendants' unlawful and

6   anticompetitive conduct, Plaintiff has been injured and damaged in its business and

7   property.

## COUNT III

**Attempted Monopolization in Violation**

**of Section 2 of the Sherman Act (15 U.S.C. § 2)**

**(Against Al Haymon, Haymon Boxing, Haymon Sports, Haymon Holdings,**

**and Does 1–10)**

13       131.   Plaintiff incorporates each preceding and succeeding paragraph as

14   though fully set forth herein.

15       132.   The Haymon Defendants have orchestrated a predatory and

16   anticompetitive scheme to leverage Haymon's monopoly power in the market for

17   management of Championship-Caliber Boxers, in an attempt to obtain a monopoly

18   in the market for promotion of Championship-Caliber Boxers, in violation of

19   Section 2 of the Sherman Act.  15 U.S.C. § 2.  This scheme includes, but is not

20   limited to, the following predatory and anticompetitive conduct:

          A.   violating the prohibition, under state and federal law, against
acting as both manager and promoter, so as to gain an unfair
advantage over legitimate promoters;

          B.   entering into unlawful "tie out" agreements to prevent
Championship-Caliber Boxers from contracting with legitimate
promoters;

          C.   surreptitiously operating in the promotion business through a
network of "sham" promoters;

- 41 -

COMPLAINT FOR VIOLATIONS OF
SHERMAN ACT AND CALIFORNIA
UNFAIR COMPETITION LAW

D.    locking up boxing talent, venues, and television broadcasters in long-term exclusive dealing arrangements;

E.    paying broadcast companies for exclusive rights to television airtime, at a significant short-term loss, so as to exclude legitimate promoters and enhance Haymon's unlawful presence in the promotion business; and

F.    other unlawful, anticompetitive, and tortious conduct.

133.  Defendants have engaged in predatory and anticompetitive conduct with a specific intent to monopolize the market for promotion of Championship-Caliber Boxers.

134.  If left unchecked, Defendants have a dangerous probability of obtaining monopoly in the market for promotion of Championship-Caliber Boxers.

135.  As a direct and proximate result of Defendants' unlawful and anticompetitive conduct, Plaintiff has been injured and damaged in its business and property.

## COUNT IV

**Injunctive Relief Under Section 16 of the Clayton Act (15 U.S.C. § 26)**

**(Against All Defendants)**

136.  Plaintiff incorporates each preceding and succeeding paragraph as though fully set forth herein.

137.  As previously alleged, Defendants' illegal, tortious, and anticompetitive scheme violates Sections 1 and 2 of the Sherman Act.

138.  As a direct and proximate result of Defendants' unlawful and anticompetitive conduct, Plaintiff has been injured and damaged in its business and property.

139.  Unless enjoined, Defendants' unlawful and anticompetitive conduct will continue and cause further injury to competition,  and Plaintiff will continue to suffer injury for which there is no adequate remedy at law.

COMPLAINT FOR VIOLATIONS OF
SHERMAN ACT AND CALIFORNIA
UNFAIR COMPETITION LAW

140.   Plaintiff therefore seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, to correct for the anticompetitive effects caused by Defendants' unlawful and anticompetitive conduct, and other relief so as to assure that such conduct does not continue or reoccur in the future.

## COUNT V

### Violation of the California Unfair Practices Act

### (Cal. Bus. & Prof. Code §§ 17000 *et seq.*)

### (Against All Defendants)

141.   Plaintiff incorporates each preceding and succeeding paragraph as though fully set forth herein.

142.   Al Haymon, Haymon Boxing, Haymon Sports, Haymon Holdings, Waddell & Reed, and MGH are persons engaged in business within the State of California.

143.   As previously alleged, Haymon, Waddell & Reed, and MGH have purchased millions of dollars' worth of network airtime from over half a dozen leading broadcasters to televise and promote PBC boxing matches featuring Haymon's boxers.  Ordinarily, television broadcasters pay for boxing broadcast rights—not the other way around.

144.   As previously alleged, Waddell & Reed and MGH have colluded with Haymon in purchasing millions' of dollars' worth of network airtime.  Waddell & Reed and MGH have jointly participated in this predatory and anticompetitive scheme, such as by investing over $400 million in PBC, attending meetings with network executives, negotiating directly with network executives, and/or actively participating in the planning, financing, and execution of broadcast events under the PBC brand.

