DANIEL M. PETROCELLI (S.B. # 97802)
dpetrocelli@omm.com
DAVID MARROSO (S.B. #211655)
dmarroso@omm.com
JAMES M. PEARL (S.B. # 198481)
jpearl@omm.com
STEPHEN J. MCINTYRE (S.B. # 274481)
smcintyre@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars
Los Angeles, California  90067
Telephone:   (310) 553-6700
Facsimile:   (310) 246-6779

Attorneys for Plaintiff
TOP RANK, INC.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TOP RANK, INC. | Case No. 2:15-cv-4961-JFW-MRW |
| Plaintiff, | **SECOND AMENDED COMPLAINT FOR VIOLATIONS OF SHERMAN ACT AND CALIFORNIA UNFAIR COMPETITION LAW** |
| v. | |
| ALAN HAYMON, HAYMON BOXING LLC, HAYMON SPORTS LLC, HAYMON HOLDINGS LLC, and ALAN HAYMON DEVELOPMENT, INC., | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

1    Plaintiff Top Rank, Inc. avers on knowledge as to itself and its own acts, and

2    on information and belief as to all other matters, as follows:

3                                  **INTRODUCTION**

4    1.    Defendant Alan "Al" Haymon, a former music mogul turned boxing

5    manager, is the fight game's biggest mystery.  Operating in the shadows, he avoids

6    being photographed and famously runs his empire from an old school flip phone.

7    For years, Haymon refused to acknowledge that he even had an office.  Now, armed

8    with nearly half a billion dollars from a hedge fund, Haymon is making a play to

9    take over boxing—law, fair competition, and fighters' rights be damned.  Widely

10   regarded as boxing's most powerful figure, Haymon brazenly claims that he "could

11   run boxing."

12   2.    Haymon has achieved market dominance by violating federal and state

13   laws.  But just as there are rules inside the ring, there are extensive regulations

14   outside of it to ensure fair competition—the Muhammad Ali Boxing Reform Act,

15   the Sherman Antitrust Act, unfair competition laws, and state laws concerning

16   management and promotion of boxers.  With the financial backing and active

17   assistance of Waddell & Reed Financial, Haymon is rigging the boxing industry, in

18   violation of these laws and regulations, so that he can control nearly every

19   "Championship-Caliber Boxer" competing professionally in the United States.[1]

20   Haymon's lawlessness has been extensively reported and an independent

21   association of State Boxing Commissions recently asked the Department of Justice

22   to investigate his conduct.

23   3.    Openly defying the statutorily-mandated "firewall" between manager

24   and promoter—two distinct professional roles that serve fundamentally different

---

[1] "Championship-Caliber Boxers" are those who have demonstrated through such quantitative factors as purse size, television rights, viewership, ticket revenue, and other objective criteria, that they belong to the 'cream' of the boxing business." *Int'l Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242 (1959) ("*International Boxing Club*").

SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF SHERMAN ACT AND
CALIF. UNFAIR COMPETITION LAW

purposes in the boxing industry—Haymon has exploited his dominance in one market, the market for <u>managing</u> Championship-Caliber Boxers, to injure and exclude competition and competitors in another market, the business of <u>promoting</u> Championship-Caliber Boxers in the United States.

4.     Haymon's modus operandi is simple.  To compete at the highest echelon of the sport, a promoter requires access to (i) top boxing talent (*i.e.*, the inputs), and (ii) major distribution channels (*i.e.*, the outputs).  Without access to top boxers, a promoter cannot stage major bouts that fans, distributors, and sponsors are willing to pay for.  Without access to major distribution channels, a promoter cannot attract Championship-Caliber Boxers or those seeking to build their careers.  In order to eliminate the competition and expand his already-dominant presence in the boxing industry, Haymon choked off access to both the inputs and the outputs.  He has blocked Top Rank and other promoters from top talent and from distribution of the boxing promotion industry.

5.     Using hundreds of millions of dollars in hedge fund money, Haymon has signed more than 200 boxers—dozens of them of Championship Caliber—to long-term managerial contracts.  Haymon's managerial contracts restrict the boxers' ability to enter into agreements with lawful, legitimate promoters.  In fact, Haymon's contracts give Haymon, not the boxer, sole discretion to decide who will promote the boxer's career and events.  This is not standard in the industry.  Haymon has repeatedly told people in boxing, including Eric Gomez of Golden Boy and Richard Schaefer (formerly of Golden Boy), that he will not allow any of his fighters to sign a promotional contract with a legitimate promoter.

6.     Haymon has made good on his illegal threat, and the injury to Top Rank has been direct and severe.  Top Rank has approached and tried to sign promotional agreements with many Championship-Caliber Boxers (and other boxers) under managerial contract to Haymon, only to be told that Haymon will not allow it.  The list includes, among others:  Deontay Wilder, Keith Thurman, Marcos

1   Maidana, Adrien Broner, Lamont Peterson, Abner Mares, and Errol Spence. ***Not***
2   ***one Championship-Caliber Boxer who was then managed by Al Haymon has***
3   ***ever signed a promotional contract with Top Rank.***

4         7.     Other legitimate promoters have been similarly blocked and injured.
5   Main Events and Golden Boy have approached and tried to sign promotional
6   agreements with Championship-Caliber Boxers (and other boxers) under
7   managerial contract to Haymon and were turned away because of Haymon. No
8   Championship-Caliber Boxer who was then managed by Al Haymon has signed a
9   promotional contract with Main Events and, since the end of 2014, none has signed
10   a promotional contract with Golden Boy.

11         8.     That is not to say the Championship-Caliber Boxers managed by
12   Haymon have no promoter. They do. His name is Al Haymon. In violation of law,
13   Haymon ***also*** acts as the primary promoter for the Championship-Caliber Boxers he
14   manages. Haymon negotiates the deals with and makes the material decisions
15   concerning broadcasters, venues, opponents, purses, and sponsors. Haymon and
16   entities he controls have a direct and indirect financial interest in the events in
17   which his Championship-Caliber Boxers participate. These are classic promoter
18   duties.

19         9.     But the law forbids a manager, like Haymon, from doubling as a
20   promoter. For that reason, Haymon often uses "front" or "sham" promoters to sign
21   paperwork and paint a façade of legality. In reality, however, Haymon simply pays
22   a fee to rent the sham promoter's license, all while maintaining primary and
23   dominant control over the actual promotion of the events, not to mention the direct
24   and indirect financial interest in them. Haymon's dual role as manager ***and***
25   promoter violates federal and state law and gives Haymon an unlawful competitive
26   advantage in the promotional market since promotional competitors like Top Rank
27   are prevented by law from competing against him as a manager.

28

10.     Through exclusionary, predatory, and unlawful conduct, Haymon has achieved market power in the markets for managing and promoting top boxing talent.  Judged by several metrics—championship, ranking, purse amount, and recent appearance on an English-speaking broadcast in the United States—there are no more than 150 Championship-Caliber Boxers under management of U.S.-based boxing managers at any given time, including today.

A.     Haymon has signed dozens of Championship-Caliber Boxers— more than half of the Championship-Caliber Boxer population managed by U.S. managers—to long-term managerial contracts. No other manager in the United States currently manages more than seven Championship-Caliber Boxers.

B.     Leveraging the "sole discretion" clauses of his managerial contracts and through other means, Haymon also acts as primary and sole promoter for dozens of the Championship-Caliber Boxers.  Haymon already promotes more than half of the Championship-Caliber Boxer population promoted by U.S. promoters.  No other promoter in the United States currently promotes anywhere close to that number of Championship-Caliber Boxers.

C.     Haymon's dominance and unlawful exercise of monopoly power already threaten the existence of Top Rank and all legitimate promoters who play by the rules and, if left unchecked, competition for the management and promotion of Championship-Caliber Boxers will be eliminated entirely.

11.     Having accumulated dominance and market power in managing and promoting Championship-Caliber Boxing talent, Haymon then locked up the vast majority of distribution avenues formerly available to legitimate promoters.  Given Haymon's experience in the music business, it is no surprise that his monopolistic

SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF SHERMAN ACT AND
CALIF. UNFAIR COMPETITION LAW

tactics in boxing include predatory "payola" practices that were employed in the music industry in the mid-20th century.  Instead of charging for the right to distribute his boxing events on television, Haymon is giving away to over half a dozen leading sports broadcasters, including ABC, ESPN, CBS, Fox, NBC, and Spike TV boxing content branded the "Premier Boxing Champions" or "PBC."  In order to stifle Top Rank and other legitimate promoters from competing against PBC, Haymon has obtained exclusivity commitments from each of these broadcasters.  Haymon's scheme is designed to exclude and has excluded competitors from nearly every major sports network that airs boxing content.

12.     The injury to Top Rank has been immediate, palpable, and severe. Top Rank has approached and tried to sign distribution agreements with multiple networks (some of whom previously aired Top Rank's events), only to find out that the networks could not or would not distribute Top Rank events because of the broadcasters' agreements and relationships with Haymon.  With the exception of one bout, none of ABC, ESPN, CBS, Fox, NBC, or Spike TV has distributed a single event promoted by Top Rank since announcing their broadcast deals with Haymon.

13.     Other legitimate promoters, including Golden Boy and Main Events, have also approached and tried unsuccessfully to sign distribution agreements with multiple networks.  None of ABC, ESPN, CBS, Fox, NBC, or Spike TV has distributed an event promoted by Golden Boy or Main Events since announcing their broadcast deals with Haymon.

14.     The vicious cycle Haymon intended is in full force.  Restricted in their ability to obtain broadcast outlets, legitimate promoters are severely and unfairly handicapped in competing for the services of today's Championship-Caliber Boxers and tomorrow's stars because they have virtually no opportunity to platform the boxers on television and to the viewing public.

SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF SHERMAN ACT AND
CALIF. UNFAIR COMPETITION LAW

15.     Between the predatory payments for exclusivity and the expenses of promoting each televised events, Haymon and his companies are operating at a significant short-term loss that is estimated to be in the hundreds of millions of dollars.  Ryan Caldwell (formerly of Waddell & Reed) bragged to the media about Haymon's exclusive deals with broadcasters, even admitting that the massive cost to secure the contracts made Haymon an "irrational player" in the short-term.  This classic "loss leader" strategy has allowed Haymon to gain further unfair advantage in the market for promoting Championship-Caliber Boxers to the severe detriment of Top Rank and other legitimate competitors.  As is the case with most predatory pricers, once Haymon obtains monopoly power in the market for promoting Championship-Caliber Boxers, he will charge exorbitant monopoly prices to broadcasters, sponsors, and consumers and reduce purses to the boxers.

16.     Haymon and his companies are engaging in at least four types of anticompetitive and predatory conduct:

       A.    Exclusionary Managerial Contracts:  Haymon and at least two of his companies (Haymon Development and Haymon Sports) have locked up dozens of Championship-Caliber Boxers to long-term exclusive managerial contracts, which grant Haymon total control and sole discretion over who will promote the Championship-Caliber Boxers' careers and events.  This is a classic tying arrangement.  Championship-Caliber Boxers who want a platform to appear on NBC, CBS, Spike, or Fox must sign a managerial agreement with Haymon and hand over to him discretion regarding choice of promoter.  In practice, Haymon has prevented *all* of his Championship-Caliber Boxers from entering promotional contracts with Top Rank, Golden Boy, Main Events, and other legitimate promoters.

B.    <u>Illegal Promotional Activities</u>:  Even though Haymon is solely licensed as a boxing manager—and forbidden by federal and state law from operating in the promotional business—Haymon and at least three companies (Haymon Boxing and Haymon Sports, of which Haymon Holdings is the manaing member) are illegally acting as promoters for the Championship-Caliber Boxers (and other boxers) Haymon has locked up with long-term managerial contracts.  By simultaneously acting in both capacities, Haymon and his companies have gained an unfair and illegal advantage over legitimate promoters like Top Rank, who are bound by law to operate solely in the promotional space.

C.    <u>Blocking Bouts Between Haymon and Non-Haymon Boxers</u>:  In order to effectively compete, promoters of Championship-Caliber Boxers must be able to secure suitable opponents for their fighters.  Haymon has repeatedly blocked Championship-Caliber Boxers he manages from fighting opponents who are not promoted by Haymon or one of his sham promoters, solely for the purpose of injuring legitimate promoters.  Because Haymon enjoys a dominant position in the market for promoting Championship-Caliber Boxers, the competitive effects of this exclusion are substantial.

D.    <u>Give-Aways, Payola, and Exclusive Deals With Broadcasters</u>:  Instead of charging a fee to a broadcaster for the right to distribute events he promotes, Haymon is giving away the content and coupling that with payments to obtain commitments from the broadcasters not to air other promoters' content.  Haymon demands and has in fact received exclusivity

SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF SHERMAN ACT AND
CALIF. UNFAIR COMPETITION LAW

1    commitments from over half a dozen top sports broadcasters,

2    including NBC, ABC/ESPN, CBS, Fox, and Spike TV.

3    Collectively, these channels account for over 80 percent of all

4    boxing programming in 2015.  Haymon's exclusive deals have

5    excluded legitimate promoters from airing their boxing content

6    on any of these television channels, thereby depriving them of

7    essential distribution outlets.

8       17.    Haymon's illegal acts are real and they are having a tangible impact on

9    the markets.  In prior years, legitimate promoters could distribute their content on a

10   variety of major sports networks.  Fans had access to events involving

11   Championship-Caliber Boxers who were promoted by Top Rank, Golden Boy,

12   Main Events, Don King, RocNation, and others.  As of late 2015, Haymon's

13   exclusive deals with broadcasters have substantially dried up consumer choice.  Just

14   this year, Haymon, Haymon Sports, and Haymon Boxing have gone from

15   promoting just one of every four English-language boxing broadcasts in the United

16   States (~25%) to promoting roughly two of every three (~66%).  Championship-

17   Caliber Boxers have been deprived of participating in lucrative matchups against

18   opponents not managed and promoted by Haymon, and fans have been deprived of

19   the best matchups and content optionality.

20      18.    Similarly, in prior years, Championship-Caliber Boxers could sign

21   agreements with any manager and promoters would compete for the right to

22   promote the boxer's career and events.  Today, any Championship-Caliber Boxer

23   who wants to be seen on the major sports networks has one choice in manager—Al

24   Haymon—and Haymon, not the Boxer, chooses the boxer's promoter.  Advancing

25   his own "PBC" brand, Haymon steadfastly refuses to allow any Championship-

26   Caliber Boxer under his managership to be promoted by anyone but Haymon.

27      19.    Make no mistake, Al Haymon controls all aspects of his fighter's

28   professional lives in the same way other abusive manager-promoters did in the

SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF SHERMAN ACT AND
CALIF. UNFAIR COMPETITION LAW

past—an imbalance in power that spurred Congress to change the way boxing is regulated.  In so doing, and as alleged below, Haymon and his accomplices have violated a number of state and federal laws, including the Sherman Antitrust Act, 15 U.S.C. §§ 1 *et seq.*; the Muhammad Ali Boxing Reform Act, 15 U.S.C. §§ 6301 *et seq.*; the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*; the California Unfair Practices Act, Cal. Bus. & Prof. Code §§ 17000 *et seq.*; and other state laws and regulations.

## THE PARTIES

20.     Plaintiff Top Rank is a limited liability company with its principal place of business in Las Vegas, Nevada.  Top Rank is a boxing promoter licensed in the States of California and Nevada, among others. Top Rank conducts promotion business in California.

21.     Defendant Alan Haymon ("Haymon") is a resident of California and this District.  Individually and through the instrumentalities of Haymon Boxing LLC, Haymon Sports LLC, Haymon Holdings LLC, and Alan Haymon Development, Inc., Alan Haymon has done continuous and systematic business in California.

22.     Defendant Haymon Boxing LLC ("Haymon Boxing") is a Delaware limited liability company with its principal place of business at 3930 Howard Hughes Parkway, Suite 350, Las Vegas, Nevada 89109.  Haymon Boxing has done continuous and systematic business in California.

23.     Defendant Haymon Sports LLC ("Haymon Sports") is a Delaware limited liability company with its principal place of business at 3930 Howard Hughes Parkway, Suite 350, Las Vegas, Nevada 89109.  Haymon Sports has done continuous and systematic business in California.

24.     Defendant Alan Haymon Development, Inc. ("Haymon Development") is a California corporation with its principal place of business at 16030 Ventura Boulevard, Suite 380, Encino, California 91436.  Haymon

Development is a resident of California and of this District.  Haymon Development is a member of Defendant Haymon Holdings.

25.    Defendant Haymon Holdings LLC, f/k/a KO Holdings LLC, f/k/a Haymon Sports LLC ("Haymon Holdings") is a Delaware limited liability company with its principal place of business at 3930 Howard Hughes Parkway, Suite 350, Las Vegas, Nevada 89109.  Haymon Holdings is the managing member of Defendant Haymon Sports.  Haymon Holdings has done continuous and systematic business in California.

26.    At all material times, Haymon was employed by and possessed actual authority to act on behalf of and to bind Defendants Haymon Boxing, Haymon Sports, Haymon Development, and Haymon Holdings.  In actual practice, Haymon routinely exercises the power to act on behalf of and to bind each of these companies.  In fact, Haymon Boxing, Haymon Sports, Haymon Development, and Haymon Holdings are each *mere instrumentalities* of Haymon himself, as demonstrated by his consistent exercise of total or near-total control over them.  The following examples are illustrative of Haymon's power:

A.    Haymon Sports:  Haymon is the Chief Executive Officer of Haymon Sports.  As further alleged below, Haymon has routinely negotiated and signed contracts and other documents on behalf of Haymon Sports, including but not limited to (i) managerial contracts with Championship-Caliber Boxers, (ii) multiple exclusive agreements with broadcasters, and (iii) the settlement agreement between Richard Schaefer, Haymon, and Golden Boy.  Haymon brought PBC into existence through the instrumentality of Haymon Sports and Haymon Boxing.

B.    Haymon Development:  Haymon is President, Chief Executive Officer, and Secretary of Haymon Development.  As further alleged below, Haymon has routinely negotiated and signed

1    contracts and other documents on behalf of Haymon

2    Development, including but not limited to (i) managerial

3    contracts with Championship-Caliber Boxers; (ii) approvals of

4    actions undertaken by the Haymon Holdings Board of Directors;

5    (iii) the settlement agreement between Richard Schaefer,

6    Haymon, and Golden Boy; and (iv) Haymon Development's

7    Articles of Incorporation.  Additionally, Haymon submitted his

8    application to become a licensed boxing manager in Nevada

9    "c/o Haymon Development."

10    C.    Haymon Holdings:  Haymon is President, Chief Executive

11    Officer, and Chairman of the Board of Haymon Holdings.

12    Under Haymon Holdings' organizational agreement, Haymon

13    personally controls three of the five potential seats on the

14    Haymon Holdings Board of Directors.  Haymon has veto power

15    over all "major decisions" taken by Haymon Holdings and/or its

16    subsidiaries, which would include Haymon Sports.  Haymon

17    personally negotiated the agreement whereby Media Group

18    Holdings LLC invested several hundred million dollars in

19    Haymon Holdings.  Haymon has routinely negotiated and signed

20    contracts or other documents on behalf of Haymon Holdings,

21    including but not limited to the settlement agreement between

22    Richard Schaefer, Haymon, and Golden Boy.

23    D.    Haymon Boxing:  Haymon is Owner and Chief Executive

24    Officer of Haymon Boxing.  As further alleged below, Haymon

25    has routinely negotiated and signed contracts and other

26    documents on behalf of Haymon Boxing, including but not

27    limited to multiple exclusive agreements with broadcasters.

28

- 12 -

1    Haymon brought PBC into existence through the instrumentality
2    of Haymon Sports and Haymon Boxing.

3        E.    Haymon runs "PBC" primarily through the entities Haymon
4    Sports and Haymon Boxing, with the benefit of investment
5    money that was funneled into these entities through Haymon
6    Holdings.  Based on the companies' press releases, Haymon
7    entered into nearly all of the broadcaster deals on behalf of
8    Haymon Sports (CBS, Fox) or Haymon Boxing (NBC,
9    ABC/ESPN, Spike TV).  According to PBC's website, "Premier
10   Boxing Champions (PBC), was created for television by
11   Haymon Sports, LLC."  Other press releases claim that "[t]he
12   PBC series was created for television by Haymon Boxing."
13   PBC's website lists Haymon Boxing as the main point of
14   contact for PBC.  Several trademarks for "Premier Boxing
15   Champions" and "PBC" are registered in Haymon Boxing's
16   name.  Haymon Sports and Haymon Boxing share the same
17   business address in Las Vegas.  Both entities are controlled by
18   Haymon himself.

19   **JURISDICTION AND VENUE**

20       27.    This Court has original jurisdiction over Plaintiff's federal antitrust
21   claims, which arise under the Sherman Antitrust Act (15 U.S.C. §§ 1, 2) and the
22   Clayton Act (15 U.S.C. §§ 15, 26).  28 U.S.C. §§ 1331, 1337(a).  This Court has
23   supplemental jurisdiction over the related claims for violations of California
24   statutory and common law alleged herein, because those claims are so related to the
25   federal claims that they form part of the same case or controversy under Article III
26   of the United States Constitution.  28 U.S.C. § 1367(a).

27
28

SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF SHERMAN ACT AND
CALIF. UNFAIR COMPETITION LAW

28.     Venue is proper in this District under 28 U.S.C. § 1391(b), because a substantial part of the acts and circumstances giving rise to this action occurred in this District, and all Defendants are subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

### *United States v. International Boxing Club of New York*

29.     The federal government has long taken an interest in preventing and remedying anticompetitive and abusive practices in the professional boxing industry.  In the early 1950s, for example, the United States Department of Justice (the "DOJ") brought a civil complaint against certain boxing clubs and promoters, alleging they had conspired to restrain and monopolize the market for promoting championship boxing matches, in violation of Sections 1 and 2 of the Sherman Act.

30.     After a bench trial, the district court ruled that the defendants had unreasonably restrained and monopolized "trade and commerce in the promotion of professional world championship boxing contests among the several states." *United States v. Int'l Boxing Club of N.Y., Inc.*, 150 F. Supp. 397, 421–22 (S.D.N.Y. 1957), *aff'd*, 358 U.S. 242 (1959).  The instruments of the defendants' scheme (just as in this case) included preventing championship contenders from contracting with rival promoters and tying up rights to radio and television broadcasts.  *Id.* at 411–19.