145.   Haymon, Waddell & Reed, and MGH have sold a product at less than the cost thereof, and/or given away a product to the television broadcasters, as those terms are defined under California law.  *See, e.g.*, Cal. Bus. & Prof. Code §§ 17024,

17026, 17043.  Haymon, Waddell & Reed, and MGH have taken these actions for the purpose of injuring competitors and/or destroying competition.

146.   Haymon, Waddell & Reed, and MGH have sold a product at less than the cost thereof, and/or given away a product to the television broadcasters, as a "loss leader," as those terms are defined under California law.  *See, e.g.*, Cal. Bus. & Prof. Code §§ 17030, 17044.  Haymon, Waddell & Reed, and MGH have taken these actions for the purpose of injuring competitors and/or destroying competition.

147.   In fact, Haymon, Waddell & Reed, and MGH have literally ***paid*** broadcasters to take their product.  This conduct is even more predatory, and even more damaging, than traditional below-cost or "loss leader" selling.

148.   As a direct and proximate result of Defendants' below-cost and "loss leader" selling, Plaintiff has suffered an injurious effect in its business and property.

## COUNT VI

**Violation of the California Unfair Competition Law**

**(Cal. Bus. & Prof. Code §§ 17200 *et seq.*)**

**(Against All Defendants)**

149.   Plaintiff incorporates each preceding and succeeding paragraph as though fully set forth herein.

150.   California Business & Professions Code §§ 17200 *et seq.* defines as "unfair competition" any unlawful business practices.  Defendants' conduct as herein alleged violates the following statutes, laws, and regulations:

      A.   Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2;

      B.   the Muhammad Ali Boxing Reform Act, 15 U.S.C. § 6301 *et seq.*;

      C.   California Code of Regulations, title 4, § 396; and

      D.   the California Unfair Practices Act, Cal. Bus. & Prof. Code §§ 17000 *et seq.*

151.   Additionally, the company controlled by Haymon and Waddell &

Reed was recently criticized for blocking California venues from promotional competitors.

152.   Moreover, the Defendants' illegal, tortious, and anticompetitive scheme constitutes unlawful, fraudulent, and unfair conduct.  In addition to the aforementioned legal violations, Defendants have engaged in the following unfair business practices:

A.   employing fraud, overbooking, and other unlawful tactics to prevent legitimate promoters from obtaining critical dates for boxing matches in major arenas, thereby inhibiting such promoters from arranging attractive and profitable bouts for their boxers; and

B.   illegally "scalping" tickets to boxing matches, and failing to pay income taxes properly due on such sales, in order to increase their revenue and gain an unfair advantage over legitimate promoters.

153.   In addition to violating the aforementioned statutes, laws, and regulations, these unlawful, fraudulent, and unfair business practices independently violate California Business & Professions Code §§ 17200 *et seq.*

154.   Defendants' illegal, tortious, and anticompetitive conduct has caused significant adverse effects on commerce in the State of California, including within this District.  Defendants have undermined and foreclosed competition in the business of professional boxing promotion, and caused substantial injury to California businesses and consumers.

155.   As a direct and proximate result of the Defendants' illegal, tortious, and anticompetitive scheme, Defendants have been unjustly enriched in an amount to be determined at trial.

156.   Unless enjoined, Defendants' unlawful conduct will continue and cause further injury to Plaintiff.  Plaintiff will continue to suffer injury for which

- 45 -

1    there is no adequate remedy at law.

2         157.   Plaintiff therefore seeks equitable and injunctive relief pursuant to Cal.

3    Bus. & Prof. Code § 17203, to correct for the injurious and anticompetitive effects

4    caused by Defendants' unlawful conduct, and other relief so as to assure that such

5    conduct does not continue or reoccur in the future.

6                                    **COUNT VII**

7         **Tortious Interference With Prospective Economic Advantage**

8                             **(Against All Defendants)**

9         158.   Plaintiff incorporates each preceding and succeeding paragraph as

10   though fully set forth herein.

11        159.   Plaintiff possesses or has possessed economic relationships with

12   Championship-Caliber Boxers, boxing venues, television broadcasters, sponsors,

13   advertisers, and other third parties in the professional boxing industry.  In each of

14   these relationships, there is or was a reasonable probability of future economic

15   benefit to Plaintiff.

16        160.   Defendants had knowledge of these relationships.