31.     The Supreme Court affirmed the district court's judgment.  *See Int'l Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242 (1959).  The Court held that the business of promoting championship boxing contests was a distinct market from promoting run-of-the-mill boxing matches, since "championship boxing is the 'cream' of the boxing business, and . . . is a sufficiently separate part of the trade or commerce to constitute the relevant market for Sherman Act purposes."  *Id.* at 249, 252.

- 14 -

**The Muhammad Ali Boxing Reform Act**

32.     In the late 1990s, Congress launched an investigation of exploitative and anticompetitive practices that had taken root in the boxing industry.

33.     Congress was particularly concerned with individuals developing unchecked contracting power that could result in a single person "gain[ing] control over a majority of championship bouts in a weight division." S. Rep. 105-371, at 5 (Oct. 6, 1998).

34.     Such contractual abuses could often be avoided if the boxer had competent and independent representation.  This is where boxing managers come into play.  Ideally, a manager should fiercely and exclusively advocate for the boxer's interests when negotiating with sophisticated business entities.  But that was frequently not the case:

> A manager is supposed to have some degree of independent judgment. . . .  [T]here are situations where a manager is actually a paid employee of a promoter or even an officer of a promotion company.  Sometimes this is quite overt, and since one of the roles of manager is to represent a boxer in negotiations with a promoter it is obvious that appropriate objectivity cannot exi[s]t in such a circumstance.

*Business Practices in the Professional Boxing Industry: Hearing Before the Committee on Commerce, Science, and Transportation*, S. Hrg. 105-712, at 29 (1998) (prepared statement).

35.     In order to address exploitative and anticompetitive business practices, Senators John McCain and Richard Bryan proposed the Muhammad Ali Boxing Reform Act (the "Ali Act").  According to the initial Senate Report, the Ali Act was intended to "curb several of the most restrictive, onerous, and anti-competitive contracting practices" in the industry.  S. Rep. 105-371, at 5 (Oct. 6, 1998).

36.     The bill also proposed to outlaw conflicts of interests between promoters and managers.   Because the amount a promoter makes is, in part, a function of how much it pays the boxers—that is, how big of a "purse" the promoter guarantees—promoters and boxers can be expected to negotiate hard over

- 15 -

payment and other terms.  The promoter and the boxer sit on opposite sides of the bargaining table, and if they strike a deal, they become business partners—but the promoter does not owe a fiduciary duty to the boxer.  Rather, it is ***the manager's*** job to represent the boxer in negotiating promotion contracts.  Since the manager's fee is tied to the size of the purse, the manager is supposed to have every incentive to bargain hard for a bigger payout to his client (and, by extension, to himself).  In order for a manager to effectively perform his duty as a fiduciary, he cannot simultaneously be sitting on the other side of the table, acting as (or on behalf of) a promoter.

37.   Congress ultimately passed the Ali Act in 2000.   President Bill Clinton signed the bill into law on May 26, 2000.  The Ali Act mandated the following major reforms:

A.   **"Firewall" Between Managers and Promoters**:  The Ali Act establishes a "firewall" between promoters and managers. Managers are prohibited from having a "***direct or indirect*** financial interest in the promotion of a boxer," and from being "employed by or receiv[ing] compensation or other benefits from a promoter."  15 U.S.C. § 6308(b) (emphasis added).

B.   **Protection from Coercive Contracts**:  The Ali Act declares that long-term "option" contracts are "in restraint of trade, contrary to public policy, and unenforceable against any boxer."  *Id.* § 6307b(a).

C.   **Required Disclosures**:  Promoters are required to make certain financial disclosures regarding the bouts they promote.  *Id.* § 6307e.

38.   The Ali Act carries severe sanctions, including criminal penalties.  *Id.* § 6309.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF SHERMAN ACT AND CALIF. UNFAIR COMPETITION LAW

39.     The Ali Act serves to protect boxers, the boxing industry, and the public from abusive, exploitative, and anticompetitive behavior.  The establishment of a strict "firewall" between managers and promoters underscores Congress' judgment that a "***manager must be a determined advocate for the boxer's interests and not be influenced by financial inducements from a promoter***."  S. Rpt. No. 106-83, at 11 (June 21, 1999) (emphasis added).

40.     The Ali Act's express overarching purpose is to "reform unfair and ***anticompetitive*** practices in the professional boxing industry."  Pub. L. No. 106-210, 114 Stat. 321 (2000) (emphasis added).   In promoting fair competition, the Ali Act benefits not only professional boxers, but the public at large.

**The Professional Boxing Industry**

41.     As the Ali Act suggests, there are at least two distinct markets in the business of professional boxing, which now comprises a multibillion dollar industry:  a market for managers, and a market for promoters.  This market separateness is a practical reality and is ***specifically mandated and required*** by the Ali Act.  As stated, the Ali Act places a strict "[f]irewall between promoters and managers," and prohibits managers from having "a direct or indirect financial interest in the promotion of a boxer" or being "employed by or receiv[ing] compensation or other benefits from a promoter."  15 U.S.C. §§ 6308(b)(1)(B)(i)–(ii).  No one person is allowed to simultaneously compete in the market for boxing managers ***and*** the market for boxing promoters.  This "firewall" benefits boxers and consumers alike.

*Boxing Managers*

42.     Under the Ali Act, "manager" refers to "a person who receives compensation for service as an agent or representative of a boxer."  *Id.* § 6301(5).  A manager is supposed to be wholly devoted to his or her clients' best interests.  Before any boxing match—and in particular highly publicized bouts between Championship-Caliber Boxers—a boxer must navigate complex contractual

relationships.  This can be daunting, especially for fighters who are not experienced or educated in the business side of boxing.  A manager's professional role (and ethical responsibility) is to represent the boxer in these various negotiations and otherwise handle the boxer's business affairs.

43.     As compensation, the manager typically receives a percentage of the boxer's "purse" for each bout.  The "purse" is the amount of money the boxer receives from the promoter of a fight.  The promoter guarantees the purse at the outset; the purse amount does not depend on the outcome of the match.  Because the manager's compensation is ordinarily tied to the purse, the manager has an incentive to negotiate vigorously with the promoter.

44.     Most states require boxing managers to be professionally licensed, and have promulgated regulations governing managers' conduct.  In California, for example, managers must pass a written examination administered by the State Athletic Commission in order to be licensed.  *See* Calif. Code Regs. title 4, § 218(a).  In Nevada, managers must apply for a license as provided in Nev. Admin. Code § 467.012.  Both states prohibit a person from acting as both manager and promoter.  *See* Calif. Code Regs. title 4, § 396; Nev. Admin. Code § 467.104.

45.     As alleged and described below, Haymon holds a dominant position in the market for managing Championship-Caliber Boxers.  Haymon has signed long-term exclusive contracts with approximately 200 fighters, including dozens of Championship-Caliber Boxers such as current and former world champions Adonis Stevenson, Danny Garcia, Adrien Broner, Anthony Dirrell, Peter Quillin, and Keith Thurman, to name just a few.  Among U.S.-based boxing managers, Haymon controls a majority share of Championship-Caliber Boxers.  No other boxing manager represents more than a dozen or so boxers of *any* description and none currently manages more than seven Championship-Caliber Boxers.  In the managerial market, after Haymon, there is no close second.

46.     All boxers managed by Haymon have been required to sign and have signed an exclusive managerial contract (or agree to similar provisions) granting Haymon near-total control over the boxer's career and revenue-generating abilities. Haymon also requires the boxer to give him (Haymon) sole discretion to choose who will be the boxer's promoter.  Haymon has told many people, including Eric Gomez or Richard Schaefer, that he will never let his fighters sign with a truly competitive promoter (even though he is firewalled from acting as a promoter). And, in fact, he never has.

### *Boxing Promoters*

47.     Promoters play a different role in boxing.  The Ali Act defines "promoter" as "the person primarily responsible for organizing, promoting, and producing a professional boxing match."  15 U.S.C. § 6301(9).  Promoters contract with boxers to provide a certain number of fights in return for compensation, in the form of a "purse" for each fight.  Promoters make money primarily from selling tickets, television rights, and advertising rights for a bout, as well as from other promotional activities.  Because a promoter's profit depends on its ability to generate more money in revenue than it spends promoting each fight, the promoter is the party that assumes all of the financial risk.  In contrast, the boxer and his manager are assured compensation at the outset, since promoters guarantee the "purse" before a fight.

48.     States regulate promoters as well.  *See, e.g.*, Calif. Code Regs. title 4, § 213; 225 Ill. Comp. Stat. § 105/10; Ala. Code § 41-9-96; Ariz. Rev. Stat. §§ 5-228, 229; Conn. Gen. Stat. 532a § 29-143j(e); Fla. Admin. Code. R. 61K1-1.005; 523 Mass. Code. Regs. 6.06; Nev. Rev. Stat. § 467.052; N.J. Rev Stat § 5:2A-14; N.Y. Comp. Codes R. & Regs., tit. 19, § 207.17; 58 Pa. Code § 21.6; Tex. Oc. Code Ann. §§ 2052.101, 102; 18 Va. Ann. Code § 120-40-120; Rev. Code Wash. § 67.08.030.  In California, for example, a promoter must demonstrate, among other things, that it possesses "financial responsibility" and the "necessary knowledge

SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF SHERMAN ACT AND
CALIF. UNFAIR COMPETITION LAW

1  and experience to act as a promoter" in order to obtain a license.  Calif. Code Regs.

2  title 4, § 213.  Additionally, all contracts between boxers and promoters must be

3  presented to, and approved by, the State Athletic Commission.  *Id.* § 222.

4       49.    The market for domestic promoters of Championship-Caliber Boxers

5  has traditionally been competitive—at least before Haymon came on the scene.

6  There are several major competitors vying to do business with top boxers, including

7  Top Rank, Golden Boy Promotions, Main Events, K2, and Roc Nation.  However,

8  Haymon has accreted market power in the market for promoting Championship-

9  Caliber Boxers.  Top Rank and other legitimate promoters have been categorically

10  excluded from promoting all boxers, including the Championship-Caliber Boxers,

11  in Haymon's stable.  Furthermore, none of the broadcast networks on which

12  Haymon airs his fighters' bouts will broadcast events promoted by Top Rank,

13  Golden Boy, Main Events, or other legitimate promoters.  Among U.S.-based

14  boxing promoters, Haymon already controls a majority share of Championship-

15  Caliber Boxers.  And, if Haymon has his way, however, he will become the ***only***

16  promoter in the market.

17                 **The Defendants' Illegal, Tortious, and Anticompetitive Scheme**

18       50.    In defiance of clear directives from Congress, Al Haymon is

19  intentionally exploiting his dominant position in the market for managing

20  Championship-Caliber Boxers to acquire, maintain, and expand his market power

21  in the market for promoting Championship-Caliber Boxers.  With the funding and

22  material assistance of Waddell & Reed, Haymon is buying up and attempting to

23  monopolize the entire vertical channel—by locking in all the top boxing talent to

24  the exclusion of legitimate promoters and buying up exclusive rights to the most

25  visible and desirable placement on television in a predatory "payola" scheme, again

26  to the exclusion of legitimate promoters.

27       51.    Haymon is using his market power in one business to take over a

28  different but unrelated business that federal and state law prohibits them from

- 20 -

entering.  Despite his reclusive personality, Haymon's activities in the promotion business are coming to light.  The *New York Times* and other periodicals have reported that "Haymon is licensed in Nevada as a manager, yet he also performs many of [the] same functions as promoters."  In disregard of the Ali Act's "firewall" between managers and promoters, Haymon "appears to operate as a hybrid."  Eight of Haymon's business associates told the same story—but tellingly, seven of them "spoke on the condition of anonymity for fear of retribution in future negotiations."

52.     Haymon's defiance of the Ali Act has already elicited a formal challenge from prominent members of the boxing industry.  In April 2015, for example, the Association of Boxing Commissions ("ABC") formally requested that United States Attorney General Loretta Lynch direct the DOJ to investigate and take action against Haymon.  ABC wrote that "Haymon and related companies make no attempt to hide that they operate in the dual capacities of promoter and manager."  After ABC submitted this request to the DOJ, World Boxing Organization ("WBO") president Francisco "Paco" Valcárcel voiced his public support for a federal investigation of Haymon.  On the social networking website Twitter, Valcárcel wrote, "I'm in agreement with the ABC's request to the US Attorney General to investigate Haymon," and pledged that "[t]he [WBO] is willing to cooperate with any investigation of the US Attorney General for the betterment of the sport of boxing."

53.     Because Haymon is acting as both promoter and manager, he enjoys an unfair and illegal advantage over Top Rank and other legitimate boxing promoters.  Legitimate boxing promoters must comply with extensive regulatory requirements at both the federal and state level.  Haymon's defiance of the law acts to the detriment of boxers, legitimate promoters, and ultimately the viewing public.

### *Waddell & Reed Invests Nearly Half a Billion Dollars in Haymon*

54.     In order to achieve his monopolistic ambitions, Haymon needed two things:  money and assistance.  He found both in Waddell & Reed.

55.     Haymon's relationship with Waddell & Reed began when Ryan Caldwell, a senior executive and portfolio manager with Waddell & Reed Financial and two of its investment management subsidiaries, was presented with an opportunity to meet with Al Haymon.  An avid boxing fan with ambitions to "own live sports,"[2] Caldwell leapt at the chance.  After meeting Haymon Caldwell ultimately agreed that Waddell & Reed would invest nearly **half a billion dollars** in Haymon in at least two stages:  an initial transfer on August 29, 2013, and another on October 31, 2013.  Waddell & Reed funneled the cash into the entity now known as Haymon Holdings.  Al Haymon himself serves as Haymon Holdings' Chairman of the Board and CEO, and personally controls three-fifths of the company's Board of Directors.  Haymon Holdings is in turn the managing parent company of Haymon Sports.

56.     This enormous cash influx has allowed Haymon to buy up, and buy out, virtually all aspects of boxing promotion—to the exclusion and detriment of Top Rank and other legitimate promoters.   His anticompetitive and exclusionary conduct has taken many forms, including but not limited to those alleged below.

*Exclusionary Contracts With Championship-Caliber Boxers*

57.     Haymon "locks in" talent on the management side and then prevents his boxers from "contract[ing] with those promoters they personally choose," which is an arrangement the Ali Act forbids.  S. Rpt. No. 106-83, at 8–9 (June 21, 1999).  Flush with cash from Waddell & Reed, Haymon uses signing bonuses and the promise of exorbitant future purses to induce top boxing talent to enter into long-term exclusive contracts with illegal, restrictive, and anticompetitive terms.  These

_____

[2] Bill King, *Boxing's Grand New Stage*, SPORTS BUS. J., April 20, 2015, http://www.sportsbusinessdaily.com/Journal/Issues/2015/04/20/In-Depth/Main.aspx.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF SHERMAN ACT AND CALIF. UNFAIR COMPETITION LAW

1   agreements carry lengthy terms of no less than three years, and can be five years or

2   longer.  The terms can be automatically extended by additional years if the boxer

3   meets certain conditions.

4        58.   Haymon signs most of his management agreements—which he often

5   characterizes as "advisor" contracts—on behalf of Haymon Development (Haymon

6   submitted his application to become a Nevada-licensed boxing manager "c/o

7   Haymon Development").  In some instances, Haymon signs these managerial

8   agreements on behalf of Haymon Sports.  Haymon Holdings is the managing

9   member of Haymon Sports.  Regardless of which Haymon entity is designated as

10  the contracting party, in all instances, these managerial agreements not only lock up

11  managerial rights, but also restrict the Championship-Caliber Boxers from entering

12  into any other agreement related to their boxing careers, including those relating to

13  ***promotional rights***.

14       59.   The restriction is express.  The contracts explicitly grant Haymon the

15  "***sole and exclusive*** right to render services on behalf of ATHLETE in connection

16  with ATHLETE's participation in professional boxing contests or exhibitions and

17  in connection with ATHLETE's participation in entertainment performances,

18  personal appearances and endorsements and/or sponsorship opportunities arising

19  out of or related in any way to ATHLETE's boxing career" (emphasis added).

20  Under the heading "EXCLUSIVE ADVISORY RIGHTS," these contracts also

21  provide that Haymon shall "publicize and ***promote*** the talents and abilities of

22  ATHLETE through various forms of media" (emphasis added).  As if to further

23  drive home the point that Haymon controls ***all*** aspects of the boxer's career,

24  including promotion, these contracts additionally provide as follows:

25       C.   During the Term of this Agreement, ATHLETE agrees to
    render services solely and exclusively for ADVISOR and agrees that

26       he will not take part in or negotiate for any professional boxing
    contests whatsoever without first obtaining the written approval of

27       ADVISOR.

28

SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF SHERMAN ACT AND
CALIF. UNFAIR COMPETITION LAW

60.    The restriction that Haymon places on the boxer's choice of promoter is crafted as a purported "consent" or "sole discretion" clause—prohibiting each boxer from entering into any agreement with any promoter without Haymon's express prior consent, and vesting Haymon with "sole discretion" over promotional agreements.  These agreements contain provisions such as the following:

> (ii)    Fighter Actions.  From and after the Effective Date and continuing for the duration of the Term, Fighter shall not (directly or indirectly) enter into any agreement or arrangement (written or verbal), or grant any authority or power, relating to any Boxing Activities, without the prior written consent of Advisor, subject to applicable law.[3]

> (iii)    Promotional Agreements.  If during the Term hereof, Fighter desires to enter into any promotional agreement or bout agreement to which Fighter is not then bound, selection of the promoter shall be at the sole discretion of the Advisor.

As a further restriction on the boxers' promotional rights, these agreements also grant Haymon the authority to "publicize and *promote* the talents of and abilities of Fighter through various forms of media" (emphasis added).

61.    Even under this latter iteration of Haymon's managerial contracts, Haymon's control over Championship-Caliber Boxers' promotional rights is protected three times over.  *First*, Haymon prohibits his boxers from freely "enter[ing] into any agreement" relating to "Boxing Activities" without his own prior written consent.  *Second*, the contract vests in Haymon the "sole discretion" to "enter into any promotional agreement."  On its face, this provision dispossesses the boxer of his innate right to choose a promoter—a right the Ali Act specifically seeks to protect—and transfers it to Haymon himself.  *Third*, the contract specifically authorizes Haymon to "publicize and promote" the boxer.

---

[3] The term "Boxing Activities" is defined broadly to include all of "Fighter's activities within boxing, including (without limitation) his participation in bouts/exhibitions and other boxing-related events, personal appearances, endorsements and/or sponsorship opportunities arising out of or related in any way to Fighter's boxing career and activities."

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF SHERMAN ACT AND CALIF. UNFAIR COMPETITION LAW

62.     These various contractual provisions, whether crafted as express reservations of promotional rights, "consent" clauses, and/or "sole discretion" causes, function ***in actual practice*** as exclusionary "tie outs," which prevent Haymon's Championship-Caliber Boxers from contracting with Top Rank or any other legitimate promoter.  The Sherman Act condemns contractual "tying" arrangements, whereby a supplier conditions the purchase of one good or service (the "tying" product) on the customer's agreement to purchase a separate good or service (the "tied" product) from that same supplier or an agreement to ***not*** purchase the separate good or service from an alternative supplier.  This latter species of tying is sometimes referred to as a "tie out" or "negative tying."  "Tie outs" may be express or established through a course of conduct.  For example, if a contract requires the supplier's consent or approval before the customer can procure a separate good or service from a competitor, but the supplier does not in practice give such consent or approval, the contract may violate the Sherman Act as an unlawful "tie out."  The question is one of substance, not form.

63.     As a condition of receiving his managerial services, Haymon requires boxers to turn over to him all control over their promotional rights.  As established by a lengthy course of conduct, Haymon's managerial contracts ***actually function*** as unlawful "tie outs" with respect to Top Rank and other legitimate promoters.  Haymon ***has never consented, and will not consent,*** to the Championship-Caliber Boxers in his stable entering into promotion contracts with Top Rank, Main Events, or other legitimate competitors.  The same is true of Main Events.  Since settling with Golden Boy in 2014,[4] Haymon ***has never consented, and will not consent***, to the Championship-Caliber Boxers in his stable entering into promotion contracts with Golden Boy.

---

[4] In 2014, Golden Boy settled a dispute with its former CEO Richard Schaefer and Haymon.  Haymon signed that settlement agreement on behalf of Haymon Development, Haymon Holdings, and Haymon Sports.

- 25 -

64.   **_Haymon has specifically singled out Top Rank_**.  In fact, while serving as CEO of Golden Boy, Schaefer expressed to his colleagues that Golden Boy did not have to worry about Haymon fighters signing with Top Rank because Haymon had specifically represented to him that he would never allow that to happen.  And, in fact, **_Haymon never has_**.  This categorical exclusion has caused specific, direct, and unequivocally actionable injury to Top Rank.

65.   Thus, **_in practice_**, Haymon's managerial contracts preclude the Championship-Boxers in Haymon's stable from entering into promotional contracts with Top Rank and other legitimate competitors—whether by expressly reserving "EXCLUSIVE ADVISORY RIGHTS" that give Haymon total control over all aspects of the boxer's career, or by vesting in Haymon "consent" rights or "sole discretion" over any and all promotional contracts.  The simple reality is that, no matter how each particular contract is drafted, Haymon **_in fact_** exercises and exploits his contractual rights to prevent his Championship-Caliber Boxers from signing with Top Rank or other rival promoters.  This allows Haymon himself and his companies (specifically, Haymon Sports and Haymon Boxing) to act as promoter to his clients, either on their own or (as further alleged below) with the assistance of "sham" promoters, who rent out their promotional licenses to Haymon in return for a fee.  In truth, the "consent" and "sole discretion" provisions are just another illusory artifice of the Haymon fraud.  In antitrust cases, the economic substance of the relationship is dispositive, not the form or precise words.  Most anticompetitive written contracts do not specifically delineate the desired and actual exclusive intent, but that can be deduced from the relevant parties' behavior. If, because of Haymon's dominant market power, Championship Caliber Boxers want or need the management services of the Haymon Defendants (the "tying product"), they must accept and rely on the illegal and unlicensed promotional services of the Haymon Defendants (the "tied product") and reject the promotional services of the Golden Boy plaintiffs or of any other legitimate promoter (the "tied out" Product).