17        161.   Defendants committed intentional acts designed to disrupt these

18   relationships with Plaintiff.  These acts include but are not limited to:

19              A.   violating the prohibition, under state and federal law, against

20                   acting as both manager and promoter, so as to gain an unfair

21                   advantage over Plaintiff;

22              B.   entering into unlawful "tie out" agreements to prevent

23                   Championship-Caliber Boxers from contracting with Plaintiff;

24              C.   locking up boxing talent, venues, and television broadcasters in

25                   coercive and exclusionary contracts;

26              D.   employing fraud, overbooking, and other unlawful tactics to

27                   prevent Plaintiff from obtaining critical dates for boxing

28                   matches in major arenas, thereby inhibiting Plaintiff from

COMPLAINT FOR VIOLATIONS OF
SHERMAN ACT AND CALIFORNIA
UNFAIR COMPETITION LAW

1          arranging attractive and profitable bouts for its boxers;

2          E.    paying broadcast companies for network television airtime, at a

3                 significant short-term loss, so as to exclude Plaintiff; and

4          F.    other unlawful, anticompetitive, and tortious conduct.

5    162.   As previously alleged, Defendants have committed unlawful,

6    anticompetitive, and tortious acts that are independently unlawful.  Defendants'

7    conduct as herein alleged violates the following statutes, laws, and regulations:

8          A.    Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2;

9          B.    the Muhammad Ali Boxing Reform Act, 15 U.S.C. § 6301 *et*

10                *seq.*;

11         C.    California Code of Regulations, title 4, § 396;

12         D.    the California Unfair Practices Act, Cal. Bus. & Prof. Code §§

13                17000 *et seq.*; and

14         E.    the California Unfair Competition Law, Cal. Bus. & Prof. Code

15                §§ 17200 *et seq.*

16   163.   As a direct and proximate result of Defendants' unlawful,

17   anticompetitive, and tortious conduct, Defendants actually disrupted Plaintiff's

18   economic relationships with third parties.

19   164.   As a direct and proximate result of Defendants' unlawful,

20   anticompetitive, and tortious conduct, Plaintiff suffered economic harm.

21                        **PRAYER FOR RELIEF**

22         WHEREFORE, Plaintiff respectfully demands judgment for the following

23   relief:

24         A.    For an injunction, permanently and pending final judgment in

25                this case, precluding Defendants and each of them and the

26                agents, employees, and representatives of each of them from

27                having any direct or indirect financial interest in the promotion

28                of bouts featuring boxers they manage, from acting as both

- 47 -

1   boxing managers and promoters, from presenting boxing

2   matches on television featuring such boxers, or from arranging

3   the arenas, sponsors and/or television broadcasts of boxing

4   matches featuring boxers they manage, from directing or

5   otherwise causing boxers not to sign written contracts with

6   Plaintiff or other promoters, from attempting, in any way, to

7   prevent Plaintiff from obtaining venues or other essential

8   facilities for the boxing matches Plaintiff promotes, from

9   attempting in any other way to monopolize the business of

10   promoting Championship-Caliber Boxers in the United States,

11   and from financing or otherwise aiding or abetting any of the

12   acts so enjoined;

13   B.   for damages in the sum of $100 million or such other sum as

14   shall be found;

15   C.   that such damages be trebled pursuant to 15 U.S.C. § 15;

16   D.   for restitution in such amount as shall be found;

17   E.   for interest at the highest lawful rate on all monetary awards;

18   F.   for Plaintiff's reasonable attorneys' fees; and

19   G.   for costs of suit and such other or further relief as the Court shall

20   deem just.

21

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATIONS OF
SHERMAN ACT AND CALIFORNIA
UNFAIR COMPETITION LAW

1

2

Dated:        July 1, 2015

3

4

5

By:           /s/ Daniel M. Petrocelli
              O'MELVENY & MYERS LLP
              BY Daniel M. Petrocelli, Esq.

*Counsel for Plaintiff Top Rank, Inc.*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATIONS OF
SHERMAN ACT AND CALIFORNIA
UNFAIR COMPETITION LAW

1

**DEMAND FOR JURY TRIAL**

2          Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by

3    jury on all issues so triable.

4

5    Dated:          July 1, 2015

6

7    By:             /s/ Daniel M. Petrocelli

8                    O'MELVENY & MYERS LLP
                     BY Daniel M. Petrocelli, Esq.

9                    *Counsel for Plaintiff Top Rank, Inc.*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATIONS OF
SHERMAN ACT AND CALIFORNIA
UNFAIR COMPETITION LAW