1

2

**Specific Injuries to Top Rank Resulting from Haymon's**

**Contractual Exclusion, Constituting Actionable Antitrust Injuries**

3       66.     By conditioning the provision of managerial services on boxers'

4    agreement to **_not_** freely contract with legitimate promoters—both through

5    exclusionary contractual terms and as demonstrated through Haymon's actual

6    course of dealing—Haymon excludes Top Rank and other legitimate promoters

7    from contracting with and promoting the Championship-Caliber Boxers in his

8    stable.  Haymon's contracts function, in practice, so as to categorically exclude or

9    "tie out" Top Rank.  **_This injury is not speculative or hypothetical._**  On many

10   occasions Top Rank attempted to negotiate with and promote Championship-

11   Caliber Boxers who are managed by Haymon, and **_without exception_** has been

12   precluded from entering promotional contracts with them.  Illustrative (but not

13   exhaustive) examples include:

14              A.    **Deontay Wilder**:  In February 2015, Carl Moretti, VP of

15                    Boxing Operations at Top Rank, reached out to Wilder, a

16                    heavyweight champion, through a third party to discuss a

17                    promotional agreement with Top Rank.  The third party reported

18                    back that because Wilder was with Haymon, he could not sign

19                    with Top Rank.

20              B.    **Keith Thurman**:  In October 2014, while in Tampa, Florida,

21                    Carl Moretti reached out to Thurman's trainer to discuss a

22                    promotional deal.  The trainer informed Moretti that Thurman

23                    could not enter a promotional deal with Top Rank because

24                    Thurman was under a managerial contract with Haymon and

25                    Haymon would not permit it.

26              C.    **Marcos Maidana**:  Todd duBoef, President of Top Rank, met

27                    with Maidana's representative in 2014 and proposed a

28                    promotional contract.  duBoef proposed specific fights that Top

- 27 -

1    Rank would offer Maidana.  Maidana's representative explained

2    that Maidana had an "advisor" contract with Haymon that

3    required Haymon's consent to any promotional contract and

4    terminated further negotiations.

5    D.    **Adrien Broner**:  In 2013, Broner met with Top Rank CEO Bob

6    Arum at his home in Los Angeles, where Arum proposed a

7    promotional contract to him.  Broner said he was interested and

8    promised to get back to Arum about the offer—but ultimately

9    never did.  Arum was later informed that Broner could not sign

10    with Top Rank because Haymon would not consent to Broner

11    being promoted by Top Rank.

12    E.    **Lamont Peterson**:  In 2013, Carl Moretti spoke to Peterson's

13    trainer about promoting Peterson.  Moretti was told that because

14    Peterson was "with Haymon," he "cannot do that."

15    F.    **Abner Mares**:  Mares was previously promoted by Golden Boy.

16    After that agreement expired, Todd duBoef  reached out to

17    Mares' representative in 2014 to discuss a promotional contract.

18    Top Rank discussed the terms with Mares' representative,

19    including specific bouts with specific opponents.  However,

20    after Mares signed a managerial contract with Haymon, Mares

21    and his team to cut off further communication with Top Rank.

22    G.    **Errol Spence**:  In 2012, Top Rank matchmaker Bruce Trampler

23    was making arrangements through Spence's trainer for Spence

24    to fly to Las Vegas to work out a promotional contract with Top

25    Rank.  Before the trip, however, the trainer called Trampler to

26    inform him that Spence would not be coming because he had a

27    deal with Haymon and therefore could not sign with Top Rank.

28

- 28 -

67. As these examples make abundantly clear, Haymon's long-term contracts with Championship-Caliber Boxers function, in practice, as exclusive, exclusionary deals as to Top Rank. In summary:

A. **No Haymon fighter has *ever* signed a promotional contract with Top Rank.**

B. Almost all Haymon fighters do not even engage with Top Rank to discuss promotional contracts because they know Haymon will never consent.

C. Haymon's repeated statements to Gomez and Schaefer make clear these repeated refusals to Top Rank are not mere coincidences. Rather, they are part of a systematic scheme to exclude Top Rank.

68. It is not only the Championship-Caliber Boxers who have expressly rejected Top Rank because of their managerial contracts with Haymon that matter. Other Championship-Caliber Boxers will not even speak to Top Rank because of the stranglehold Haymon has over them. Given that Haymon has never allowed a single Championship-Caliber Boxer managed by him to sign a promotional contract with Top Rank, Top Rank need not undertake the futile act of asking over and over again. The practical reality is that any Championship-Caliber Boxer who is managed by Haymon is off-limits to Top Rank.

69. Haymon has also consistently excluded Golden Boy, Main Events, and every other legitimate promoter from contracting with and promoting the Championship-Caliber Boxers in his stable as well. For example, Golden Boy has repeatedly sought, but been denied, promotional contracts with the following Haymon-contracted boxers: Antonio Tarver; Shawn Porter; Gary Russell; Daquan Arnett; Errol Spence; Robert Easter Jr.; Jamel Herring; Dominic Wade; Daniel Jacobs; Jermall Charlo; Michael Hunter; Prichard Colon; Marcus Browne; Terrell Gausha; Rau'shee Warren; Dominic Braezeale; John Molina; Beibut Shumenov;

1   Justin DeLoach; Andre Direll; David Grayton; Thomas Williams; and Julian

2   Williams.  Golden Boy has often been told by Championship-Caliber Boxers or

3   their representatives that Haymon would not consent to the proposals.  In fact, ever

4   since Golden Boy settled with Schaefer and Haymon, Haymon has categorically

5   refused to permit *any* of his Championship-Caliber Boxers to enter into any

6   promotional agreement with Golden Boy.

7          70.    This fact bears repeating:  Al Haymon is only licensed as a boxing

8   manager.  And yet, pursuant to Championship-Caliber Boxers' managerial contracts

9   with Haymon (which Haymon typically signs on behalf of Haymon Sports or

10  Haymon Development), Haymon is in fact blocking these boxers from entering into

11  promotional contracts with Top Rank and other legitimate promoters.  Because

12  Haymon possesses immense power in the market for domestic managers of

13  Championship-Caliber Boxers, the effect of these exclusionary contracts on the

14  market for domestic promoters of Championship-Caliber Boxers is substantial,

15  resulting in millions of dollars of lost revenue among legitimately licensed

16  promoters, including Top Rank.

17         71.    Haymon's exclusionary agreements have significantly undermined

18  competition in the market for domestic promoters of Championship-Caliber Boxers,

19  since Haymon uses the agreements to categorically exclude from Top Rank and

20  other rival promoters from competing for contracts with a majority of the

21  Championship-Caliber Boxers.  As a direct and proximate result of this exclusion,

22  Top Rank has been unable to sign *any* of the Championship-Caliber Boxers in

23  Haymon's stable, resulting in significant lost profits.  But for Haymon's

24  exclusionary contracts, many of the Championship-Caliber Boxers in Haymon's

25  management stable would in fact contract with Top Rank, and Top Rank would in

26  fact earn tens of millions of dollars (if not more) from promoting those boxers.

27  Absent Haymon's exclusionary and illegal conduct, Top Rank and other legitimate

28

SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF SHERMAN ACT AND
CALIF. UNFAIR COMPETITION LAW

1    promoters would also be more effective rivals and better able to compete in the

2    market for domestic promoters of Championship-Caliber Boxers.

3        72.    The effects of the Haymon's exclusionary contracts with

4    Championship-Caliber Boxers have been felt in California, where Haymon

5    routinely promotes bouts involving Championship-Caliber Boxers.  Were it not for

6    the "tie out," Top Rank would have contracts with several Championship-Caliber

7    Boxers currently in Haymon's stable, and would promote bouts for those boxers at

8    California venues.

9                          *Attempted Elimination of Golden Boy*

10       73.    Haymon's coercive and exclusionary managerial agreements are only

11   one aspect of Defendants' anticompetitive scheme.  In late 2013, Haymon

12   attempted to surreptitiously undermine competition in the boxing promotion

13   business by having Waddell & Reed acquire one of the industry's premier

14   promoter, Golden Boy Promotions, on his behalf.

15       74.    On September 30, 2013, Ryan Caldwell signed a Letter of Intent with

16   Golden Boy on behalf of Waddell & Reed Investment Management Co.

17   ("WRIMCO") and an affiliated company, Media Group Holdings LLC ("MGH").

18   The Letter of Intent provided that MGH, designated as the "Buyer," would

19   purchase all of the outstanding equity securities of Golden Boy for $100 million

20   through a separate and newly formed acquiring entity.  Two days after the Letter of

21   Intent was executed, MGH's counsel (Latham & Watkins LLP) formed KO

22   Acquisition LLC as the designated entity to acquire Golden Boy.

23       75.    Though MGH was designated as the Buyer, Haymon was directly

24   involved in the transaction.  Only two days before ***KO Acquisition*** LLC was

25   formed (*i.e.*, on the same day Caldwell signed the Letter of Intent), Haymon

26   formally changed the name of one of his companies to ***KO Holdings*** LLC.[5]

27   _____

28   [5] KO Holdings LLC was subsequently renamed Haymon Holdings LLC.

SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF SHERMAN ACT AND
CALIF. UNFAIR COMPETITION LAW

Additionally, on the *same day* that Latham & Watkins formed KO Acquisition LLC, Latham & Watkins also formed Haymon Sports LLC.

76.     The draft deal documents reveal that Haymon did not intend for Golden Boy to continue operating as a robust competitor in the promotion business. Rather, Haymon intended to *eliminate* Golden Boy—one of his biggest rivals in the market for promoting Championship-Caliber Boxers.  For example, the draft Securities Purchase Agreement placed several "Conditions" on MGH's obligation to purchase Golden Boy, which included the following:

(r)     Venue Agreements.

(i)     The Company [*i.e.*, Golden Boy Boxing, LLC] shall have delivered, or caused to be delivered, to the Buyer [*i.e.*, KO Acquisition], a written waiver and release, in form and substance reasonably satisfactory to the Buyer, from each of the applicable venue owner-operators under the Venue Agreements, in each case, waiving and releasing any and all claims of such owner-operator against the Company and/or the applicable Company Subsidiary with respect to any and all breaches (known or unknown) under such Venue Agreement prior to the Closing Date.

(ii)     Golden Boy Promotions, Inc. shall have entered into an amendment to the AEG Venue Agreement (x) granting Golden Boy Promotions, Inc. the exclusive right to promote all professional boxing events at the Venues (as defined in the AEG Venue Agreement) during the remainder of the term of the AEG Venue Agreement and (y) reducing the number of events to be organized and promoted by Golden Boy Promotions, Inc. during the remainder of the term of the AEG Venue Agreement to a number reasonably satisfactory to Buyer, and otherwise on such terms that are reasonably satisfactory to the Buyer, and the Company shall have delivered to the Buyer a true, correct and complete copy of such amendment.

(iii) Golden Boy Promotions, LLC shall have entered into an amendment to the Barclays Venue Agreement reducing the number of events to be organized and promoted by Golden Boy Promotions, LLC during the remainder of the term to the Barclays Venue Agreement to a number reasonably satisfactory to the Buyer, and otherwise on such terms that are reasonably satisfactory to the Buyer, and the Company shall have delivered to the Buyer a true, correct and complete copy of such amendment.

77.     As a condition of the acquisition, Haymon and MGH required Golden Boy to obtain exclusive promotion rights at AEG venues and then "reduc[e] the number of events to be organized and promoted by Golden Boy Promotions" under

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF SHERMAN ACT AND CALIF. UNFAIR COMPETITION LAW

the AEG agreement "to a number reasonably satisfactory to the Buyer."  Similarly, Haymon and MGH required as a condition of the acquisition that Golden Boy "reduc[e] the number of events to be organized and promoted by Golden Boy Promotions, LLC" under a venue agreement with Barclays "to a number reasonably satisfactory to the Buyer."  Rather than ensuring Golden Boy's continued competition in the promotion space, the acquisition would have required Golden Boy to ***deliberately reduce its output***—to promote fewer fights—at  top venues affiliated with AEG and Barclays.  This contractual provision constitutes direct evidence of Haymon's specific intent to reduce and eliminate competition in the market for promoting Championship-Caliber Boxers.

78.     Ultimately, Golden Boy rejected MGH's attempts to buy the company, largely because of onerous anticompetitive restrictions the deal documents would have imposed on Golden Boy's founder, Oscar De La Hoya.  Unable to buy out and eliminate the competition directly, Haymon and his accomplices set out to do it indirectly.

### *Illegal Promotional Activities*

79.     Haymon may have failed in his attempt to have MGH buy out an established California-based promoter, but that has not stopped him from illegally participating and destroying competition in the boxing promotion market.  With hundreds of millions of dollars in his pocket from Waddell & Reed, Haymon has used signing bonuses and promises of exorbitant future purses to induce numerous Championship-Caliber Boxers—including many boxers formerly under contract with Golden Boy—to sign on to long-term managerial or "advisor" contracts.  As previously alleged, Haymon exploits these contracts to prevent his boxers from entering promotional deals with Top Rank, Golden Boy, and other rival promoters.

80.     Having prevented his boxers from contracting with legitimate promoters, Haymon himself brazenly acts as an unlicensed and illegal promoter for his clients' bouts.  Haymon does not merely perform ***some*** promotional functions;

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF SHERMAN ACT AND CALIF. UNFAIR COMPETITION LAW

rather he is "the person primarily responsible for organizing, promoting, and producing [his fighters'] professional boxing match[es]." 15 U.S.C. § 6301(9) (Ali Act definition of "promoter"). To be clear, however, a licensed boxing manager need not satisfy the Ali Act's definition of "promoter" in order to violate the "firewall" provision. Rather, a manager violates the "firewall" merely by (i) "hav[ing] a direct or indirect financial interest in the promotion of a boxer, or (ii) being "employed by or recev[ing] compensation or other benefits from a promoter." 15 U.S.C. § 6308(b)(1)(B).

81.    Haymon is intimately involved in all aspects of promotion.

82.    Haymon conceals his role in promoting these bouts by employing "sham" promoters or "frontmen"—nominal promoters who are in fact controlled by Haymon. Haymon's network of "sham" promoters includes, but is not limited to, Warriors Boxing, Mayweather Promotions, Lou DiBella and DiBella Entertainment, Tom Brown and TGB Promotions, Group Yvon Michel (GYM) Promotions, Leon Margules, and Luis DeCubas, Jr. For a fee, these (and other) sham promoters effectively rent their promoters' licenses to Haymon and function in a perfunctory role under his direct instruction. Ultimately, however, the money passes through Haymon's accounts, and Haymon makes all material decisions.

83.    In response to recent public criticism of Haymon's disregard for the Ali Act's "firewall," one of Haymon's frontmen, Lou DiBella, has stated: "Nothing says that a manager can't utilize the services of a promoter." This is false. The Ali Act plainly prohibits "collusion between manager and promoter." *Main Events Productions, LLC v. Lacy*, 358 F. Supp. 2d 391, 398 (D.N.J. 2004). Haymon may attempt to conceal his illicit promotional activities by "utiliz[ing] the services" of frontmen like DiBella, but the reality is undeniable: Haymon simultaneously serves as manager and promoter to his clients, and thereby obtains a "direct or indirect financial interest in the promotion of . . . boxer[s]," in violation of the Ali Act. 15 U.S.C. § 6308(b)(1)(B)(i).

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF SHERMAN ACT AND CALIF. UNFAIR COMPETITION LAW

84.     Haymon's brazen illegal activities were recently put on public display. In April 2015, a boxer named Julio Cesar Chavez, Jr. competed against Andrzej Fonfara in Carson, California.  After the fight, Chavez, Jr. posted on the popular social networking site Instagram a picture of a $1,750,000 million check made out to his personal company, Chavez Jr. Promotions, LLC.  The payor:  Defendant Haymon Sports, of which Defendant Haymon Holdings is the managing member. The following is written in the Notes section of the $1,750,000 check:  "Purse 4/18/15."



The transaction could hardly be more explicit—Haymon Sports paid nearly $2 million of Chavez Jr.'s "purse" for the bout against Fonfara.  Paying the purse is a classic promoter responsibility, *not* the job of a true manager.  Telingly, Chavez Jr.'s Instagram post was removed minutes after it appeared on the Internet site.

SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF SHERMAN ACT AND
CALIF. UNFAIR COMPETITION LAW

85.     Haymon's boxers themselves recognize the nature of Haymon's role. Following a September 26, 2015 bout against Vicente Sandez, Haymon boxer Charles Martin publicly thanked his "promoter Al Haymon":

 **Dan Rafael** 
@danrafaelespn

Just watched Charles Martin score a KO3 on NBCSN. In his interview after the bout he thanked "my promoter Al Haymon." Hmmmmmmmmmm.

86.     While Haymon's sham promoters may in some instances formally execute contracts with venues, sponsors, broadcasters, and other stakeholders, and may submit those contracts to state athletic commissions, they do not control the negotiations.  Rather, Haymon directs everything himself.  It is Haymon who acts as the promoter for the boxers' matches, even if his name does not appear on every contract.

87.     There is absolutely no question that, frontman or not, license or not, Haymon makes the promotional decisions with regard to such matters as broadcaster, ticket prices, and presentation, and others. By way of illustration, recently there was a PBC show in California.  The ostensible promoter was an entity called TB Goossen.  All promotional advertising for the show reflect that it was a PBC show and according to news reports every single featured boxer (of which there were six) were signed to Haymon management or advisory contracts. However, no contracts were filed reflecting Haymon's involvement either as a manager or promoter.

88.     The fact that Haymon may pay his frontmen a fee to carry out some logistical tasks does not change the fact that Haymon himself is the real and

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF SHERMAN ACT AND CALIF. UNFAIR COMPETITION LAW

primary promoter—or as the Ali Act puts it, "the person primarily responsible for organizing, promoting, and producing a professional boxing match."  15 U.S.C. § 6301(9).  Nor does Haymon's use of frontmen change the fact that the money associated with promoting Haymon's boxers is flowing into and out of Haymon-controlled accounts, as evidenced by the Haymon Sports "Purse" check to Julio Cesar Chavez Jr.  In paying the promotional expenses—and reaping the profits—Al Haymon, Haymon Sports, Haymon Boxing, and (in all likelihood) other companies controlled by Haymon obtain a "direct or indirect financial interest in the promotion of a boxer," in violation of the Ali Act. 15 U.S.C. § 6308(b)(1)(B)(i).  Blocking other promoters through exclusionary tactics so that Haymon can profit through PBC-promoted fights is a direct interest in the promotion of a boxer as well.

89.     Industry observers widely recognize that Haymon himself acts as the true and primary promoter for his boxers.  For example, Haymon was hailed as the "main promoter" for the immensely lucrative bout on May 2, 2015 between Floyd Mayweather and Manny Pacquiao.  In violation of law, Haymon directly and personally negotiated contracts with the venue, the broadcaster, and sponsors.  Top Rank witnessed this first hand.  Haymon himself reaped millions of dollars for his role in promoting the bout.

90.     Communications that would ordinarily be directed at a boxer's promoter go straight to Haymon instead.  When the International Boxing Federation (the "IBF") proposes fights, for instance, it ordinarily contacts each boxer's promoter.  But in the case of Haymon's boxers, all communications from the IBF are directed to Haymon himself or his assistant, Sylvia Browne-Owens.

91.     Haymon is violating state laws and regulations that require the promoters to apply for, obtain, and maintain an active promoter license in order to promote a boxing event.  Haymon has been the primary promoter for events in more than a dozen states—including Alabama, Arizona, California, Connecticut, Florida, Illinois, Massachusetts, New Jersey, Nevada, New York, Pennsylvania,

SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF SHERMAN ACT AND
CALIF. UNFAIR COMPETITION LAW

Texas, Virginia, and Washington—without possessing a valid promoter's license, as the laws of those states require. *See, e.g.*, Calif. Code Regs. title 4, § 213 (boxing promoters must obtain licenses, which requires, *inter alia*, proof of "financial responsibility," at least $50,000 in liquid assets, proof of a Commission-approved short-term medical assistance insurance program, and demonstration that applicant has "necessary knowledge and experience to act as a promoter"); 225 Ill. Comp. Stat. § 105/10 ("[P]romoters must be licensed with and in good standing with the Department. . . .  A licensed promoter may not act as, and cannot be licensed as, a second, contestant, referee, timekeeper, judge, or manager."); *see also* Ala. Code § 41-9-96; Ariz. Rev. Stat. §§ 5-228, 229; Conn. Gen. Stat. 532a § 29-143j(e); Fla. Admin. Code. R. 61K1-1.005; 523 Mass. Code. Regs. 6.06; Nev. Rev. Stat. § 467.052; N.J. Rev Stat § 5:2A-14; N.Y. Comp. Codes R. & Regs., tit. 19, § 207.17; 58 Pa. Code § 21.6; Tex. Oc. Code Ann. §§ 2052.101, 102; 18 Va. Ann. Code § 120-40-120; Rev. Code Wash. § 67.08.030.  Instead, Haymon, through Haymon Sports and Haymon Boxing, enters agreements with "sham promoters" pursuant to which Haymon pays a fee to "rent" the promoter's license, even though Haymon conducts all material promotional negotiations, makes all material promotional decisions, and bears all or substantially all of the direct and indirect financial risks of the event.

92.     Acting as both promoter and manager, Haymon runs headlong into the precise conflict of interest the Ali Act is designed to prevent—to the detriment of his boxers, his boxers' would-be opponents, ***and*** legitimate promoters like Top Rank.  Each time Haymon, Haymon Sports, or another Haymon-controlled entity covers a promotion expense (such as paying the purse) or collects promotional revenues (including the millions Haymon personally reaped from promoting the Mayweather/Pacquiao bout), Haymon takes a "direct or indirect financial interest in the promotion of a boxer"—in blatant violation of federal and state law.  15 U.S.C. § 6308(b)(1)(B)(i); *see also, e.g.*, Calif. Code Regs. title 4, § 396.  And because

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF SHERMAN ACT AND CALIF. UNFAIR COMPETITION LAW

Haymon is intimately involved in all aspects of promoting his fighters' bouts, making all material decisions with respect to venue, broadcast rights, ticket distribution, sponsorship, purse size, and so on, he plainly meets the statutory definition of "promoter": "the person primarily responsible for organizing, promoting, and producing a professional boxing match." 15 U.S.C. § 6301(9). This in spite of the fact that he is **only** licensed as a manager.

93.     By traversing the Ali Act's "firewall" and acting outside of regulations that apply to licensed promoters, Haymon gains an unfair advantage over Top Rank and other legitimate promoters.  Unlike Haymon, Top Rank does not do business on both sides of the "firewall"—which means that it has no way of fully competing "on the merits" with Haymon.  As a direct and proximate result of Haymon's illegal promotional activities, Top Rank has suffered an unfair business disadvantage vis-à-vis Haymon.  Moreover, Haymon's illegal promotional activities have caused Top Rank to incur significant lost profits:  if Haymon abided by the Ali Act's "firewall" provision, many of the Championship-Caliber Boxers he manages would enter into promotional contracts with Top Rank.

94.     As ABC described in its letter to Attorney General Loretta Lynch:

> While Haymon hires certain promoters to run the local aspect of the show, the television contracts run through the Haymon controlled entities, purses for the major fighters on the card are set by Haymon controlled entities, the production format is set by the Haymon controlled entities. . . .

> . . . [T]he funding for the PBC series comes exclusively from Haymon controlled entities, the purses are set by Haymon controlled entities, the selection of the main event fighters is controlled by Haymon controlled entities and the format is controlled by Haymon controlled entities. . . .

### *Blocking Fights With Non-Haymon Boxers*

95.     Haymon does not simply prevent his boxers from entering into promotional contracts with Top Rank and other legitimate promoters.  He also refuses to allow his Championship-Caliber Boxers to participate in certain fights

- 39 -

with non-Haymon boxers, and induces the boxers under his control to forego significant earnings, all for the purpose of harming legitimate promoters. As a result of this exclusionary conduct, boxers' careers have been damaged, consumer welfare has been diminished, and Top Rank and other legitimate promoters have been denied significant promotional opportunities.

96.     In 2014, for example, boxing promoter Roc Nation (which is owned by recording artist and entrepreneur Jay Z) won a $1.9 million purse bid to promote a fight between Peter Quillin and Matt Korobov, who is promoted by Top Rank. Quillin was an undefeated WBO middleweight champion who stood to earn $1.4 million for the fight—***more than three times*** larger than any previous payday he had seen. He was also a new father. Top Rank itself stood to benefit substantially from the bout—financially from a fee for the use of Korabov's services, and reputationally from guiding one of its fighters to world championship status. Nonetheless, at the direction of his "advisor" Al Haymon, Quillin turned down the fight and relinquished his title. As was reported in the press, "It's most likely that Quillin dropping the title was a move orchestrated by Haymon to keep Jay Z out of his business."[6] As one Roc Nation executive wondered, "Who turns [down] $1.4 million and gives up his belt for nothing?" Because of Haymon's conduct, Top Rank was directly injured and lost out on the promotional fee, the value of being associated with a championship event, and the reputation of being a promoter who helps guide its fighters to the pinnacle of the sport.

97.     Haymon cannot plausibly claim that Quillin gave up the $1.4 million purse in favor of a better opportunity. After forfeiting his title, Quillin's very next bout (against Andy Lee in April 2015) carried only a $500,000 purse.

---

[6] Kevin Iole, *Peter Quillin Passes on Career-high $1.4 Million, Dumps WBO Middleweight Belt*, YAHOO! SPORTS, Sept. 4, 2014, https://sports.yahoo.com/ blogs/boxing/peter-quillin-passes-on-career-high--1-4-million--dumps-wbo-middleweight-belt-195021380.html.

- 40 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF SHERMAN ACT AND CALIF. UNFAIR COMPETITION LAW

98.     Haymon has blocked other fights involving Top Rank's boxers as well. For example, in March 2015, the IBF contacted Top Rank and Haymon (through Silvia Browne-Owens) regarding a potential match between Tim Bradley, whom Top Rank promotes, and Haymon boxer Amir Khan.  Top Rank accepted the offer on behalf of Bradley, but Haymon rejected the offer so as to deprive Top Rank of a valuable promotional opportunity and Bradley of a chance to advance his career. Remarkably, Haymon apparently rejected the offer ***without ever discussing the opportunity with Khan***.  When reporters questioned Khan about the rejected fight against Bradley, Khan stated:  "I have not been approached.  I cannot believe when I heard that.  They tried to put me down by saying that I was offered Bradley in an eliminator and I turned it down so now they are going to put someone else in like Frankie Gavin.  That's bullocks because I had nothing offered to me."  The fight never happened.

99.     There are other instances in which Haymon prevented the Championship-Caliber Boxers in his stable from participating in bouts against boxers under contract with other promoters—even though boxing fans have clamored for these matches, and even though refusing these fights may have been detrimental to the careers of his own boxers (to say nothing of the careers of the would-be opponents).  These include, but are not limited to, the following examples:

A.     Adonis Stevenson (Haymon) vs. Sergey Kovalev (Main Events), proposed for March 2014.

B.     Adonis Stevenson (Haymon) vs. Bernard Hopkins (Golden Boy), proposed for July 2014.

C.     Andrzej Fonfara (Haymon) vs. Sergey Kovalev (Main Events), proposed at various times.

D.     Artur Beterbiev (Haymon) vs. Sergey Kovalev (Main Events), proposed for August 2015.

SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF SHERMAN ACT AND
CALIF. UNFAIR COMPETITION LAW

1    100.   When Haymon repeatedly blocks matches between his own

2    Championship-Caliber Boxers and fighters promoted by Top Rank, Golden Boy,

3    Main Events, or Roc Nation, then everyone loses—except for him.  Consumers do

4    not receive the match-ups that they would most like to see.  Boxers are denied

5    valuable career opportunities.  Legitimate promoters are deprived of lucrative

6    bouts.  Due to Haymon's ability to effectively control output in the sport—which

7    stems from the dominant positions he holds in the relevant markets for managing

8    and promoting Championship-Caliber Boxers—other industry players have little

9    choice but to bow to his anticompetitive and self-serving demands (as further

10   alleged below).  As Haymon's power grows, boxers face mounting pressure to sign

11   with him or suffer irreparable damage in their careers—which only gives Haymon

12   *more* power in these relevant markets.   In a competitive market, the potential for

13   matchups is unlimited.  In the Haymon-dominated boxing world, output is

14   constrained, as only a fraction of these potential fights can happen.  The harm to

15   consumers is already evident, as ratings for the PBC broadcasts continue to

16   plummet and Haymon has been forced to give away tickets to fights.

17   101.   As a direct and proximate result of Haymon's "tie out" contracts,

18   illegal promotional activities, and exclusionary conduct, Top Rank and other

19   legitimate promoters have been excluded from promoting lucrative bouts between

20   their clients and many Championship-Caliber Boxers in Haymon's stable, including

21   but not limited to the proposed bouts that Top Rank specifically identifies above.

22   But for Haymon's exclusionary and illegal conduct, Top Rank would have been

23   able to promote many more bouts involving Haymon-managed Championship-

24   Caliber Boxers, and would have made millions of dollars from doing so.  Absent

25   Haymon's exclusionary and illegal conduct, Top Rank and other legitimate

26   promoters would also be more effective rivals and better able to compete in the

27   market for domestic promoters of Championship-Caliber Boxers.

28   *Predatory "Payola" Practices*

SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF SHERMAN ACT AND
CALIF. UNFAIR COMPETITION LAW

102.   Before entering the boxing industry, Haymon was a music promoter who staged over 1,000 concerts.  His clients included artists like M.C. Hammer and Whitney Houston.  Given his background, it is not surprising that Haymon has engaged in an unlawful and anticompetitive practice that has historically been associated with the music business:  "payola."

103.   Payola is the practice of paying broadcasters in return for airtime.  In the music industry, record companies have at times been known to compensate or otherwise induce disc jockeys and radio stations to play their artists' songs more frequently.  Ultimately, Congress amended the Federal Communications Act to expressly prohibit undisclosed payola.  *See* 47 U.S.C. § 317.

104.   More recently, the New York Attorney General's Office conducted a large-scale investigation of payola in the music business, which was followed by a slew of antitrust suits.  While most of these cases settled quickly, in at least one instance a district judge—Judge Margaret M. Morrow of the Central District of California—issued a ruling on the complaints.  Judge Morrow denied a motion to dismiss, holding that the plaintiffs had adequately alleged that the defendants' payola practices caused them injury in violation of the Sherman Act.  *See Radikal Records, Inc. v. Warner Music Group Corp.*, No. 06-CV-1713 (C.D. Cal. Oct. 11, 2006), Dkt. No. 30.

105.   Acting as an illegal promoter, Haymon has engaged in a new and modified form of payola:  giving away content to broadcasters to air fights involving Haymon-promoted boxers, under the PBC banner; and paying for network support and exclusivity commitments.  With Waddell & Reed's several-hundred-million dollar investment in hand, Haymon has taken unprecedented steps to give away content and lock in television time with major broadcasters—to the exclusion of the legitimate boxing promoters who have traditionally aired their content on these channels.  Haymon is intentionally operating at a massive short-term loss in order to sustain and expand his illegal presence in the boxing

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF SHERMAN ACT AND CALIF. UNFAIR COMPETITION LAW

promotion business, and to exclude Top Rank and other rival promoters from accessing crucial distribution channels.  Haymon already has a dominant share of the English-speaking television broadcasters locked up.  If left unrestrained, Haymon will achieve a total monopoly, which will allow him to recoup his (and his investors') short-term losses.

106.   So far, Haymon has bought airtime for Premier Boxing Champions fights on over half a dozen major broadcasters.  These buys are substantial and far-reaching, with over 100 different show dates locked up with different broadcasters, leaving almost no room, dates, or opportunities for other promoters and other fighters, to the detriment of the consumers.  Specifically, Haymon has engaged in the following exclusionary time-buys:

A. **NBC**:  On or around January 30, 2015, it was announced that NBC and Haymon Boxing had reached a multi-year agreement, under which the NBC and NBC Sports networks would air 40 live PBC shows through the end of 2016.

B. **CBS**:  On or around February 17, 2015, it was announced that CBS and Haymon Sports had reached a multi-year agreement, under which CBS would air up to eight live PBC fights on network television in 2015 alone.  Haymon was and remains the sole provider of fights to CBS Sports.

C. **ABC/ESPN**:  On or around March 18, 2015, it was announced that ABC and ESPN had reached an agreement with Haymon Boxing to air PBC fights through July 2017.  The deal provided for 24 two-hour PBC cards, two of which would air on ABC. The remaining cards would air on ESPN, and would take the place of the long-running series *Friday Night Fights*.  Haymon received an option for six additional cards.  According to

SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF SHERMAN ACT AND
CALIF. UNFAIR COMPETITION LAW

1    ESPN's own reporting, "Haymon also has to pay the fighter
2    purses and the other expenses related to putting on an event."

3    D.   **Fox**:  On or around August 4, 2015, it was announced that Fox
4    had reached a multi-year deal with Haymon Sports, under which
5    Fox Sports 1 would air 21 PBC cards through June 2016.  Fox
6    announced that PBC would be its "exclusive boxing program."
7    On or around October 16, 2015, it was announced that the Fox
8    network would also air three PBC cards in 2016.

9    E.   **Spike TV**:  On or around January 22, 2015, it was announced
10   that Spike reached a multi-year agreement with Haymon Boxing
11   to televise monthly PBC fights on Friday evenings, beginning in
12   March 2015.  The agreement provided for at least 33 monthly
13   shows through 2017.

14   F.   **Bounce TV**:  On or around March 2, 2015, it was announced
15   that Bounce had reached an agreement with Al Haymon to air
16   *PBC The Next Round*, which would feature monthly prospect-
17   oriented cards, beginning in July 2015.

18   107.   While many of the details surrounding these transactions have not
19   been publicly disclosed, it has been reported that Haymon has agreed to give away
20   content and pay tens of millions of dollars for support and exclusivity, with millions
21   more set aside for "promotion and marketing."  It has also been reported that each
22   of the deals is exclusive.

23   108.   Haymon's aggressive "payola" scheme has been bankrolled by
24   Waddell & Reed.  When Haymon first laid out his vision for what was to become
25   PBC, Ryan Caldwell told Haymon:  "You have to be capitalized for three to five
26   years to do this.  To weather the storm.  Because in some regards you [are] going to

SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF SHERMAN ACT AND
CALIF. UNFAIR COMPETITION LAW

be the irrational player for a while."[7]  As previously alleged, Waddell & Reed transferred **hundreds of millions** to Haymon through MGH and Haymon Holdings.

109.   Haymon's scheme reverses the ordinary flow of money as between promoter and broadcaster.  Typically, the money flows from broadcaster to promoter, with the broadcaster paying for the right to distribute on television a promoter's content.  But as Caldwell himself has admitted, Haymon's illegal payola scheme turns this model "completely upside down."  Haymon, Haymon Sports, and Haymon Boxing **give away** the content and pay the broadcasters huge sums for marketing and other support and for exclusivity—all at a significant short-term loss.  Boxing industry insiders and analysts have estimated that Haymon's short-term losses with PBC may exceed **$200 million or more**.[8]

110.   These "payola" deals are predatory in the extreme.  By operating significantly below cost in the short term, Haymon is attempting to expand his (already unlawful) presence in the boxing promotion business, so that he can operate as a monopolist and recoup his losses in the long run.  Haymon and his companies are literally giving away content to take his product in order to eliminate competition from Top Rank and other legitimate promoters, all in the name of building a monopoly.  Once that objective is obtained, Haymon and his companies will more than recoup their upfront losses through supracompetitive pricing.  This expectation is explicit.  As Caldwell (who now serves as Chief Operating Operator for Haymon Sports) put it to Haymon at the outset, PBC would need sufficient capitalization to "be the irrational player for a while."  But once Haymon achieves a monopoly in the market for promoting Championship-Caliber Boxers, PBC's losses

---

[7] King, *supra* note 2 .

[8] *See id.* ("[I]t became clear that Haymon's company might have to bleed upward of $100 million—**and perhaps two to three times that much**—as it built a brand and an audience" (emphasis added)).

- 46 -

SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF SHERMAN ACT AND
CALIF. UNFAIR COMPETITION LAW

1   will turn to supracompetitive profits—to the detriment of television broadcasters

2   and consumers alike.

3         111.   Since Haymon's deals with NBC, CBS, Fox, ABC/ESPN, Spike TV,

4   and Bounce TV were announced, Top Rank, Golden Boy, Main Events, and other

5   legitimate promoters have been unable to air their own competing content on *any* of

6   these channels.  Because Haymon enjoys unparalleled dominance and power in the

7   markets for managing and promoting Championship-Caliber Boxers, he has the

8   power to demand these exclusionary terms, and is in fact exercising that power to

9   suppress competition and harm competitors.

10        112.   With hundreds of millions of dollars from Waddell & Reed, Haymon

11  can sustain this predatory strategy for *years*, if necessary, to achieve the monopoly

12  he seeks.  But it is not taking years.  Given that Haymon *already* possesses a

13  dominant share of the market for U.S. promoters of Championship-Caliber Boxers,

14  and now has exclusive deals with broadcasters who account for over 80 percent of

15  all televised English-language boxing programming in the United States this year.

16  Haymon has market power and dominance and there exists a dangerous probability

17  of achieving a monopoly (if he has not already obtained one)—at which point he

18  will recoup the predatory outlays he is presently incurring.

19              **Specific Exclusion of Top Rank from Distribution,**

20              **Constituting Actionable Antitrust Injuries**

21        113.   Already, Haymon's predatory "payola" payments and exclusive deals

22  with broadcasters have harmed Top Rank by shutting off broadcast opportunities.

23  By definition, *exclusive* agreements *exclude* all competitors—including Top Rank.

24  Indeed, Top Rank had advanced discussions with several broadcasters to distribute

25  Top Rank content.  In each instance, Top Rank's negotiations were cut off as a

26  result of the exclusive deals the broadcasters reached with Haymon:

27        A.    **Fox**:  In 2014, executives from Top Rank had discussions with

28              executives from the network Fox Sports 1 about a deal, pursuant

1   to which Fox would broadcast numerous boxing events

2   promoted by Top Rank on the Fox Sports 1 station.  Among

3   other things, Top Rank and Fox discussed the frequency and

4   quality of the events to be broadcast and certain formatting,

5   including a proposed day of the week on which the broadcast

6   would air, the "motto" for the event, and sponsors and

7   sponsorships.  A deal would have generated (1) substantial

8   benefit to Top Rank, including millions of dollars in revenue,

9   expanded viewership, notoriety, and a platform for talent; and

10   (2) substantial benefit to consumers.  In mid-2015, however,

11   Fox Sports informed Top Rank that they needed to terminate the

12   discussions because Fox was entering into an exclusive

13   agreement with Haymon.

14   B.   **Spike TV**:  Beginning in 2013 and continuing through 2014,

15   executives from Top Rank had discussions with executives from

16   the network Spike about structuring a broadcast deal for a

17   boxing product on Spike.  Under the structure, Spike would

18   broadcast numerous boxing events promoted by Top Rank.

19   Among other things, Top Rank and Spike discussed the date and

20   frequency of the events to be broadcast.  A deal would have

21   generated (1) substantial benefit to Top Rank, including millions

22   of dollars in revenue, expanded viewership, notoriety, and a

23   platform for talent; and (2) substantial benefit to consumers.   In

24   late 2014, however, the executives from Spike terminated the

25   discussions; and in early 2015, they notified Top Rank that it

26   was not "possible" to speak further because Spike was in

27   negotiations with an unnamed "group."  Shortly thereafter,

28   Spike and Haymon announced they had entered into an

- 48 -

1      agreement pursuant to which Spike would exclusively distribute

2      boxing events promoted and/or arranged by Haymon and his

3      companies.

4        C.    **NBC**:  In late 2013 and continuing through 2014, executives

5           from Top Rank had discussions with executives from the

6           network NBC about NBC's desire to broadcast boxing events

7           promoted by Top Rank.  Among other things, Top Rank and

8           NBC discussed when such a program could commence.  NBC

9           did not engage with Top Rank in any further discussions, and in

10          early 2015 NBC and Al Haymon announced they had entered

11          into an agreement pursuant to which NBC would exclusively

12          distribute boxing events promoted and/or arranged by Haymon

13          and his companies.

14     114.   Other promoters have been frozen out of doing business with major

15 sports broadcasters as well.  For example, Main Events spearheaded NBC Sports'

16 *Fight Night* series beginning in 2012.  The series was successful and enjoyed wide

17 viewership.  Ever since Haymon's exclusive deal with NBC was announced,

18 however, *Fight Night* has been shelved, and Main Events has unable to get its

19 content onto NBC's networks.

20     115.   Simply put, ever since Haymon's exclusive broadcast deals were

21 announced, Top Rank, Golden Boy, Main Events, and other legitimate promoters

22 have been precluded from airing their content on these networks.  With only one

23 exception, none of these broadcasters—ABC/ESPN, CBS, Fox, NBC, or Spike

24 TV—has distributed a single event promoted by Top Rank since announcing their

25

26

27

28

SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF SHERMAN ACT AND
CALIF. UNFAIR COMPETITION LAW

1  broadcast deals with Haymon.[9]  Simply put, these multi-year agreements are

2  exclusive in both name and practice.

3       116.  Haymon's exclusive broadcaster agreements also hinder legitimate

4  promoters from nurturing up-and-coming fighters who have the potential to become

5  Championship-Caliber.  Every promoter strives to get exposure for its up-and-

6  coming boxers by securing spots for them on "undercards" for big fights between

7  Championship-Caliber Boxers.  The main fight not only drives revenue for the

8  promoters; it creates valuable career opportunities for the boxers on the undercard.

9  However, for each bout involving one of Haymon's Championship-Caliber Boxers,

10 Haymon invariably insists on **total control** of the undercard.  With over 200 total

11 boxers in his stable, many of whom are not yet Champion-Chaliber, Haymon has a

12 wealth of up-and-coming boxers to fill these spots.  Almost without exception, only

13 Haymon-managed boxers have appeared on PBC undercards.  By locking up over

14 half a dozen major sports channels, and then excluding nearly all non-Haymon

15 boxers from undercard spots on those channels, Haymon precludes legitimate

16 promoters from securing invaluable television exposure for their up-and-coming

17 boxers.  This, in turn, hinders legitimate promoters' ability to develop new

18 Championship-Caliber Boxers over the long run.

19      117.  Haymon may claim that PBC is good for competition and consumers

20 because it airs boxing content on basic cable and network television, where that

21 would not otherwise be the case.  Such a claim is simply not accurate.  ***Before***

22 ***PBC, Top Rank and other promoters were already airing fights on many of the***

23 ***same networks that Haymon has now tied up***.  As alleged above, Main Events

24 formerly had a broadcast deal with NBC.  Golden Boy used to air bouts on Fox

25 Sports 1.  In the three years preceding PBC's launch, Top Rank aired several

26

---

27 [9] The lone exception is the May 2, 2015 bout between Manny Pacquiao, who is promoted by Top Rank, and Floyd Mayweather, who is managed by Haymon.  That

28 event, which was not a PBC event, was broadcast jointly by HBO.

SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF SHERMAN ACT AND
CALIF. UNFAIR COMPETITION LAW

matches on ESPN.  Of course, once Haymon bought time with ESPN, ESPN's *Friday Night Fights* series—which had a 17-year run—was canceled and replaced with PBC.  In other words, Haymon did not create a new market with PBC; he has merely taken over an existing market that was once competitive.

118.  One need look no further than whose events have been broadcast on major sports networks in 2015 to see Haymon's growing dominance in the market for U.S.-based promoters of Championship-Caliber Boxers.  In the first five months of 2015, before Haymon's exclusive deals with the major sports networks took effect, approximately three out of every four (~75 percent) English-language boxing broadcasts in the United States were promoted by a promoter other than Haymon.  In the last five months of 2015, after Haymon's exclusive deals with the major networks took effect, only approximately one out of every three (~33 percent) English-language boxing broadcasts in the United States was promoted by a promoter other than Haymon.  Put another way, in less than a year's time, ***Haymon, Haymon Boxing, and Haymon Sports have gone from controlling roughly one-quarter of the English-language boxing broadcasts in the United States to controlling roughly two-thirds***.  Their dominance and market power continues to grow, each day, as legitimate promoters continue to be deprived of opportunities to compete fairly for new Championship-Caliber Boxing talent and are blocked from platforming existing talent on the major sports networks.

119.  Haymon now has exclusive deals with television broadcasters who collectively account for ***81 percent*** of all English-language boxing broadcasts in the United States from January 1, 2015 through October 31, 2015—NBC/NBC Sports, Fox/Fox Sports 1, ABC/ESPN, CBS, Spike TV, and Bounce TV.  Only 19 percent of boxing content was aired on networks with which Haymon does not currently have exclusive agreements (HBO and truTV).

120.  It did not used to be this way.  Before the advent of PBC, boxing programming on television was open to all promoters.  For example, Main Events

worked with other promoters to produce *Fight Night* matches on NBC Sports, and ESPN's *Friday Night Fights* aired bouts in collaboration with many promoters. But now it is nearly all PBC, over which Haymon exercises complete control.

121. The notion that PBC is good for consumers, or good for the sport, is also false. Without the pressure of competition, Haymon is not producing quality boxing content. Many boxing fans and commenters have often criticized PBC's matches for their low quality and lack of variety. For example, author Thomas Hauser—who won the 1991 William Hill Sports Book of the Year award for his biography of Muhammad Ali and has served as chairman of the Boxing Writers Association of America—has described PBC as "disappointing," stating that "[o]ne of the selling points for PBC was, 'Al controls everything, so he can match the best against the best.' So far, that hasn't happened." Michael Woods, Editor-in-Chief of *The Sweet Science*, has made a similar assessment: "For the fans, though, who simply want the best fighting the best, [PBC] hasn't been a win. Yes, they are getting free content, but these consumers are actually willing to pay up for quality, as evidenced by the fact that they have been doing so for too many years, to see quality bouts, which are too often shifted to the PPV platform. The consumer is not being best served, so far." Sportscaster Jim Lampley criticizes Haymon for his "avoidance of risky competition," aptly stating that such an "approach is not the right approach for the overall enhancement of boxing." Airing content on network television or basic cable is ***not*** a boon for consumer welfare where, as is the case here, overall product quality and variety are being reduced through the actions of a soon-to-be monopolist. The ratings reflect this.

122. In short, Haymon is behaving exactly as one would expect a monopolist to act: having largely insulated himself from competition in the market for domestic promoters of Championship-Caliber Boxers, he has no incentive to provide consumers of the quality and variety that they deserve and expect. So far, PBC bouts simply have not matched the best with the best—even though Al

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF SHERMAN ACT AND CALIF. UNFAIR COMPETITION LAW

Haymon has long-term contracts with a majority of Championship-Caliber Boxers in the relevant managerial and promotional markets (as further demonstrated below).  So long as Top Rank and other legitimate promoters are excluded from competing with PBC on top sports broadcasters like ESPN, NBC, and Fox Sports 1, competition and consumer welfare will continue to suffer,  and the output of quality fight possibilities will continue to be artificially constrained.

123.   As a direct and proximate result of Haymon's predatory conduct and exclusive deals, Top Rank has been excluded from airing its boxers' fights on the top U.S. sports broadcasters, including CBS, ABC/ESPN, NBC, Fox, and Spike TV.  But for Haymon's conduct, Top Rank would in fact have successfully negotiated agreements with many of these broadcasters.  These lost broadcast opportunities have cost Top Rank tens of millions of dollars in profit.  The harm from PBC is neither speculative nor inchoate.  Top Rank has ***already*** been injured by this anticompetitive scheme.

## RELEVANT MARKETS

124.   As described above, the Defendants' conduct affects two distinct relevant markets—the market for managing Championship-Caliber Boxers, and the market for promoting Championship-Caliber Boxers.  Under federal and state law, there is supposed to be a "firewall" between the managerial and promotional markets.  The Ali Act and analogous state laws prohibit boxing managers from acting as or on behalf of a boxing promoter, and from obtaining a direct or indirect financial interest in the promotion of a boxer.  Nonetheless, with the assistance of his accomplices, Haymon is not only unlawfully operating in both relevant markets—he is exploiting his dominance in both markets to undermine and eliminate competition in them.

### The Market for Managing Championship-Caliber Boxers

125.   In the United States boxing industry, there is a distinct and defined market for the management of "Championship-Caliber Boxers"—that is,

professional boxers who, within the past three years, have demonstrated through such quantitative factors as purse size, television rights, viewership, ticket revenue, and other objective criteria, that they belong to "the 'cream' of the boxing business." *Int'l Boxing Club*, 358 U.S. at 252.

126.   The Supreme Court has recognized that there are distinct tiers of boxers within the professional boxing industry, and that separate tiers correlate with distinct markets.  In *International Boxing Club*, the Court affirmed that the relevant market had properly been defined as "the promotion of **championship** boxing contests in contrast to ***all*** professional boxing events."  358 U.S. at 249 (1959) (emphasis in original).  As noted above, the Court recognized that "the 'cream' of the boxing business . . . is a sufficiently separate part of the trade or commerce to constitute the relevant market for Sherman Act purposes."  *Id.* at 252.  The same is true today.

127.   For this reason, management services provided to Championship-Caliber Boxers—"the 'cream' of the boxing business"—are fundamentally different from, and therefore not interchangeable with, management services provided to boxers in lower strata of the industry.  The business affairs of a Championship-Caliber Boxer are inherently more complicated than those of other professional boxers.  A manager charged with handling the business affairs of a Championship-Caliber Boxer must be highly sophisticated and experienced in many areas of the business.  Managing a boxer who participates in televised bouts held in venues like the MGM Grand in Las Vegas or Madison Square Garden in New York City, where the purse may be in the millions or tens of millions of dollars, requires far greater skill than managing a boxer who strictly participates in untelevised bouts at minor venues, where the purse may only be in the thousands or even hundreds of dollars.  The necessary business and legal acumen also makes it difficult, if not impossible, for a Championship-Caliber Boxer to serve as his own manager.  The market for the

- 54 -

management Championship-Caliber Boxers is defined by the distinct and inimitable nature of the services these managers provide.

128.   Moreover, because of the unique nature of the professional boxing industry, people and firms that represent other types of professional athletes, like baseball players or football players, cannot be—and, as a matter of practice, are not—a substitute for a manager who represents Championship-Caliber Boxers. Unlike other professional sports, there are no professional leagues in boxing; rather, promoters and "matchmakers" arrange bouts on an individualized basis.  In order for the boxers to get paid, boxing managers have to negotiate directly with boxing promoters—a role for which there are no clear analogues in other professional sports.  Moreover, boxing is closely regulated by state and federal laws and regulations that reflect and respond to the extraordinary nature of boxing.  Simply put, boxing managers operate in a wholly different market from agents who represent other professional athletes.

129.   Agents or representatives of other entertainers, such as actors or singers, also operate in a separate market from managers of Championship-Caliber Boxers.  The knowledge and experience required to manage Championship-Caliber Boxers are specific to the boxing industry, and in practice representatives of other entertainers are not interchangeable with, nor do they substitute for, managers of Championship-Caliber Boxers.  Additionally, representatives of other entertainers do not have the business relationships with boxing promoters that are absolutely necessary for managing a Championship-Caliber Boxer.

130.   There are also high barriers to successful entry in the market for domestic managers of Championship-Caliber Boxers.  As previously noted, boxing managers must be professionally licensed in many states, including California and Nevada.  In California, for example, licensure requires that one take and pass a written exam.  In order to effectively represent Championship-Caliber Boxers, a manager must possess deep knowledge and experience in both the boxing industry

and many areas of business and law.  Additionally, a manager cannot attract Championship-Caliber Boxers as clients unless his or her reputation and personal "brand" in the industry are consummate with the boxers' own status as "the 'cream' of the boxing business."  Particularly in an industry where one's relationships and "brand" are important, Championship-Caliber Boxers' preferences often become entrenched.  Moreover, the use of long-term exclusive contracts by established Championship-Caliber Boxer managers—in particular Haymon and his companies, whose contracts with Championship-Caliber Boxers can last for five or more years—makes it extremely difficult, if not impossible, for new entrants to obtain Championship-Caliber Boxers as clients.  The Defendants' use of exorbitant signing bonuses to lure Championship-Caliber Boxers into their stable also increases the capital requirements that potential new entrants would have to incur in order to compete against Haymon.  A would-be manager of Championship-Caliber Boxers would need many millions of dollars to even stand a chance of successfully breaking in to the market.  Few (if any) potential entrants have access to the several-hundred-million-dollar investment stream that has allowed Haymon to buy up so much of the relevant market.  Moreover, with television distribution severely limited by Haymon's exclusive deals with broadcasters, any manager other than Haymon cannot promise meaningful television viewership to build his name and brand.

131.   Existing competitors in the market for domestic managers of Championship-Caliber Boxers lack the ability to increase their "output" in the short run.  There are only so many Championship-Caliber Boxers in the market at a given time.  By virtue of the Defendants' and other managers' use of long-term exclusive contracts with Championship-Caliber Boxers, incumbent managers have no practical ability to sign meaningful numbers of new Championship-Caliber Boxers in the short term—which is a necessary prerequisite to increasing their "output" of managerial services within the market for managing such boxers.  And with

1  television distribution severely limited by Haymon's exclusive deals with

2  broadcasters, other incumbent managers cannot secure meaningful television

3  viewership to grow their business and increase their output.  Moreover, because

4  Haymon controls the vast majority of undercards for televised boxing events and

5  seldom allows competitors' up-and-coming boxers to participate in these

6  undercards, incumbent managers are severely disadvantaged in their ability to get

7  the non-Championship-Caliber Boxers in their stables the exposure and experience

8  they need to potentially become Championship-Caliber Boxers in the long run.

9       132.  The relevant geography for the market for managers of Championship-

10  Caliber Boxers is the United States.  Although there may be some foreign-based

11  managers, none has gained a significant number of boxers or the type of business

12  resources, relationships and acumen required to serve as a close substitute to the

13  U.S.-based (and U.S.-licensed) managers of Championship-Caliber Boxers.  The

14  very few foreign-based managers have only penetrated where they have a local

15  talent that becomes marketable in the United States such as Vladimir Klitschko.

16  Additionally, a small but significant non-transitory increase in price by a

17  hypothetical monopolist would not induce significant substitution by customers (in

18  this case, boxers) to managers from outside the United States.  Fighters are simply

19  not switching from Haymon to anyone else but certainly not to managers outside

20  the United States.  A manager in the United States with market power can extract

21  more money (and more egregious concessions) from Championship-Caliber

22  Boxers, without fear that the boxers will resort to the services of someone who does

23  not operate in the United States.  Because of this, there is low cross-elasticity of

24  demand between the services of U.S.-based managers of Championship-Caliber

25  Boxers and the services of foreign-based managers.

26       133.  Because of these market characteristics, a small but significant non-

27  transitory increase in price by a hypothetical monopolist would not induce

28  significant substitution by customers (in this case, boxers) to managers from outside

SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF SHERMAN ACT AND
CALIF. UNFAIR COMPETITION LAW

1    the market.  A manager with market power can extract more money (and more

2    egregious concessions) from Championship-Caliber Boxers, without fear that the

3    boxers will resort to the services of someone who occupies a different market.

4    Because of this, there is low cross-elasticity of demand between the services of

5    U.S.-based managers of Championship-Caliber Boxers and services provided by

6    others.

7                    **The Market for Promoting Championship-Caliber Boxers**

8            134.   In the United States boxing industry, there is also a distinct market for

9    the promotion of Championship-Caliber Boxers (as defined herein).  As indicated

10   above, the Supreme Court has already acknowledged the existence of a separate,

11   cognizable market for promoting Championship-Caliber Boxers.  In *International*

12   *Boxing Club*, the Court affirmed that the relevant market had properly been defined

13   as "the promotion of ***championship*** boxing contests in contrast to ***all*** professional

14   boxing events."  358 U.S. at 249 (emphasis in original).  The Court recognized that

15   the promotion of championship boxing contests, which involve "the 'cream' of the

16   boxing business," represents a "separate, identifiable market."  *Id.* at 249, 252.  The

17   Supreme Court further held that non-championship fights, which by definition do

18   ***not*** involve "the 'cream' of the boxing business," were "not 'reasonably

19   interchangeable [. . .] for the same purpose' as championship contests."  *Id.* at 251

20   (quoting *United States v. du Pont & Co.*, 351 U.S. 377, 395 (1956)).  The same is

21   true today.

22           135.   As the Supreme Court recognized, promoting a boxing match

23   involving a Championship-Caliber Boxer is fundamentally different from

24   promoting boxers and matches in lower strata in the industry.  In order to

25   effectively promote a large-scale, highly visible boxing match, a promoter must

26   have sufficient financial resources to shoulder significant upfront expenditures,

27   including those required to acquire an appropriate venue, attract major sponsors and

28   advertisers, contract with innumerable outside vendors, and guarantee a certain size

- 58 -

"purse" to the boxers and their managers—which itself may be in the millions or tens of millions of dollars.  Planning and negotiating each of these highly complex arrangements and, perhaps most importantly, the television broadcast of the bouts (whether on network television or pay-per-view), requires extensive, often arcane knowledge of multiple businesses, not to mention possession of useful connections in each business area.  A promoter who operates at a lower strata in the industry simply cannot accomplish what the promoter of a Championship-Caliber Boxer can.  For this reason, promoters for lower-tier boxers are not interchangeable with promoters of Championship-Caliber Boxers.  The market for the promotion of Championship-Caliber Boxers is defined by the distinct and inimitable nature of the services these promoters provide.

136.   In the world of professional sports, nothing remotely compares to the unique business of professional boxing promotion.  A professional baseball or tennis player, for example, does not directly contract with a third party to organize, sell tickets for, televise, and otherwise promote his or her games or matches.  Rather, these activities are handled by an overarching league or governing organization, such as Major League Baseball or the United States Tennis Association.  Outside of the boxing industry, there are no close substitutes for licensed promoters of Championship-Caliber Boxers.

137.   Due in large part to the factors described above, there are significant barriers to successful entry in the market for domestic promoters of Championship-Caliber Boxers.  While all promoters must be professionally licensed and comply with extensive laws and regulations, only those with significant financial resources, deep industry knowledge, an established reputation among industry participants, and far-reaching business contacts can orchestrate a high-profile boxing match for a Championship-Caliber Boxer—and shoulder the sizeable financial risk associated with such a production.  The capital requirement is particularly significant; promoting a ***single match*** for a Championship-Caliber Boxer may require

1   expenditures of millions of dollars.  While Haymon's incursion into the

2   promotional business has been supported by a several-hundred-million-dollar cash

3   infusion, very few (if any) other potential entrants enjoy similar financial backing.

4   Moreover, the statutory "firewall" separating managers from promoters prevents

5   many industry insiders—at least the law-abiding ones—from engaging in

6   promotion.  These inherent barriers to entry are only exacerbated by Haymon's

7   long-term "tie out" contracts, which function so as to prevent Haymon's dominant

8   share of Championship-Caliber Boxers from contracting with legitimate promoters

9   (whether they are new entrants or incumbents), and Haymon's long-term exclusive

10  deals with broadcasters, which categorically block would-be promoters of

11  Championship-Caliber Boxers from accessing necessary distribution channels.

12  Even if one of these exclusive broadcaster deals terminated—something that has, so

13  far, never happened—a new entrant would need tens of millions of dollars to

14  counter Haymon's loss-leader "payola" payments.

15       138.   Existing competitors in the market for domestic promoters of

16  Championship-Caliber Boxers lack the ability to meaningfully increase their

17  "output" in the short run.  In order to meaningfully expand one's output, a domestic

18  promoter of Championship-Caliber Boxers would need, ***at minimum***, (i) access to

19  additional Championship-Caliber Boxers; (ii) access to suitable opponents for any

20  Championship-Caliber Boxers under contract; and (iii) access to major television

21  distribution channels.  Haymon has severely restricted legitimate promoters' access

22  to ***each*** of these necessary inputs.

23       A.   <u>Access to Additional Championship-Caliber Boxers</u>:  There are

24            only so many Championship-Caliber Boxers at a given time.

25            The Defendants have induced a dominant share of those fighters

26            to enter long-term exclusive contracts that prevent Top Rank

27            and other incumbent promoters from signing those boxers.  The

28            Defendants have also hindered incumbent promoters' ability to

- 60 -

1     develop new Championship-Caliber Boxers in the **long** term.

2     Having locked up nearly all television outlets for boxing,

3     Haymon has nearly without exception denied PBC undercard

4     spots to other promoters' up-and-coming boxers.  This exclusion

5     denies these boxers the television exposure and experience they

6     need to grow into Championship-Caliber Boxers.

7     B.    Access to Suitable Opponents:  The Defendants have repeatedly

8     blocked rival promoters from arranging matches for their

9     fighters **against** Haymon-contracted Championship-Caliber

10     Boxers.  Top Rank has identified several instances in which

11     Haymon vetoed matches between his Championship-Caliber

12     Boxers and those of rival promoters.

13     C.    Access to Major Television Distribution Channels:  Haymon has

14     also tied up virtually all of the major sports broadcasters in

15     exclusive contracts, which deprive incumbent promoters of the

16     ability to secure adequate airtime for their fighters' bouts.

17     Due to these factors, incumbent promoters have no practical ability to

18    meaningfully increase their "output" in the short term—or indeed in the **long** term.

19     139.   The relevant geography for the market for promoters of

20    Championship-Caliber Boxers is the United States.  According to a recently

21    published research report, all major boxing promoters "are based in the United

22    States and focus on providing domestic services."  Although there may be some

23    foreign-based promoters, none has promoted a significant number of major events

24    or has the relationships required to serve as a close substitute to the U.S.-based (and

25    U.S.-licensed) promoters of Championship-Caliber Boxers.  Promoters rely on

26    relationships with networks, venues, boxers and managers that are in the United

27    States.  It is not practical or likely that a foreign-based promoter could regularly

28    organize large-scale events in the United States and maintain the relationships all

SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF SHERMAN ACT AND
CALIF. UNFAIR COMPETITION LAW

over the country where fights are held to gain a foothold or act as a competitive check on United States promoters. A small but significant non-transitory increase in price by a hypothetical monopolist therefore would not induce significant substitution by customers (in this case, boxers) to promoters from outside the United States.  Because of this, there is low cross-elasticity of demand between the services of U.S.-based promoters of Championship-Caliber Boxers and the services of foreign-based promoters.

140.   Because of these market characteristics, a small but significant non-transitory increase in price by a hypothetical monopolist would not induce significant substitution by customers to promoters from outside the market.  As Haymon continues to accrete dominant power in this market, he will be able to charge broadcasters, sponsors, and fans more—and pay boxers less—without fear that they will resort to the services of promoters in other markets.  Because of this, there is low cross-elasticity of demand between the services of U.S.-based promoters of Championship-Caliber Boxers and services provided by others.

141.   The market for promotion of Championship-Caliber Boxers is distinct from the market for management of Championship-Caliber Boxers.  Under applicable state and federal laws, there is a "firewall" between these markets, and no single person may lawfully participate in both markets at the same time.  As a practical matter, most market participants *do* in fact respect the boundary between these markets—with the notable exception of Haymon, as alleged herein.

### THE DEFENDANTS' MARKET POWER

142.   Haymon possesses market power in both relevant markets:  the market for domestic managers of Championship-Caliber Boxers, and the market for domestic promoters of Championship-Caliber Boxers.

143.   As previously alleged, a "Championship-Caliber Boxer" is a professional boxer who, within the past three years, has demonstrated through such quantitative factors as purse size, television rights, viewership, ticket revenue, and

1   other objective criteria, that he belongs to "the 'cream' of the boxing business."

2   *Int'l Boxing Club*, 358 U.S. at 252.  This Court has already held that Top Rank has

3   adequately defined the markets for U.S.-based managers and U.S.-based promoters

4   of Championship-Caliber Boxers, which incorporate this definition.  (Oct. 16, 2015

5   Order at 7–8, Dkt. 85.)

6        144.   Determining the precise contours of a relevant market—and, therefore,

7   the Defendants' power within that market—"can involve a complicated economic

8   analysis, including concepts like cross-elasticity of demand, and 'small but

9   significant nontransitory increase in price' ('SSNIP') analysis." *Theme*

10  *Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1002 (9th Cir. 2008).  The

11  Supreme Court has stated that it may be necessary for the Court to "examine[]

12  closely the economic reality of the market at issue" in order to "determin[e] the

13  existence of market power, and specifically the 'responsiveness of the sales of one

14  product to price changes of the other.'" *Eastman Kodak Co. v. Image Tech. Servs.,*

15  *Inc.*, 504 U.S. 451, 467 (1992) (quoting *United States v. E.I. du Pont de Nemours &*

16  *Co.*, 351 U.S. 377, 417 (1956)).  According to the leading treatise on antitrust law,

17  "the question of market definition and market power is typically left to economic

18  experts."  Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of*

19  *Antitrust Principles and their Application* ¶ 307d2 (4th ed. 2015).  For these

20  reasons, market power need not be "pled with specificity" before fact and expert

21  discovery has taken place. *Newcal Indus., Inc. v. IKON Office Solution*, 513 F.3d

22  1038, 1044–45 (9th Cir. 2008).

23       145.   Nonetheless, Top Rank has undertaken a preliminary market analysis

24  (which is typically done after discovery through expert reports) based upon data

25  currently available to it.  In order to conduct this analysis, Top Rank compiled

26  extensive data concerning objective and quantifiable indicia of whether a boxer is

27  "Championship-Caliber"—such as purse sizes, television appearances, rankings,

28

SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF SHERMAN ACT AND
CALIF. UNFAIR COMPETITION LAW

and boxing titles.  Top Rank has drawn this information from a number of sources, including but not limited to the following:

        A.    **Televised Fights**

            i.    Top Rank TV Slots – file provided by Top Rank

            ii.    Bad Left Hook (http://www.badlefthook.com)

            iii.    HBO (http://www.hbo.com/boxing/fights/past-fights.html)

            iv.    PBC (http://www.premierboxingchampions.com/boxing-schedule)

        B.    **Championship Fights and Rankings**

            i.    Box Rec (http://boxrec.com)

            ii.    WBA (http://www.wbanews.com)

            iii.    IBF (http://www.ibf-usba-boxing.com)

            iv.    WBC (http://www.wbcboxing.com)

            v.    WBO (http://www.wboboxing.com)

        C.    **Purse Size Data**

            i.    Top Rank's internal data concerning purse sizes for its own boxers

            ii.    ESPN (http://espn.go.com/boxing)

            iii.    Bad Left Hook (http://www.badlefthook.com)

            iv.    Ring TV (http://ringtv.craveonline.com)

            v.    Wikipedia (https://www.wikipedia.org)

            vi.    Sports Illustrated (http://www.si.com/boxing)

            vii.    Forbes (http://www.forbes.com/forbes/welcome)

            viii.    Boxing Scene (http://www.boxingscene.com)

        D.    **Manager and Promoter Information**

            i.    Top Rank website (http://www.toprank.com/fighters)

            ii.    Golden Boy website

SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF SHERMAN ACT AND
CALIF. UNFAIR COMPETITION LAW

1    (http://www.goldenboypromotions.com/fighters/)

2        iii.    Box Rec (http://boxrec.com)

3        146.   Without the benefit of fact or expert discovery, Top Rank does not

4    have sufficiently comprehensive data to make **exact** judgments about which criteria

5    are most "economically significant," and how those criteria should be weighed so

6    as to "correspond to the commercial realities of the industry." *Brown Shoe Co. v.*

7    *United States*, 370 U.S. 294, 336–37 (1962) (internal quotation omitted).

8        147.   Nonetheless, Top Rank's analysis of the data that is currently available

9    to it (before any discovery) demonstrates that, even as the criteria for identifying

10   Championship-Caliber Boxers are adjusted and assigned different thresholds,

11   Haymon invariably possesses a dominant share of **both** relevant markets—the

12   market for U.S.-based managers of Championship-Caliber Boxers, and the market

13   for U.S.-based promoters of Championship-Caliber Boxers.  By way of example

14   only, Top Rank's analysis indicates that U.S.-based managers manage over 100

15   Championship-Caliber Boxers, where such boxers are identified as those currently

16   ranked in the Top 10 by at least one sanctioning organization (WBA, WBC, WBO,

17   and/or IBC) and who have appeared on English-language television in the U.S.

18   since January 2014.  The number of boxers managed is a relevant measure of output

19   for boxing managers, and Haymon manages 56 percent of the U.S.-managed boxers

20   defined by the criteria above.  Under this metric, Haymon's share of the market for

21   U.S.-based managers of Championship-Caliber Boxers is therefore 56 percent.

22       148.   Top Rank's analysis also indicates that U.S.-based promoters promote

23   over 100 Championship-Caliber Boxers, where such boxers are identified as those

24   currently ranked in the Top 10 by at least one sanctioning organization and who

25   have appeared on English-language television in the U.S. since 2014.  The number

26   of boxers promoted is a relevant measure of output for boxing promoters, and

27   Haymon promotes 52 percent of the U.S.-managed boxers defined by the criteria

28

SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF SHERMAN ACT AND
CALIF. UNFAIR COMPETITION LAW

stated above.  Under this metric, Haymon's share of the market for U.S.-based promoters of Championship-Caliber Boxers is therefore 52 percent.

149.   Haymon maintains a dominant share of the market for U.S.-based managers of Championship-Caliber Boxers and the market for U.S.-based promoters of Championship-Caliber Boxers under *several* alternative definitions of a Championship-Caliber Boxer.  For example:

A.   **Fighters ranked in the Top 10 by at least one sanctioning organization (WBA, WBC, WBO, and/or IBC) who have appeared on English-language television in the United States since 2014 (example provided above)**:

  i.    Haymon share of U.S. manager market:  56%

  ii.   Haymon share of U.S. promoter market:  52%

B.   **Fighters ranked in the Top 10 by at least one sanctioning organization (WBA, WBC, WBO, and/or IBC) who have appeared on English-language television in the United States in the year 2015**:

  i.    Haymon share of U.S. manager market:  61%

  ii.   Haymon share of U.S. promoter market:  56%

C.   **Fighters ranked in the Top 10 by at least one sanctioning organization (WBA, WBC, WBO, and/or IBC) who have earned at least $100,000 in a single fight**:

  i.    Haymon share of U.S. manager market:  59%

  ii.   Haymon share of U.S. promoter market:  52%

D.   **Fighters ranked in the Top 10 by at least one sanctioning organization (WBA, WBC, WBO, and/or IBC) who have earned at least $100,000 in a single fight *and* appeared on English-language television in the United States since 2014**:

  i.    Haymon share of U.S. manager market:  59%

  ii.   Haymon share of U.S. promoter market:  53%

E.   **Fighters ranked in the Top 10 by at least one sanctioning organization (WBA, WBC, WBO, and/or IBC) who have earned at least $100,000 in a single fight *and* appeared on English-language television in the United States in the year 2015**:

  i.    Haymon share of U.S. manager market:  66%

ii.     Haymon share of U.S. promoter market:  60%

150.   As in every antitrust case, developing a precise economic model for measuring the boundaries of the relevant markets and the Defendants' power within those markets will require fact and expert discovery.  But even without discovery, Top Rank has *already* identified numerous plausible, economically meaningful profiles for Championship-Caliber Boxers, which allows it to gauge the size of each relevant market and the Defendants' market share and market power in those markets.  The fact that Haymon's shares of both relevant markets remain high across so many metrics suggests that Top Rank's preliminary finding of the Defendants' already established market power is robust, and will be further corroborated through fact and expert discovery.  This level of specificity far surpasses what is required prior to discovery.[10]

151.   The Defendants' possession of power in both relevant markets is further supported by the existence of significant barriers to entry and expansion in those markets, as previously alleged.  (*See supra* ¶¶ 130–31, 137–38.)  These barriers are significant and constrain the normal operation of the relevant markets, such that the Defendants' possession and exercise of power in those markets is unlikely to be self-correcting.

152.   Haymon's power in both relevant markets is enhanced by a "lock in" effect.  Due to (i) signing bonuses and promises of future earnings, (ii) asymmetrical sophistication and bargaining power between Haymon and his clients, (iii) the impracticality (if not impossibility) of assessing the long-term costs and

---

[10] As an example, the plaintiffs in *Ritz Camera & Image, LLC v. SanDisk Corp.*, alleged, without further analysis, that the Defendants had a 75 percent share of the relevant market.  *See* First Am. Compl. ¶¶ 12, 26, *Ritz Camera & Image, LLC v. SanDisk Corp.*, No. 10-cv-2787 (N.D. Cal. Aug. 25, 2010), Dkt. 27.  Accepting this allegation as true, the district court held that the plaintiffs had adequately alleged that the defendants possessed market power.  772 F. Supp. 2d 1100, 1107 (N.D. Cal. 2011), *aff'd*, 700 F.3d 503 (Fed. Cir. 2012).

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF SHERMAN ACT AND CALIF. UNFAIR COMPETITION LAW

effects of Haymon's "tie out" clauses and other onerous terms *ex ante*, (iv) the difficulty and high cost of switching from one manager to another, (v) the lengthy terms of Haymon's management contracts, and (vi) the relative lack of adequate substitutes for Haymon's management services, boxers are highly susceptible to being "locked in" to Haymon's exclusionary managerial or "advisor" contracts. Once locked in, Haymon's boxers are precluded—whether by the express terms of the contract, Haymon's refusal to give contractually-required consent, or both— from entering into agreements with legitimate promoters. This "lock out" effect therefore strengthens Haymon's dominance in, and ability to monopolize, the markets for managing and promoting Championship-Caliber Boxers.

## ANTICOMPETITIVE EFFECTS AND DAMAGES

### *Effects on Interstate Commerce and California*

153.   At all material times, Al Haymon, Haymon Boxing, Haymon Sports, Haymon Development, and Haymon Holdings engaged in the business of professional boxing management and the business of professional boxing promotion throughout the United States, including in California. In connection with this business, monies, contracts, bills, and other forms of business communication and transactions were transmitted in a continuous and uninterrupted flow across state lines. The Defendants used various devices to carry out the illegal acts alleged herein, including the United States mail, interstate travel, and interstate telephone commerce. The Defendants' activities were within the flow of, and have substantially affected, interstate commerce.

154.   In order to expand Haymon's unlawful presence in, and exclude legitimate competitors from, the market for domestic promoters of Championship-Caliber Boxers, the Defendants have conducted extensive business in the State of California, including within this District. The Defendants' activities in California include, but are not limited to:  acting as a boxing manager and promoter in California; negotiating and entering into contracts with boxers, venues,

broadcasters, sponsors, and other persons in California; organizing, promoting, and facilitating boxing matches at California venues, including The Forum, Staples Center, the StubHub Center, and the Citizens Business Bank Arena; selling tickets for boxing matches to California residents; and broadcasting boxing matches over television to California residents.

155.   Moreover, Haymon, Haymon Boxing, and Haymon Sports have promoted many fights under the PBC banner in this very District.  For example, the March 13, 2015 Andre Berto-Josesito Lopez, Shawn Porter-Erick Bone, and Chris Arreola-Curtis Harper bouts were broadcast from the Citizens Business Bank Arena in Ontario, California; and the June 6, 2015 Robert Guerrero-Aron Martinez fight was broadcast from StubHub Center in Los Angeles, California.

156.   The Defendants have taken significant overt acts in California in furtherance of their unlawful scheme.  Haymon participated in meetings with Caldwell in California, through which he obtained the funding necessary to support his plan to take over the market for domestic promoters of Championship-Caliber Boxers.  Haymon attempted to eliminate Golden Boy, a California-based promoter, with the assistance of MGH.  Haymon, Haymon Boxing, and Haymon Sports have unlawfully promoted numerous PBC bouts in California (including but not limited to those identified herein), in violation of the Ali Act and California boxing regulations.  Haymon's managerial contracts, which he typically signs on behalf of Haymon Sports or Haymon Development, allow Haymon to both manage and promote Championship-Caliber Boxers in California, to the exclusion of legitimate promoters.

### *Harm to Competition*

157.   As a direct and proximate result of the Defendants' unlawful actions, competition has been substantially foreclosed in both relevant markets.  By preventing Top Rank and other legitimate promoters from competing for contracts with dozens of Championship-Caliber Boxers, and nearly all major U.S. sports

SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF SHERMAN ACT AND
CALIF. UNFAIR COMPETITION LAW

broadcasters, Haymon has forced more boxers and broadcasters to do business with him and his companies—and ultimately more boxing fans to consume Haymon's boxing content—than would be true in a competitive market.  Having substantially excluded his rivals from competing in the market for domestic promoters of Championship-Caliber Boxers, Haymon has limited consumers' choices for boxing content and is putting on lower-quality and less competitive bouts.  Consumers are *already* losing out, since they are not getting the matchups they would otherwise see, and are enjoying less variety than they would in a competitive market.  The Defendants' conduct has already caused a reduction in competition and a reduction in the output of consumer-desired fights.  This has seriously impaired consumer welfare.

158.   The Defendants' market power and anticompetitive conduct are not only bad for consumers; they are bad for boxers and legitimate promoters as well. Fighters are *already* being harmed by the Defendants' conduct.  With all control in Haymon's hands, fighters are being prevented from fighting the opponents that will most enhance their career.  They are only able to fight the opponents Haymon lets them fight.  In a competitive market for domestic managers of Championship-Caliber Boxers, Haymon would not be able to obtain or exercise such sweeping control over his clients' careers.  For instance, in a competitive market, Haymon would not be able to induce the boxers in his stable to turn down lucrative bouts with non-Haymon boxers or give him veto power over any promotional contracts the boxers would otherwise enter into.  In a competitive market for domestic managers of Championship-Caliber Boxers, it would be far more difficult (if not impossible) for Haymon to lock in the top boxers' managerial *and* promotional rights in lengthy "advisor" contracts, in willful disregard for the Ali Act's "firewall" provision.  The fact that Haymon can engage in such exploitative and coercive conduct, to the detriment of the Championship-Caliber Boxers in his stable, provides direct evidence that the market for domestic managers of  Championship-

1   Caliber Boxers is not competitive, and that Haymon has a "special ability—usually

2   called 'market power'—to force a [Championship-Caliber Boxer] to do something

3   that he would not do in a competitive market." *Jefferson Parish Hosp. Dist. No. 2*

4   *v. Hyde*, 466 U.S. 2, 13–14 (1984).

5       159.   Moreover, Haymon exercises total control over the undercards for his

6   Championship-Caliber Boxers' matches.  With few exceptions, Haymon has not

7   allowed rival promoters' up-and-coming boxers to participate in PBC undercards.

8   With over 200 total boxers in his managerial stable, Haymon has a wealth of his

9   own up-and-coming boxers (many of whom may become Championship-Caliber

10  Boxers) to fill these spots.  By excluding legitimate promoters' up-and-coming

11  boxers from PBC undercards—which are increasingly the only television outlet for

12  these fighters—Haymon significantly hinders these promoters' ability to develop

13  new Championship-Caliber Boxers over the long run.

14      160.   Haymon's willingness to violate the Ali Act has allowed him to extend

15  his power in the managerial market to the promotional market.  Acting on behalf of

16  and through the instrumentality of Haymon Sports and Haymon Development,

17  Haymon has locked in numerous Championship-Caliber Boxers under long-term

18  managerial or "advisor" contracts that give him total control over the boxers'

19  promotional rights.  While this control is sometimes expressed as a "consent"

20  clause, whereby Haymon's prior approval is required before the boxer can enter

21  into any promotional agreement, these "consent" clauses in fact function as

22  contractual "tie outs."  As a matter of actual practice, Haymon **has not granted**

23  **consent** for **any** of his Championship-Caliber Boxers to enter into promotional

24  contracts with Top Rank, Golden Boy (post-settlement), Main Events, or any other

25  legitimate promoter.  The "consent" and "sole discretion" clauses function as a

26  permanent veto of legitimate promoters.  Thus, despite the contracts' creative

27  drafting, Haymon has effectively excluded legitimate promoters from accessing the

28  key input that domestic promoters of Championship-Caliber Boxers need to

SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF SHERMAN ACT AND
CALIF. UNFAIR COMPETITION LAW

1    effectively compete.  This gives Haymon and his companies enormous power in the

2    relevant market for U.S.-based promoters of Championship-Caliber boxers.

3        161.    Haymon has aggressively exercised that power to further impair his

4    rivals from competing in the promotional space.  Perhaps most egregiously,

5    Haymon has made tens of millions of dollars' worth of "payola" payments in return

6    for air time on virtually all major sports broadcasters in the United States, including

7    ABC/ESPN, NBC/NBC Sports, CBS, and Spike TV.  In return, Haymon has

8    elicited and in fact received tacit or express exclusivity commitments from each of

9    these broadcasters.  Not only have these exclusive deals been widely reported,

10   legitimate promoters have experienced their effects.  Top Rank has attempted to

11   secure air time on several networks, but in each instance has been rebuffed.  After

12   airing content on NBC Sports for several years, Main Events has been unable to get

13   any matches on that network since Haymon's agreement with NBC.  Golden Boy

14   can no longer air its bouts on Fox.  ESPN replaced *Friday Night Fights*, which was

15   open to legitimate promoters, with PBC.  Neither Top Rank, Golden Boy, nor any

16   other legitimate promoter has been able to air a ***single bout*** on any network that has

17   contracted with Haymon.

18       162.    Defendants' conduct harms competition by impairing the ability of

19   Top Rank and other legitimate promoters to compete in the market for U.S.-based

20   promoters of Championship-Caliber Boxers.  The Defendants have foreclosed rival

21   promoters from the inputs they need—*e.g.*, Championship-Caliber Boxers and key

22   sports broadcasters—to compete effectively with Haymon.  Without sufficient

23   access to those inputs, Top Rank and other legitimate promoters will not be able to

24   restrain Haymon's exercise of market power.  This conduct also deters entry into

25   both relevant markets, and thereby reduces the likelihood that rivals to Haymon will

26   emerge in the future.

27       163.    In many instances, Haymon has blocked his Championship-Caliber

28   Boxers from fighting opponents who are contracted with rival promoters.  (The

- 72 -

May 2015 Mayweather/Pacquiao fight was a rare exception.)  Top Rank has identified several such instances, both involving itself and other promoters.  Unable to secure suitable matches for their own fighters, legitimate promoters have suffered significant economic damages from lost promotional opportunities—and have seen an exodus of fighters to Haymon.  Because Haymon can effectively control output in the sport, Championship-Caliber Boxers face tremendous pressure to sign with him or run the risk of sacrificing their careers.

164.   For Haymon to require boxers to sign with him as a *de facto* or *de jure* condition of fighting the Championship-Caliber Boxers already in his stable is plainly anticompetitive.  The Ali Act itself defines such requirements as "coercive provisions," and states in no uncertain terms that it is "***in restraint of trade***"—a clear allusion to Section 1 of the Sherman Act—for a promoter to impose a "coercive provision . . . for a period greater than 12 months."  *See* 15 U.S.C. §§ 6307b(a)(1)(A)(i), (B) (emphasis added); *see also* 15 U.S.C. § 1 (prohibiting contracts "in restraint of trade").  As alleged herein, Haymon's contracts extend for terms that are far longer than 12 months.

165.   Haymon's conduct has affected a substantial volume of commerce in the market for promoting Championship-Caliber Boxers—and proximately injured boxers, legitimate promoters, and consumers alike.  As evidenced by the fact that Haymon already possesses and exercises significant power in the market for domestic promoters of Championship-Caliber Boxers, there is a dangerous probability that he will succeed in obtaining a monopoly in that market.  If that happens, the injuries and anticompetitive affects described herein will only continue and become more egregious.

166.   The cumulative anticompetitive effects of the Defendants' conduct lack any redeeming value and far outweigh any ostensible procompetitive benefits that the Defendants may allege.

SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF SHERMAN ACT AND
CALIF. UNFAIR COMPETITION LAW

167.   The Defendants have engaged in the illegal, tortious, and anticompetitive conduct alleged herein with the specific intent to acquire and maintain a monopoly in the markets for domestic managers and promoters of Championship-Caliber Boxers.  If left unchecked, the Defendants have a dangerous probability of achieving monopoly power in the market for domestic promoters of Championship-Caliber Boxers.

### *Threatened Anticompetitive Consequences*

168.   If the Defendants' scheme succeeds, and Haymon becomes the *de facto* sole promoter of Championship-Caliber Boxers, it will be incredibly difficult for any remaining non-Haymon boxers to gain exposure and quality opponents.  In order to salvage their careers, the few remaining non-Haymon boxers will have no choice but to sign up with Haymon—on both the management and promotion sides.  As Haymon's power and influence in both relevant markets grow, he will exert even more control over the entire boxing industry.

169.   Haymon's scheme will continue to harm consumers.  The more power Haymon has in the relevant markets, the less quality and variety consumers will enjoy.  Haymon's scheme will ensure that consumers only see Haymon fights and Haymon boxers.  Already, Haymon has exclusive deals with television broadcasters who account for over 80 percent of all televised boxing events from January 1, 2015 through October 31, 2015, on English-language channels in the United States (*i.e.*, ABC/ESPN, CBS, NBC/NBC Sports, Fox/Fox Sports 1, and Spike TV).  Moreover, once Haymon's predatory "payola" tactics pay off, consumers will only pay **more** to see these bouts.  The investment funds  financing Haymon's scheme fully expect recoupment of the predatory outlays currently being used to finance and monopolize airtime.

170.   While Haymon's PR machine touts "#FreeBoxingForAll," such is the claim of any dominant market player engaging in predatory pricing.  Predation by definition offers purchasers low prices in the first phase of the plan, when rivals are

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF SHERMAN ACT AND CALIF. UNFAIR COMPETITION LAW

1    harmed and eliminated through below-cost pricing.  Once the competition is

2    eliminated, however, the losses are recouped.  Haymon's financial backers did not

3    invest upwards of a half a billion dollars as charity to bring free boxing to the

4    public.  The plan has always been to act "irrationally" for several years, and then,

5    once Haymon has achieved total control of both the managerial and promotion

6    sides of the business, create a "league" with no competition, where Haymon makes

7    *every major decision* about every fighter.

8         171.    Distributors of boxing content, including arenas and broadcasters, also

9    stand to lose out.  As Haymon excludes more competitors in the promotion market,

10   arenas will be forced to deal exclusively with Haymon—giving him

11   disproportionate bargaining power.  And once Haymon is the only show in town,

12   there is no reason to believe that he will be paying broadcasters to air his content.

13   Not only will broadcasters be paying him, they will be paying more than they ever

14   would in a competitive promotion market.

15                    *Antitrust Injury and Damages to Top Rank*

16        172.    Top Rank has been, and will continue to be, injured as a direct and

17   proximate result of the Defendants' illegal, tortious, and anticompetitive conduct.

18   As previously alleged, Top Rank has been "frozen out" of competing for contracts

19   with a majority of Championship-Caliber Boxers in the U.S. promotional market,

20   and virtually all of the top sports broadcasters.  Haymon has even prevented Top

21   Rank from arranging and promoting certain fights involving Haymon's fighters.

22   This injury is not speculative or hypothetical.  Exclusive contracts and "tie outs" *by*

23   *definition* injure and exclude all competitors.  Predation *inherently* harms

24   competitors by raising their costs and forcing them to choose between losing

25   business or operating at an unsustainable loss.  But Top Rank's allegations do not

26   stop there.  Top Rank has identified numerous *specific instances* in which it has

27   attempted to break through the Defendants' "tie outs" and exclusive deals, but been

28   precluded from doing so.  (*See supra* ¶¶ 66–68.)

SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF SHERMAN ACT AND
CALIF. UNFAIR COMPETITION LAW

173.   As the leading antitrust treatise states, "Standing is clear . . . when the plaintiff alleges that its rival engaged in an exclusionary practice designed to rid the market of the plaintiff, or preclude its entry or raise its costs, so that the defendant could maintain or create a monopoly."  Areeda & Hovenkamp, *Antitrust Law* ¶ 348d1.  Top Rank's allegations demonstrate that it has been repeatedly injured as a result of the Defendants' anticompetitive conduct.  Because Top Rank's injuries directly flow from the competition-reducing aspect of Defendants' conduct, it has suffered antitrust injury and possesses antitrust standing.

174.   But for the conduct alleged herein, many of the Championship-Caliber Boxers whom Haymon manages and promotes would in fact contract with Top Rank.  But for the conduct alleged herein, many of the Championship-Caliber Boxers whom Haymon manages and promotes would in fact compete in bouts against Top Rank's boxers.  But for the conduct alleged herein, Top Rank would in fact air its matches on many of the broadcasters with which Haymon has exclusive deals.  Through his illegal, tortious, and anticompetitive conduct, Haymon has substantially excluded Top Rank and other legitimate promoters from competing in the market for promoting Championship-Caliber Boxers, and reduced overall output in that relevant market.  These anticompetitive effects constitute direct evidence of Haymon's market power in the market for domestic promoters of Championship-Caliber Boxers.

175.   Top Rank has sustained economic injury within California as a direct and proximate result of the Defendants' anticompetitive and illegal conduct.  For example, by virtue of Haymon's "tie out" agreements, Top Rank is categorically excluded from contracting with huge numbers of Championship-Caliber Boxers, including within California.  But for the "tie out," many of these Championship-Caliber Boxers would in fact enter into promotional contracts with Top Rank, and Top Rank would in fact promote those boxers in bouts at California venues, such as Staples Center, The Forum, and StubHub Center.  Additionally, Haymon's

- 76 -

"payola" payments to and exclusive agreements with such major broadcasters as NBC, Fox, and ABC/ESPN categorically exclude Top Rank from broadcasting its boxers' bouts to California consumers over those networks. But for Haymon's predatory conduct and exclusive deals, Top Rank would in fact be able to secure airtime with some of these broadcasters, and would in fact air its boxers' bouts to California consumers. As a result of these injuries, Top Rank has sustained millions of dollars in lost profits.

176. As a direct and proximate result of the Defendants' conduct, Plaintiff Top Rank has suffered significant harm. The full extent of Plaintiff's damages cannot yet be fully measured, but Plaintiff alleges that its damages exceed $100 million. Such damages should be trebled pursuant to 15 U.S.C. § 15.

**CLAIMS FOR RELIEF**

**COUNT I**

**Attempted Monopolization in Violation**

**of Section 2 of the Sherman Act (15 U.S.C. § 2)**

**(Against All Defendants)**

177. Plaintiff incorporates each preceding and succeeding paragraph as though fully set forth herein.

178. Section 2 of the Sherman Act prohibits "attempt[s] to monopolize" trade or commerce. 15 U.S.C. § 2. Attempted monopolization consists of: (1) predatory or anticompetitive conduct, with (2) a specific intent to monopolize, and (3) a dangerous probability of achieving monopoly power. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

**Predatory or Anticompetitive Conduct**

179. The Defendants have collectively orchestrated and carried out a predatory and anticompetitive scheme to in an attempt to acquire and maintain a monopoly in the market for domestic promoters of Championship-Caliber Boxers,

in violation of Section 2 of the Sherman Act.  15 U.S.C. § 2.  This scheme includes, but is not limited to, the following predatory and anticompetitive conduct:

    A.   violating the prohibition, under state and federal law, against acting as both manager and promoter, so as to gain an unfair advantage over Top Rank and other legitimate promoters (Haymon, Haymon Sports, Haymon Boxing, Haymon Holdings);

    B.   entering into and engaging in long-term exclusive and exclusionary contracts with Championship-Caliber Boxers, by which Haymon categorically prevents Championship-Caliber Boxers from contracting with Top Rank and other legitimate promoters (Haymon, Haymon Development, Haymon Sports);

    C.   paying major broadcast companies (including ABC/ESPN, Fox, NBC, CBS, and Spike TV) for exclusive rights to television airtime, at a significant short-term loss, so as to expand Haymon's power in the market for promoting Championship-Caliber Boxers and exclude Top Rank and other legitimate promoters from accessing necessary distribution channels; eliciting long-term exclusivity commitments (whether tacit or express) from major broadcast companies (including ABC/ESPN, Fox, NBC, CBS, and Spike TV), expand Haymon's power in the market for promoting Championship-Caliber Boxers and exclude Top Rank and other legitimate promoters from accessing necessary distribution channels (Haymon, Haymon Sports, Haymon Boxing, Haymon Holdings); and

    D.   refusing to permit Championship-Caliber Boxers under contract with Haymon to participate in certain bouts against non-

- 78 -

1   Haymon boxers, for the sole purpose of freezing out Top Rank

2   and other legitimate promoters (Haymon, Haymon Sports,

3   Haymon Development).

4   **<u>Specific Intent to Monopolize</u>**

5   180.   All of the Defendants have engaged in predatory and anticompetitive

6   conduct with a specific intent to monopolize the market for domestic promoters of

7   Championship-Caliber Boxers.  This intent is evident from Haymon's ***own***

8   ***statements***—and as previously shown, Haymon has attempted to monopolize the

9   market for domestic promoters of Championship-Caliber Boxers through the

10  instrumentality of ***each*** Defendant, and has consistently acted on behalf of ***each***

11  Defendant.  Moreover, each Defendant's specific intent may be inferred from the

12  illegal and anticompetitive conduct in which each Defendant has engaged.

13  Evidence of the Defendants' specific intent to monopolize includes, but is not

14  limited to, the following:

15  A.   Al Haymon, who controls and at all material times acted through

16  and on behalf of Haymon Boxing, Haymon Sports, Haymon

17  Development, and Haymon Holdings, has expressed to

18  ***numerous*** individuals, including Eric Gomez and Richard

19  Schaefer, on ***multiple*** occasions, that under no circumstances

20  would he allow any of his boxers to contract with Top Rank or

21  another legitimate promoter;

22  B.   Haymon has in fact ***never*** granted consent or exercised

23  discretion under his managerial contracts (which he enters into

24  on behalf of Haymon Sports and Haymon Development) so as to

25  allow ***any*** Championship-Caliber Boxer in his stable to enter

26  into a promotional contract with Top Rank, Golden Boy

27  (subsequent to the Haymon/Schaefer settlement), Main Events,

28  or any other legitimate promoter;

SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF SHERMAN ACT AND
CALIF. UNFAIR COMPETITION LAW

C.    Haymon rechristened one of his companies KO Holdings (now known as Haymon Holdings) and formed Haymon Sports in conjunction with MGH's attempted acquisition of Golden Boy (through KO Acquisition), whereby Golden Boy would have been required to reduce the number of bouts it promoted at AEG and Barclays venues—to deliberately decrease its output—"to a number reasonably satisfactory to [KO Acquisition LLC]";

D.    operating on his own and through Haymon Sports, Haymon Boxing, and Haymon Holdings (the managing member of Haymon Sports and the channel through which Waddell & Reed's investment was funneled into Haymon Sports and Haymon Boxing), Haymon has made tens of millions of dollars in predatory "payola" payments to major broadcasters, and is deliberately operating at a massive short-term loss—as an "irrational player"—so as to freeze out rival promoters;

E.    acting on his own and through Haymon Sports and Haymon Boxing, Haymon has entered into long-term exclusive agreements with nearly all major sports broadcasters in the United States, including NBC, ABC/ESPN, CBS, Fox, Spike TV, and Bounce TV; and

F.    pursuant to contracts that Haymon entered into on behalf of Haymon Development and Haymon Sports, Haymon has refused to permit his Championship-Caliber Boxers to participate in certain bouts against non-Haymon boxers—to the detriment of Haymon's own clients—in order to freeze out rival promoters.

**Dangerous Probability**

SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF SHERMAN ACT AND
CALIF. UNFAIR COMPETITION LAW

181.   The showing of market power that is necessary to demonstrate that Defendants have a dangerous probability of achieving a monopoly is "a lower quantum" than that required in actual monopolization cases—particularly where there is evidence of actual exclusionary conduct.  *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995) (defendant's 44 percent market share sufficient to support attempted monopolization claim); *see Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 676 F.2d 1291, 1298, 1308–09 (9th Cir. 1982) (24 percent market share sufficient to support attempted monopolization claim where exclusionary conduct was present); *Meridian Project Sys., Inc. v. Hardin Constr. Co.*, No. 04-cv-2728, 2005 WL 2615523, at *4 (E.D. Cal. Oct. 4, 2005) ("CMIC's allegation of 37% market share may be adequate if combined with allegations of high entry barriers or anticompetitive conduct").

182.   As previously alleged, the Defendants already possess market power in the market for domestic promoters of Championship-Caliber Boxers.  Top Rank has put forth numerous metrics for analyzing the contours of this market, based on objective and quantifiable criteria.  Under ***each*** such metric, Haymon and his companies possess a market share in excess of 50 percent in the relevant promotional market.  Depending on which metric is used, Haymon's share of the market for promoting Championship-Caliber Boxers is as high as 60 percent.  As evidenced by their existing market power and actual exclusionary conduct, the Defendants have a dangerous probability of obtaining a monopoly in the market for domestic promoters of Championship-Caliber Boxers.

183.   As a direct and proximate result of the Defendants' unlawful and anticompetitive conduct, Plaintiff has been injured and damaged in its business and property.  Competition as a whole has been harmed.  Consumers have suffered and will suffer if the scheme is allowed to continue.

## COUNT II

### Unlawful "Tie Out" in Violation

**of Section 1 of the Sherman Act (15 U.S.C. § 1)**

**(Against All Defendants)**

184.   As a direct and proximate result of the Defendants' unlawful and anticompetitive conduct, Plaintiff has been injured and damaged in its business and property.

185.   Plaintiff incorporates each preceding and succeeding paragraph as though fully set forth herein.

186.   Section 1 of the Sherman Act prohibits contracts, combinations, and conspiracies in restraint of trade or commerce. 15 U.S.C § 1. "Tying" or "tie out" arrangements can be challenged as unlawful contracts in restraint of trade under a *per se* rule or the rule of reason.

187.   The Defendants have knowingly and intentionally entered into unlawful "tie out" contracts with Championship-Caliber Boxers in restraint of trade, which constitute a *per se* violation of Section 1 of the Sherman Act. These "tie out" contracts also violate Section 1 under a rule of reason analysis. The agreements have restrained trade in a substantial portion of the market for domestic promoters of Championship-Caliber Boxers.

## *Per Se* Violation

188.   To make out a *per se* tying claim, a plaintiff must allege "(1) that the defendant tied together the sale of two distinct products or services; (2) that the defendant possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product; and (3) that the tying arrangement affects a 'not insubstantial volume of commerce' in the tied product market." *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 913 (9th Cir. 2007).

### **Tying Arrangement**

189.   Domestic managers and promoters of Championship-Caliber Boxers provide two distinct services within two distinct relevant markets. The separateness of these markets is both a practical economic reality and a specific requirement of

SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF SHERMAN ACT AND
CALIF. UNFAIR COMPETITION LAW

1    federal and state law.  This Court has already held that Top Rank has sufficiently

2    alleged the existence of these two relevant markets.

3         190.   As previously alleged, Haymon's managerial contracts with

4    Championship-Caliber Boxers expressly and/or in actual practice condition

5    Haymon's managerial services on the boxers' agreement to not contract with

6    legitimate boxing promoters.  Because Haymon does not grant "consent" or

7    exercise his "sole discretion" to permit his Championship-Caliber Boxers to enter

8    into contracts with Top Rank or other legitimate promoters, these agreements

9    constitute and function in actual practice as unlawful "tying" or "tie out"

10   arrangements (sometimes known as "negative tying").

11        191.   Haymon enters into these managerial contracts on behalf of Haymon

12   Development and Haymon Sports.  Haymon Holdings is the managing member of

13   Haymon Sports.  Haymon exercises his "consent" rights and "sole discretion" over

14   promotional contracts so as to require his Championship-Caliber Boxers to obtain

15   promotional services from Haymon, Haymon Sports, and Haymon Boxing.

16        192.   "Tie out" agreements are actionable as *per se* violations of the

17   Sherman Act.  For example, the plaintiffs in *Image Technical Services v. Eastman*

18   *Kodak* alleged that Kodak had illegally tied the sale of its photocopier parts to an

19   agreement not to use the maintenance services of independent services

20   organizations.  903 F.2d 612, 614–15 (9th Cir. 1990) ("Kodak will not sell

21   replacement parts for its equipment to Kodak equipment owners unless they agree

22   not to use ISOs").  The Ninth Circuit determined that the plaintiffs' claim was

23   cognizable under Section 1's *per se* rule, *id.* at 619, and the Supreme Court

24   affirmed.  *Eastman Kodak Co. v. Image Tech. Servs.,* 504 U.S. 451, 479 (1992); *see*

25   *also, e.g.*, *RealPage, Inc. v. Yardi Sys., Inc.*, 852 F. Supp. 2d 1215, 1222–29 (C.D.

26   Cal. 2012) (denying motion to dismiss *per se* "negative tying" claim).

27        193.   As this Court has recognized, "'consent' clauses may practically

28   function as unlawful tying arrangements."  (Oct. 16, 2015 Order at 12, Dkt. 85); *see*

SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF SHERMAN ACT AND
CALIF. UNFAIR COMPETITION LAW

*also* Areeda & Hovenkamp, *Antitrust Law* ¶ 1753g ("To be sure, a tie-in would exist if the willingness to approve others is merely a charade.").  Top Rank has alleged specific facts demonstrating that Haymon's managerial contracts create an unlawful "tying" relationship between services sold in distinct and separately defined relevant markets:  the market for management of Championship-Caliber Boxers (*i.e.*, the "tying" market), and the market for promotion of Championship-Caliber Boxers (*i.e.*, the "tied" market).  Specifically, as a matter of actual practice, Haymon does not provide his managerial services to Championship-Caliber Boxers unless the Championship-Caliber Boxers **do not** contract with Top Rank or other legitimate promoters.  Haymon has **never** granted "consent" or exercised his "sole discretion" over promotional rights to permit **any** of his Championship-Caliber Boxers to enter into promotional contracts with Top Rank.  Instead, Haymon requires his Championship-Caliber Boxers to rely on himself, Haymon Sports, and Haymon Boxing for promotion.

194.   Haymon will not allow any of the Championship-Caliber Boxers in his management stable to contract with Top Rank or other legitimate promoters.  Haymon has expressly stated that he would never do so, and mentioned Top Rank specifically in making these statements.  Moreover, in actual practice, Haymon has consistently refused to allow his Championship-Caliber Boxers to contract with Top Rank, notwithstanding repeated attempts to negotiate promotional contracts with these fighters.  As a matter of practice, Haymon's Championship-Caliber Boxers are required to use Haymon, sometimes with the assistance of Haymon's "sham" promoters, to promote their bouts.  Thus, despite the use of "consent" or "sole discretion" clauses in some of Haymon's contracts, all of these contracts function as *de facto* "tie out" agreements.

195.   The Defendants have a financial interest in promoting Championship-Caliber Boxers.  As alleged herein, the Defendants have made millions of dollars

- 84 -

from promoting boxers, and will make many millions more if they are successful in obtaining the monopoly that Haymon seeks.

### Economic Power

196.   The Supreme Court explained in *Kodak* that "economic power in the tying product market" refers to market power.  504 U.S. at 464.  As previously demonstrated, the Defendants possess significant power in the "tying" market, *i.e.*, the market for managing Championship-Caliber Boxers.  Top Rank has put forth numerous metrics for analyzing the contours of this market, based on objective and quantifiable criteria.  Under ***each*** such metric, Haymon and his companies possess a market share in excess of 50 percent.  Depending on which metric is used, Haymon's share of the market for managing Championship-Caliber Boxers is as high as 66 percent.  Additionally, Top Rank has pleaded facts showing the existence of high barriers to entry in this relevant market and the inability of incumbent competitors to increase their output in the short-run.  The Defendants' power in this relevant market is enhanced by the susceptibility of Championship-Caliber Boxers to becoming "locked in."  Collectively, these facts demonstrate that the Defendants possess significant power in the market for managing Championship-Caliber Boxers.

197.   Moreover, the Defendants have in fact demonstrated their "special ability . . . to force a [Championship-Caliber Boxer] to do something that he would not do in a competitive market."  *Jefferson Parish*, 466 U.S. 2.  As alleged herein, Haymon has induced Championship-Caliber Boxers to do things that they would not do in a competitive market—such as taking actions to their detriment (*e.g.*, forfeiting a championship title) and acceding to onerous contractual terms.  In a competitive market for managers of Championship-Caliber Boxers, Haymon would be incapable of coercing boxers to do these things.

### Not Insubstantial Volume of Commerce in the "Tied" Market

198.   The Defendants' "tie out" agreements have in fact affected a not insubstantial volume of commerce in the "tied" market, *i.e.*, the market for promoting Championship-Caliber Boxers.  The Ninth Circuit has held that foreclosure of a ***single*** customer representing a contract worth $100,000 per year constitutes a "not insubstantial volume of commerce" for purposes of a *per se* tying claim.  *Datagate, Inc. v. Hewlett-Packard Co.*, 60 F.3d 1421, 1424–26 (9th Cir. 1995).  As alleged herein, the Defendants' "tie out" agreements have blocked Top Rank, Golden Boy, Main Events, and other legitimate promoters from entering into promotional contracts with ***any*** of the Championship-Caliber Boxers in Haymon's stable.  This foreclosure has caused millions of dollars in damage to legitimate promoters.  Under binding Ninth Circuit case law, foreclosing legitimate promoters from contracting with ***dozens*** of Championship-Caliber Boxers, resulting in ***millions*** of dollars in lost profits, plainly constitutes a "not insubstantial volume of commerce."

199.   As a direct and proximate result of Defendants' unlawful and anticompetitive conduct, Plaintiff has been injured and damaged in its business and property.   Competition as a whole has been harmed.  Consumers have suffered and will suffer if the scheme is allowed to continue.

<u>Rule of Reason Violation</u>

200.   The Defendants' "tie out" contracts with Championship-Caliber Boxers also constitute unreasonable agreements in restraint of trade, which violate Section 1 of the Sherman Act under the "rule of reason."

201.   The antitrust "rule of reason" requires the factfinder to "weigh[] legitimate justifications for a restraint against any anticompetitive effects," to "determine whether the anticompetitive aspects of the challenged practice outweigh its procompetitive effects." *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1156 (9th Cir. 2003).  The essential question is whether the challenged restraint "may suppress or even destroy competition." *FTC v. Ind. Fed'n of*

1   *Dentists*, 476 U.S. 447, 458 (1986) (quoting *Chi. Bd. of Trade v. United States*. 246

2   U.S. 231, 238 (1918)).  The rule of reason therefore "distinguishes between

3   restraints with anticompetitive effect that are harmful to the consumer and restraints

4   stimulating competition that are in the consumer's best interest."  *Leegin Creative*

5   *Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007).

6       202.   In order to challenge a "tying" or "tie out" arrangement under the rule

7   of reason, the plaintiff must allege:  "(1) a contract, combination or conspiracy

8   among two or more persons or distinct business entities; (2) by which the persons

9   or entities intended to harm or restrain trade or commerce among the several States,

10  or with foreign nations; (3) which actually injures competition."  *Brantley v. NBC*

11  *Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012) (quoting *Kendall v. Visa*

12  *U.S.A., Inc.*, 518 F.3d 1042, 1046 (9th Cir. 2008)).

13      **Agreement Between Two or More Persons or Entities**

14      203.   Each of the Defendants' managerial or contracts is between two or

15  more individuals or entities:  Haymon and/or one of his companies (typically

16  Haymon Sports or Haymon Development), on the one hand, and a Championship-

17  Caliber Boxer on the other hand.  Haymon Holdings is the managing member of

18  Haymon Sports.

19      **Intended to Restrain Trade or Commerce**

20      204.   While the Ninth Circuit has at times suggested that a Section 1 rule of

21  reason claim requires proof that the contracting parties "intended to harm or restrain

22  trade or commerce," the Ninth Circuit has also expressly held that Section 1 does

23  ***not*** require a plaintiff to plead or prove specific intent to harm competition.  In

24  *Paladin Associates, Inc. v. Montana Power  Co.*, the Ninth Circuit held that a

25  district court erred in requiring the plaintiff to plead "specific intent to destroy

26  competition" as part of its *prima facie* case under Section 1.  328 F.3d at 1153.  The

27  court stated that "[o]ur antitrust law is clear that [a plaintiff] need not prove intent

28  to control prices or destroy competition to demonstrate the element of 'an

SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF SHERMAN ACT AND
CALIF. UNFAIR COMPETITION LAW

agreement . . . among two or more entities.'" *Id.* at 1153–54 (citing *Am. Ad Mgmt.*, 92 F.3d at 788; *Eichman v. Fotomat Corp.*, 880 F.2d 149, 161 (9th Cir. 1989); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 632–33 (9th Cir. 1987)).  While evidence of specific intent to harm competition may be probative "in determining whether a particular agreement is ***unreasonable***," *i.e.*, likely to harm competition, *Paladin Associates* holds that it is not a necessary element of a Section 1 rule of reason claim. *Id.* at 1154 (emphasis in original).

205.   In any event, as previously alleged, the Defendants knowingly and intentionally entered into these managerial agreements with the intent to harm or restrain trade or commerce in the market for domestic promoters of Championship-Caliber Boxers.  Evidence of this intent to restrain trade or commerce includes, but is not limited to, the following:

A. Al Haymon, who controls and at all material times acted through and on behalf of Haymon Boxing, Haymon Sports, Haymon Development, and Haymon Holdings, has expressed to ***numerous*** individuals, including Eric Gomez and Richard Schaefer, on ***multiple*** occasions, that under no circumstances would he allow any of his boxers to contract with Top Rank or another legitimate promoter;

B. Haymon has in fact ***never*** granted consent or exercised discretion under his managerial contracts (which he enters into on behalf of Haymon Sports and Haymon Development) so as to allow ***any*** Championship-Caliber Boxer in his stable to enter into a promotional contract with Top Rank, Golden Boy (subsequent to the Haymon/Schaefer settlement), Main Events, or any other legitimate promoter;

C. Haymon rechristened one of his companies KO Holdings (now known as Haymon Holdings) and formed Haymon Sports in

SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF SHERMAN ACT AND
CALIF. UNFAIR COMPETITION LAW

conjunction with MGH's attempted acquisition of Golden Boy (through KO Acquisition), whereby Golden Boy would have been required to reduce the number of bouts it promoted at AEG and Barclays venues—to deliberately decrease its output—"to a number reasonably satisfactory to [KO Acquisition LLC]";

D. operating on his own and through Haymon Sports, Haymon Boxing, and Haymon Holdings (the managing member of Haymon Sports and the channel through which Waddell & Reed's investment was funneled into Haymon Sports and Haymon Boxing), Haymon has made tens of millions of dollars in predatory "payola" payments to major broadcasters, and is deliberately operating at a massive short-term loss—as an "irrational player"—so as to freeze out rival promoters;

E. acting on his own and through Haymon Sports and Haymon Boxing, Haymon has entered into long-term exclusive agreements with nearly all major sports broadcasters in the United States, including NBC, ABC/ESPN, CBS, Fox, Spike TV, and Bounce TV; and

F. pursuant to contracts that Haymon entered into on behalf of Haymon Development and Haymon Sports, Haymon has refused to permit his Championship-Caliber Boxers to participate in certain bouts against non-Haymon boxers—to the detriment of Haymon's own clients—in order to freeze out rival promoters.

## Injury to Competition

206. The Defendants' "tie out" agreements have in fact injured and eliminated competition in the market for promoting Championship-Caliber Boxers. To satisfy this element of the claim, antitrust plaintiffs typically "delineate a

- 89 -

relevant market and show that the defendant plays enough of a role in that market to impair competition significantly." *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1413 (9th Cir. 1991).  However, "[a] full blown market analysis is not necessary." *Id.* The Ninth Circuit has held that "[a] lesser analysis may show that the restraint has actually produced significant anti-competitive effects, such as a reduction in output. If the plaintiff can make a showing of anti-competitive effects, a formal market analysis becomes unnecessary." *Id.* (citing *Ind. Fed'n of Dentists*, 476 U.S. at 460–61 (holding that proof of anticompetitive effects "can obviate the need for an inquiry into market power, which is but a 'surrogate for detrimental effects'")).

207.   As previously alleged, the Defendants possess significant power in both the "tying" market, *i.e.*, the market for managing Championship-Caliber Boxers, and the "tied" market, *i.e.*, the market for promoting Championship-Caliber Boxers.  Top Rank has put forth numerous metrics for analyzing the contours of these markets, based on objective and quantifiable criteria.  Under *each* such metric, Haymon and his companies possess a market share in excess of 50 percent in *both* relevant markets.  Depending on which metric is used, Haymon's share of the market for managing Championship-Caliber Boxers is as high as 66 percent, and his share of the market for promoting Championship-Caliber Boxers is as high as 60 percent.  Additionally, Top Rank has pleaded facts showing the existence of high barriers to entry in both relevant markets and the inability of incumbent competitors to increase their output in the short-run.  Collectively, these facts demonstrate that the Defendants possess significant power in both the "tying" market and the "tied" product market.

208.   Top Rank has also identified actual anticompetitive effects.  In the context of a rule of reason "tying" claim, the Ninth Circuit has held that "the potential injury to competition threatened by this practice is that the tying arrangement will either 'harm existing competitors or create barriers to entry of new competitors in the market for the tied product' . . . or will 'force buyers into

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF SHERMAN ACT AND CALIF. UNFAIR COMPETITION LAW

giving up the purchase of substitutes for the tied product.'" *Brantley*, 675 F.3d at 1199 (quoting *Jefferson Parish*, 466 U.S. at 14; *United States v. Loew's*, 371 U.S. 38, 45 (1962)).  As previously alleged, the Defendants' "tie out" contracts have in fact caused *each* of these injuries to competition:

    A.    <u>Harm to existing competitors</u>:  In actual practice, Haymon uses the contracts to categorically exclude Top Rank, Golden Boy, Main Events, and other legitimate promoters from entering into promotional contracts with his Championship-Caliber Boxers.  This across-the-board exclusion has significantly foreclosed competition in the "tied" market.

    B.    <u>Barriers to entry of new competitors</u>:  By categorically blocking the Championship-Caliber Boxers in his stable from contracting with legitimate promoters, Haymon imposes a significant entry barrier on potential new entrants in the "tied" market.  Would-be entrants are altogether excluded from competing for contracts with Haymon's Championship-Caliber Boxers.

    C.    <u>Forcing "buyers" to giving up purchase of substitutes for the "tied" product</u>:  In the market for promoting Championship-Caliber Boxers, boxers themselves are the immediate "consumers" of the promotional services.  That is, promoters compete to secure contracts with Championship-Caliber Boxers.  Haymon has induced huge numbers of Championship-Caliber Boxers to giving up their right to seek "substitutes of the tied product"—promotional services from legitimate promoters.

    D.    <u>Harm to consumers</u>:  Consumers are not getting the fights they want and will be compelled to consume only Haymon product once all of the legitimate promoters are killed off.   When

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF SHERMAN ACT AND CALIF. UNFAIR COMPETITION LAW

1    Haymon owns the entire market, there will be no competitive

2    check on what is offered to fighters, fans or broadcasters.

3    209.   These anticompetitive effects far outweigh any purported

4    procompetitive benefits of the Defendants' agreements.

5    210.   As a direct and proximate result of Defendants' unlawful and

6    anticompetitive conduct, Plaintiff has been injured and damaged in its business and

7    property.   Competition as a whole has been harmed.  Consumers have suffered and

8    will suffer if the scheme is allowed to continue.

9    **<u>COUNT III</u>**

10   **Injunctive Relief Under Section 16 of the Clayton Act (15 U.S.C. § 26)**

11   **(Against All Defendants)**

12   211.   Plaintiff incorporates each preceding and succeeding paragraph as

13   though fully set forth herein.

14   212.   As previously alleged, the Defendants' illegal, tortious, and

15   anticompetitive scheme violates Sections 1 and 2 of the Sherman Act.

16   213.   As a direct and proximate result of the Defendants' unlawful and

17   anticompetitive conduct, Plaintiff has been injured and damaged in its business and

18   property.

19   214.   Unless enjoined, the Defendants' unlawful and anticompetitive

20   conduct will continue and cause further injury to competition,  and Plaintiff will

21   continue to suffer injury for which there is no adequate remedy at law.

22   215.   Plaintiff therefore seeks equitable and injunctive relief pursuant to

23   Section 16 of the Clayton Act, 15 U.S.C. § 26, to correct for the anticompetitive

24   effects caused by the Defendants' unlawful and anticompetitive conduct, and other

25   relief so as to assure that such conduct does not continue or reoccur in the future.

26   **<u>COUNT IV</u>**

27   **Violation of the California Unfair Practices Act**

28   **(Cal. Bus. & Prof. Code §§ 17000 *et seq.*)**

- 92 -

**(Against Defendants Al Haymon, Haymon Boxing, Haymon Sports, and Haymon Holdings)**

216.  Plaintiff incorporates each preceding and succeeding paragraph as though fully set forth herein.

217.  Section 17043 of the California Unfair Practices Act ("UPA") makes it unlawful for "any person engaged in business within this State to sell any article or product at less than the cost thereof to such vendor, or to give away any article or product, for the purpose of injuring competitors or destroying competition."  Cal. Bus. & Prof. Code § 17043.

218.  Section 17044 of the UPA makes it unlawful for "any person engaged in business within this State to sell or use any article or product as a 'loss leader' as defined in Section 17030 of this chapter."  *Id.* § 17044.  Section 17030 defines "loss leader" to as "any article or product sold at less than cost: (a) Where the purpose is to induce, promote or encourage the purchase of other merchandise; or (b) Where the effect is a tendency or capacity to mislead or deceive purchasers or prospective purchasers; or (c) Where the effect is to divert trade from or otherwise injure competitors."  *Id.* § 17030.

219.  The UPA defines "article or product" to include "any article, product, commodity, thing of value, service or output of a service trade."  *Id.* § 17024.

220.  In any action brought under the UPA, "proof of one or more acts of selling or giving away any article or product below cost or at discriminatory prices, together with proof of the injurious effect of such acts, is presumptive evidence of the purpose or intent to injure competitors or destroy competition."  *Id.* § 17071.

221.  Defendants Al Haymon, Haymon Boxing, Haymon Sports, and Haymon Holdings are persons engaged in business within the State of California. These Defendants have violated Sections 17043 and 17044 of the UPA.

<u>Section 17043 Claim</u>

222.   To state a claim under Section 17043, a plaintiff must allege (1) that the defendant sold an article or product below cost, or gave away an article or product, (2) for the purpose of injuring competitors or destroying competition, (3) which resulted in competitive injury.  *See Bebe Au Lait, LLC v. Mothers Lounge, LLC*, No. 13-cv-3035, 2014 WL 4744758, at *2 (N.D. Cal. Sept. 23, 2014).

**Giving Away Product**

223.   As previously alleged, Haymon has given away millions of dollars' worth of boxing content to half a dozen leading broadcasters to televise and promote PBC boxing matches featuring Haymon's boxers.  Ordinarily, television broadcasters pay for boxing broadcast rights—not the other way around.  Haymon additionally pays the networks money for marketing and other support and for exclusivity promises from the networks.

224.   Haymon entered into these broadcast contracts on behalf of Haymon Sports and Haymon Boxing.  The money that supports the broadcast deals and promotional expenses associated with PBC matches was funneled into these entities through Haymon Holdings, which is the managing member of Haymon Sports.

225.   The cost of Haymon's product—televised PBC boxing matches—typically exceeds one million dollars per event.  Haymon, Haymon Sports, and Haymon Boxing shoulder all promotional expenses, including paying the boxers' purses.  Haymon Holdings, as the managing member of Haymon Sports, directly oversees Haymon Sports' operations.

226.   Haymon's cost of doing business is at least tens of millions of dollars per year.  As previously alleged, Haymon has devoted tens of millions of dollars to buying time on the broadcast networks, inducing Championship-Caliber Boxers to sign managerial contracts with Haymon Development and Haymon Sports, and promoting PBC events.  The Defendants' near-term losses with PBC are estimated to exceed two hundred million dollars or more.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF SHERMAN ACT AND CALIF. UNFAIR COMPETITION LAW

227.   The price at which Haymon, Haymon Boxing, and Haymon Sports offer this product to broadcasters is zero.  They are, in effect, giving away a product—televised PBC boxing matches—to the top broadcasters for free.

**Competitive Injury**

228.   To establish a violation of the Section 17043, a plaintiff need not allege marketwide injury to competition.  Injury to competition *or* injury to a single competitor may suffice.  *Bay Guardian Co. v. N.Y. Times Media LLC*, 187 Cal. App. 4th 438, 459–61 (Cal. Ct. App. 2010).  The Defendants' giving-away of televised PBC boxing matches has both injured competition and injured Top Rank.

229.   By predatorily giving away their product (at a significant short-term loss), Haymon, Haymon Boxing, Haymon Sports, and Haymon Holdings have expanded the Defendants' market power in the market for domestic promoters of Championship-Caliber Boxers, to the exclusion of rival promoters.  As a result of this predatory conduct, broadcasters have terminated or failed to renew prior agreements with legitimate promoters, such as Main Events; and canceled boxing programs that used to be open to multiple promoters, such as *Friday Night Fights*. The broadcasters have refused to enter new agreements and/or refused to air boxing content provided by anyone except Haymon.  As a result, competition has been significantly reduced.

230.   Top Rank has suffered injury as a direct and proximate result of Haymon, Haymon Boxing, Haymon Sports, and Haymon Holdings' giving-away of televised PBC boxing matches to major broadcasters.  As previously alleged, Top Rank has been excluded from airing its content on broadcast networks that currently air PBC.

**Intent to Injure Competitors or Destroy Competition**

231.   In any action brought under the UPA, proof of an "injurious effect" constitutes "presumptive evidence of the purpose or intent to injure competitors or destroy competition."  Cal. Bus. & Prof. Code § 17071.  As previously alleged,

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF SHERMAN ACT AND CALIF. UNFAIR COMPETITION LAW

Haymon, Haymon Boxing, Haymon Sports, and Haymon Holdings' predatory giving-away of televised PBC boxing matches has caused an "injurious effect" to competition generally and to Top Rank specifically.  This injurious effect gives rise to a presumption that Haymon, Haymon Boxing, Haymon Sports, and Haymon Holdings intended to injure competitors or destroy competition.

232.   Haymon, Haymon Boxing, Haymon Sports, and Haymon Holdings cannot rebut this presumption, because they in fact acted with a specific intent to injure competitors or destroy competition.  In launching PBC, their express purpose was to be the "irrational player" and operate below cost, until they achieved a monopoly.

Section 17044 Claim

233.   To state a claim under Section 17044, a plaintiff must allege (1) use of a loss leader, and (2) intent to injure a competitor or to destroy competition. *Dooley's Hardware Mart v. Food Giant Markets, Inc.*, 21 Cal. App. 3d 513, 516–17 (Cal. Ct. App. 1971).

**Loss Leader**

234.   Haymon, Haymon Boxing, Haymon Sports, and Haymon Holdings have employed a "loss leader" strategy within the meaning of Section 17044, by selling a product—televised PBC boxing matches—at less than cost, with the "effect" of "divert[ing] trade from or otherwise injur[ing] competitors."  Cal. Bus. & Prof. Code §§ 17030, 17044.

235.   As previously alleged, Haymon, Haymon Boxing, Haymon Sports, and Haymon Holdings are effectively giving away their product for free, which is by definition less than cost.  "Give-aways" constitute below-cost "selling" within the meaning of Section 17044. *Bebe Au Lait*, 2014 WL 4744758, at *3 (denying motion to dismiss Section 17044 claim where the defendants "charge[d] $0" for their product).

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF SHERMAN ACT AND CALIF. UNFAIR COMPETITION LAW

236.   As previously alleged, Haymon, Haymon Boxing, Haymon Sports, and Haymon Holdings' predatory giving-away has diverted trade from and injured Top Rank, Golden Boy, Main Events, and other legitimate promoters.

**Intent to Injure Competitors or Destroy Competition**

237.   As previously alleged, Haymon, Haymon Boxing, Haymon Sports, and Haymon Holdings' predatory giving-away has caused an "injurious effect" to competition generally and to Top Rank specifically.  This injurious effect gives rise to a presumption that the Defendants intended to injure competitors or destroy competition.

238.   Haymon, Haymon Boxing, Haymon Sports, and Haymon Holdings cannot rebut this presumption, because they in fact acted with a specific intent to injure competitors or destroy competition.  In launching PBC, their express purpose was to be the "irrational player" and operate below cost, until they achieved a monopoly.

239.   As a direct and proximate result of Haymon, Haymon Boxing, Haymon Sports, and Haymon Holdings' predatory giving-away (Section 17043) and "loss leader" selling (Section 17044), Plaintiff has suffered an injurious effect in its business and property.

**COUNT V**

**Violation of the California Unfair Competition Law**

**(Cal. Bus. & Prof. Code §§ 17200 *et seq.*)**

**(Against All Defendants)**

240.   Plaintiff incorporates each preceding and succeeding paragraph as though fully set forth herein.

241.   California Business & Professions Code §§ 17200 *et seq.* defines as "unfair competition" any unlawful business practices.  The Defendants' conduct as herein alleged violates the following statutes, laws, and regulations:

A.      Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2;

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF SHERMAN ACT AND CALIF. UNFAIR COMPETITION LAW

B.    the Muhammad Ali Boxing Reform Act, 15 U.S.C. § 6301 *et seq.*;

C.    the California Unfair Practices Act, Cal. Bus. & Prof. Code §§ 17000 *et seq.*;

D.    Ala. Code § 41-9-96;

E.    Ariz. Rev. Stat. §§ 5-228, 229;

F.    Calif. Code Regs. title 4, §§ 213, 396;

G.    Conn. Gen. Stat. 532a § 29-143j(e);

H.    Fla. Admin. Code. R. 61K1-1.005;

I.    225 Ill. Comp. Stat. § 105/10;

J.    523 Mass. Code. Regs. 6.06;

K.    Nev. Rev. Stat. § 467.052;

L.    N.J. Rev Stat § 5:2A-14;

M.    N.Y. Comp. Codes R. & Regs., tit. 19, § 207.17;

N.    58 Pa. Code § 21.6;

O.    Tex. Oc. Code Ann. §§ 2052.101, 102;

P.    18 Va. Ann. Code § 120-40-120; and

Q.    Rev. Code Wash. § 67.08.030.

242.   The Defendants' illegal, tortious, and anticompetitive conduct has caused significant adverse effects on commerce in the State of California, including within this District.  The Defendants have undermined and foreclosed competition in the business of professional boxing promotion, and caused substantial injury to California businesses and consumers.

243.   As a direct and proximate result of the Defendants' illegal, tortious, and anticompetitive conduct, the Defendants have been unjustly enriched in an amount to be determined at trial.

244.   As a direct and proximate result of the Defendants' illegal, tortious, and anticompetitive conduct, Top Rank has sustained economic injury, *i.e.*, lost

money or property, within California.  As previously alleged, Haymon's managerial agreements categorically exclude Top Rank from contracting with huge numbers of Championship-Caliber Boxers, including within California.  But for these agreements, many of these Championship-Caliber Boxers would in fact enter into promotional contracts with Top Rank, and Top Rank would in fact promote those boxers in bouts at California venues, such as Staples Center, The Forum, and StubHub Center.  Additionally, Haymon's "payola" payments to and exclusive agreements with such major broadcasters as NBC, Fox, and ABC/ESPN categorically exclude Top Rank from broadcasting its boxers' bouts to California consumers over those networks.  But for Haymon's predatory conduct and exclusive deals, Top Rank would in fact be able to secure airtime with some of these broadcasters, and would in fact air its boxers' bouts to California consumers.

245.   As a result of these injuries, Top Rank has sustained millions of dollars in lost profits.  Top Rank believes and alleges that its damages exceed $100 million.

246.   Unless enjoined, the Defendants' unlawful conduct will continue and cause further injury to Plaintiff.  Plaintiff will continue to suffer injury for which there is no adequate remedy at law.

247.   Plaintiff therefore seeks equitable and injunctive relief pursuant to Cal. Bus. & Prof. Code § 17203, to correct for the injurious and anticompetitive effects caused by the Defendants' unlawful conduct, and other relief so as to assure that such conduct does not continue or reoccur in the future.

## COUNT VI

### Tortious Interference With Prospective Economic Advantage

### (Against All Defendants)

248.   Plaintiff incorporates each preceding and succeeding paragraph as though fully set forth herein.

249.   Plaintiff possesses or has possessed economic relationships with Championship-Caliber Boxers, television broadcasters, and other third parties in the

professional boxing industry.  In each of these relationships, there is or was a reasonable probability of future economic benefit to Plaintiff.

250.   By way of example, Top Rank had a reasonable probability of future economic benefit with the following persons and entities, among others:

        A.    Fox

        B.    NBC

        C.    Spike TV

        D.    Deontay Wilder

        E.    Keith Thurman

        F.    Marcos Maidana

        G.    Adrien Broner

        H.    Lamont Peterson

        I.    Abner Mares

        J.    Errol Spence

251.   The Defendants had knowledge of these relationships.

252.   The Defendants committed intentional acts designed to disrupt these relationships with Plaintiff.  These acts include but are not limited to:

        A.    violating the prohibition, under state and federal law, against acting as both manager and promoter, so as to gain an unfair advantage over Top Rank and other legitimate promoters;

        B.    entering into and engaging in long-term exclusive and exclusionary contracts with Championship-Caliber Boxers, by which Haymon categorically prevents Championship-Caliber Boxers from contracting with Top Rank and other legitimate promoters;

        C.    paying major broadcast companies (including ABC/ESPN, Fox, NBC, CBS, and Spike TV) for exclusive rights to television airtime, at a significant short-term loss, so as to expand

1    Haymon's power in the market for promoting Championship-

2    Caliber Boxers and exclude Top Rank and other legitimate

3    promoters from accessing necessary distribution channels;

4    eliciting long-term exclusivity commitments (whether tacit or

5    express) from major broadcast companies (including

6    ABC/ESPN, Fox, NBC, CBS, and Spike TV), expand

7    Haymon's power in the market for promoting Championship-

8    Caliber Boxers and exclude Top Rank and other legitimate

9    promoters from accessing necessary distribution channels; and

10   D.    refusing to permit Championship-Caliber Boxers under contract

11         with Haymon to participate in certain bouts against non-

12         Haymon boxers, for the sole purpose of freezing out Top Rank

13         and other legitimate promoters.

14   253.   As previously alleged, the Defendants have committed unlawful,

15   anticompetitive, and tortious acts that are independently unlawful.  The Defendants'

16   conduct as herein alleged violates the following statutes, laws, and regulations:

17         A.    Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2;

18         B.    the Muhammad Ali Boxing Reform Act, 15 U.S.C. § 6301 *et*

19               *seq.*;

20         C.    the California Unfair Practices Act, Cal. Bus. & Prof. Code §§

21               17000 *et seq.*;

22         D.    the California Unfair Competition Law, Cal. Bus. & Prof. Code

23               §§ 17200 *et seq.*;

24         E.    Ala. Code § 41-9-96;

25         F.    Ariz. Rev. Stat. §§ 5-228, 229;

26         G.    Calif. Code Regs. title 4, §§ 213, 396;

27         H.    Conn. Gen. Stat. 532a § 29-143j(e);

28         I.    Fla. Admin. Code. R. 61K1-1.005;

SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF SHERMAN ACT AND
CALIF. UNFAIR COMPETITION LAW

1          J.     225 Ill. Comp. Stat. § 105/10;

2          K.     523 Mass. Code. Regs. 6.06;

3          L.     Nev. Rev. Stat. § 467.052;

4          M.     N.J. Rev Stat § 5:2A-14;

5          N.     N.Y. Comp. Codes R. & Regs., tit. 19, § 207.17;

6          O.     58 Pa. Code § 21.6;

7          P.     Tex. Oc. Code Ann. §§ 2052.101, 102;

8          Q.     18 Va. Ann. Code § 120-40-120; and

9          R.     Rev. Code Wash. § 67.08.030.

10     254.    As a direct and proximate result of the Defendants' unlawful, anticompetitive, and tortious conduct, the Defendants actually disrupted Plaintiff's economic relationships with third parties.

13     255.    As a direct and proximate result of the Defendants' unlawful, anticompetitive, and tortious conduct, Plaintiff suffered economic harm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully demands judgment for the following relief:

         A.     For an injunction, permanently and pending final judgment in this case, precluding the Defendants and each of them and the agents, employees, and representatives of each of them from having any direct or indirect financial interest in the promotion of bouts featuring boxers they manage, from acting as both boxing managers and promoters, from presenting boxing matches on television featuring such boxers, or from arranging the arenas, sponsors and/or television broadcasts of boxing matches featuring boxers they manage, from directing or otherwise causing boxers not to sign written contracts with Plaintiff or other promoters, from attempting in any other way to

SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF SHERMAN ACT AND
CALIF. UNFAIR COMPETITION LAW

1    monopolize the business of promoting Championship-Caliber
2    Boxers in the United States, and from financing or otherwise
3    aiding or abetting any of the acts so enjoined;

4    B.    for damages in the sum of $100 million or such other sum as
5          shall be found;

6    C.    that such damages be trebled pursuant to 15 U.S.C. § 15;

7    D.    for restitution in such amount as shall be found;

8    E.    for interest at the highest lawful rate on all monetary awards;

9    F.    for Plaintiff's reasonable attorneys' fees; and

10   G.    for costs of suit and such other or further relief as the Court shall
11         deem just.

SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF SHERMAN ACT AND
CALIF. UNFAIR COMPETITION LAW

1    Dated:        October 30, 2015

2

3    By:           /s/ Daniel M. Petrocelli

4                  O'MELVENY & MYERS LLP
                   BY Daniel M. Petrocelli, Esq.

5                  *Counsel for Plaintiff Top Rank, Inc.*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED COMPLAINT FOR
                                               VIOLATIONS OF SHERMAN ACT AND
                                               CALIF. UNFAIR COMPETITION LAW

1

**DEMAND FOR JURY TRIAL**

2          Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by

3  jury on all issues so triable.

4

5  Dated:          October 30, 2015

6

7  By:          /s/ Daniel M. Petrocelli

8          O'MELVENY & MYERS LLP
          BY Daniel M. Petrocelli, Esq.

9          *Counsel for Plaintiff Top Rank, Inc.*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF SHERMAN ACT AND
CALIF. UNFAIR COMPETITION LAW